[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10172

_____

D.C. Docket Nos. 1:16-cv-02392-TWT; 1:10-cr-00305-TWT-RVG-1


IRMA OVALLES,

                                                          Petitioner - Appellant,

versus

UNITED STATES OF AMERICA,

                                                          Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 4, 2018)

Before ED CARNES, Chief Judge, TJOFLAT, MARCUS, WILSON, WILLIAM
PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM,
BRANCH, and HULL,[*] Circuit Judges.

NEWSOM, Circuit Judge:

_____
[*] Senior Circuit Judge Hull elected to participate in this decision, pursuant to 28 U.S.C. § 46(c).

The question before us is whether one of the key provisions of an important federal criminal statute, 18 U.S.C. § 924(c), is unconstitutionally vague. As relevant to our purposes, § 924(c) makes it a federal offense—punishable by a term of imprisonment ranging from five years to life—for any person to use, carry, or possess a firearm in connection with a "crime of violence." 18 U.S.C. § 924(c)(1)(A). The provision challenged here—§ 924(c)(3)'s "residual clause"— defines the term "crime of violence" to mean a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id*. § 924(c)(3)(B).

This case is in some respects a successor to *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), in which the Supreme Court invalidated similarly-worded residual clauses on vagueness grounds. In the wake of those decisions, all here seem to agree that if § 924(c)(3)'s residual clause is interpreted to require determination of the crime-of-violence issue using what (in court-speak) has come be called the "categorical approach," the clause is doomed. As the Supreme Court has explained and applied it, this categorical approach—which the provisions at issue in both *Johnson* and *Dimaya* were deemed to embody—does not permit consideration of a defendant's specific conduct or how she "might have committed [her crime] on a particular occasion," but rather focuses exclusively on "how the law defines the offense" as a formal

2

matter and whether, in the abstract, "the kind of conduct that the crime involves in the ordinary case" meets the statutory standard. *Johnson*, 135 S. Ct. at 2557 (internal quotation marks and citation omitted). In both *Johnson* and *Dimaya*, the Court concluded that application of a standard that requires a reviewing court "to 'imagine' an 'idealized ordinary case of the crime'" rendered the challenged clauses impermissibly vague. *Dimaya*, 138 S. Ct. at 1214 (quoting *Johnson*, 135 S. Ct. at 2557–58).

On the flip side, *Johnson* and *Dimaya* also make clear—and it is common ground here—that if § 924(c)(3)'s residual clause is instead interpreted to incorporate what we'll call a "conduct-based approach" to the crime-of-violence determination, then the provision is *not* unconstitutionally vague. As its name suggests, the conduct-based approach, in stark contrast to the categorical, focuses not on formal legal definitions and hypothetical "ordinary case[s]," but rather on the real-world facts of the defendant's offense—*i.e.*, how the defendant actually went about committing the crime in question. And as the Supreme Court emphasized in *Johnson*—and then reiterated in *Dimaya*—there is no reason to "doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Johnson*, 135 S. Ct. at 2561 (quoted in *Dimaya*, 138 S. Ct. at 1214).

The obvious (and decisive) question, then: Which is it here—categorical or

3

conduct-based?  Because we find ourselves at this fork in the interpretive road—

the categorical approach imperiling § 924(c)(3)'s residual clause, a conduct-based

reading saving it—we invoke the canon of "constitutional doubt."  Pursuant to that

"elementary rule," the Supreme Court has long held, "every reasonable

construction must be resorted to in order to save a statute from

unconstitutionality."  *Hooper v. California*, 155 U.S. 648, 657 (1895).  The pivotal

issue, therefore, is not whether § 924(c)(3)'s residual clause is *necessarily*, or even

*best*, read to incorporate a conduct-based interpretation—but simply whether it can

"reasonabl[y]," *see id.*, "plausibl[y]," *Clark v. Martinez*, 543 U.S. 371, 381 (2005),

or "fairly possibl[y]," *I.N.S. v. St. Cyr*, 533 U.S. 289, 300 (2001), be so understood.

Joining the Second Circuit, which recently came to the same conclusion, *see*

*United States v. Barrett*, __ F.3d ___, 2018 WL 4288566 (2d Cir. Sept. 10, 2018),

we find that § 924(c)(3)(B) can be read to embody the conduct-based approach—

and therefore, under the constitutional-doubt canon, that it *must* be.

Accordingly, we hold that § 924(c)(3)(B) prescribes a conduct-based

approach, pursuant to which the crime-of-violence determination should be made

by reference to the actual facts and circumstances underlying a defendant's

offense.  To the extent that our earlier decision in *United States v. McGuire*, 706

F.3d 1333 (11th Cir. 2013), holds otherwise, it is overruled.

4

# I

## A

Under 18 U.S.C. § 924(c), "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" is guilty of a federal offense and subject to a prison term ranging between five years and life.  18 U.S.C. § 924(c)(1)(A).  Section 924(c) defines the term "crime of violence" as "an offense that is a felony" and—

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3).  For ease of reference—and as a way of facilitating comparisons with other similar statutes—we'll call Subsection (3)(A) the "elements clause" and Subsection (3)(B) the "residual clause."[1]

Importantly here, this Court held in *United States v. McGuire* that the question whether a predicate offense qualifies as a "crime of violence" under either subsection is one that a court "must answer 'categorically'—that is, by reference to the elements of the offense, and not the actual facts of [the defendant's] conduct."

---

[1] We have at times referred to these as the "use-of-force" and "risk-of-force" clauses, respectively.  *See Ovalles v. United States*, 861 F.3d 1257, 1263 (11th Cir. 2017), *reh'g en banc granted, opinion vacated*, 889 F.3d 1259 (11th Cir. 2018).  The terminological distinction makes no substantive difference.

706 F.3d 1333, 1336 (11th Cir. 2013) (citation omitted).

**B**

In 2010, Irma Ovalles was charged by information with six robbery- and carjacking-related offenses, all of which arose out of what can only be described as a three-day crime binge. As particularly relevant here, Ovalles was charged with (1) attempted carjacking in violation of 18 U.S.C. § 2119 and (2) using and carrying a firearm during a "crime of violence"—the attempted carjacking—in violation of 18 U.S.C. § 924(c)(1)(A). Ovalles entered into a written plea agreement in which she admitted that "she [was] in fact guilty" on all six counts. At her plea hearing, the government outlined the elements of each crime, and Ovalles explained that she understood what the government would have to prove should she opt to go to trial.

The government then made a comprehensive factual proffer detailing Ovalles's involvement in the crimes. In general, the proffer summarized the evidence demonstrating that Ovalles and her co-conspirators (1) robbed a grocery store while armed with baseball bats, then (2) still wielding the bats, carjacked a Dodge Ram, then (3) carjacked a Toyota 4-Runner, pistol-whipping its owner, then (4) attempted to carjack a Chevy Venture—more on this one below—and finally (5) carjacked a Ford F-150 at gunpoint. More specifically, concerning the attempted carjacking of the Chevy Venture—during which one of Ovalles's

6

accomplices fired an AK-47, and which therefore serves as the predicate offense

for Ovalles's § 924(c) conviction—the government's proffer explained as follows:

> They see a family getting out of a Chevy Venture in Clayton County, Georgia, and as the family is getting out of their car, these two defendants along with their co-conspirators go up to the family and demand the keys to the car and demand the car. Now, they have a baseball bat and guns with them. There's a juvenile, a 13-year-old female, who is part of that family group of victims. They hit that juvenile in the mouth with a baseball bat. The damage to her I am sure will be addressed at sentencing. It was not—she did not go to the hospital. Let me say that.
>
> They are demanding the keys. Somebody comes out of the apartment complex where this is happening and that person has a gun. He then confronts the assailants …. They flee, not taking the Chevy Venture, which is why it is an attempted carjacking.
>
> The government would show that the Chevy Venture traveled in interstate commerce, that it was not made in the State of Georgia. The government would prove it was these defendants not only through their confessions as to this event, also through the victims' testimony. They do I.D. the defendants in this particular case.
>
> On the way out of the apartment complex … co-conspirator … Jerry Arriaga … has an AK-47 style assault rifle and he then discharges that gun several times towards the victim family, the guy who came to rescue them, who was armed, and the car, and that is the basis of Count Five, the use of a firearm during and in relation to a crime of violence.

With respect to each of the charges—including, as relevant here, the

attempted-carjacking and § 924(c) counts—Ovalles stated that she had no

"material disagreement with what the government sa[id] it could prove . . . ."

Having heard the government's summary of the evidence against her, Ovalles

7

pleaded guilty to each of the charged offenses, acknowledged that her pleas were voluntary, and explained that she was so pleading because she was "in fact guilty as charged in the criminal information."

The district court thereafter sentenced Ovalles to serve 120 months in prison on the § 924(c) count—which, per the statute, the court imposed to run consecutively to the concurrent 108-month terms on the remaining charges. Ovalles did not object to her sentences, nor did she file a direct appeal.

## C

Several years later, Ovalles filed a motion for relief under 28 U.S.C. § 2255 contending that her § 924(c) conviction and sentence were unconstitutional in light of the Supreme Court's intervening decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015). In short, the Court in *Johnson* invalidated as unconstitutionally vague the Armed Career Criminal Act's residual clause—which, for purposes of applying that statute's recidivism-based sentence enhancement, defines the term "violent felony" to include any crime that is punishable by a year in prison and that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Court voided the ACCA's residual clause principally based on its conclusion that the provision necessitated the categorical approach to determining whether an underlying conviction constitutes a "violent felony." *See Johnson*, 135 S. Ct. at 2557–58, 2561–63. Ovalles asserted

8

that because § 924(c)(3)'s residual clause is "nearly identical to" the ACCA's, *Johnson*'s reasoning rendered it unconstitutional, as well. Accordingly, she argued, she was "no longer guilty of violating" § 924(c) because her predicate attempted-carjacking offense "no longer qualifie[d] as a crime of violence under § 924(c)(3)(B)."

The district court denied Ovalles's § 2255 motion, reasoning that § 924(c)(3)'s residual clause did "not suffer from the same unpredictability" as the ACCA's. The court subsequently granted Ovalles a certificate of appealability on the question whether § 924(c)(3)(B) is unconstitutionally vague under *Johnson*.

A panel of this Court affirmed the district court's decision. For our purposes, the panel's opinion did two significant things. First, in accordance with (and citing to) our earlier decision in *McGuire*, it held that the question whether Ovalles's attempting-carjacking offense constitutes a "crime of violence" within the meaning of § 924(c)(3) had to be answered using the categorical approach. *See Ovalles v. United States*, 861 F.3d 1257, 1268–69 (11th Cir. 2017), *reh'g en banc granted, opinion vacated*, 889 F.3d 1259 (11th Cir. 2018). Second, though—and notwithstanding its application of the categorical approach—the panel held that *Johnson* did not invalidate § 924(c)(3)'s residual clause because, it said, the definition of "crime of violence" in § 924(c)(3)(B) is clearer than the definition of "violent felony" in the ACCA. *Id.* at 1265–66. In particular, the panel emphasized

9

(1) that § 924(c)(3)'s residual clause refers not (as does the ACCA's) to the risk of "physical injury," but rather to the risk of "physical force," which it thought was more precise; (2) that § 924(c)(3)(B)'s inclusion of the qualifying phrase "in the course of committing the offense"—which is absent from the ACCA—narrows the statute's reach; and (3) that § 924(c)(3)'s residual clause isn't plagued (and confused, as is the ACCA's) by linkage to a disjointed hodgepodge of enumerated offenses. *Id.* at 1266.[2]

Not long after the panel issued its opinion, the Supreme Court decided *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). There, following *Johnson*, the Court struck down 18 U.S.C. § 16's residual clause (at least as that clause is incorporated by a provision of the Immigration and Nationality Act prescribing the bases on which aliens may be rendered removable). Section 16's residual clause is similar to the clause invalided in *Johnson* and essentially identical to § 924(c)(3)'s residual clause at issue here. Once again applying the categorical approach—there, to determining whether an alien's prior conviction qualified as a "crime of violence"—the Court concluded that § 16's residual clause is unconstitutionally vague under the reasoning of *Johnson*. *Dimaya*, 138 S. Ct. at 1214–15. Notably, in the course of its opinion, the *Dimaya* Court rejected, with respect to § 16(b),

---

[2] The panel separately held that Ovalles's attempted-carjacking offense qualifies as a "crime of violence" under the elements clause, *see* 18 U.S.C. § 924(c)(3)(A). *Ovalles*, 861 F.3d at 1267–69. That holding is not before the en banc Court.

10

many of the same textual arguments that the panel decision in this case had

embraced as bases for distinguishing § 924(c)(3)'s residual clause from the

ACCA's. *See id.* at 1218–21.

In light of the Supreme Court's decision in *Dimaya*, we vacated the panel's

opinion and took this case en banc to determine (1) whether 18 U.S.C.

§ 924(c)(3)'s residual clause is unconstitutionally vague under *Dimaya* and (2)

whether we should overrule *McGuire* to the extent that it requires a categorical

approach to determining whether an offense constitutes a "crime of violence"

within the meaning of § 924(c)(3)(B).[3]

## II

At the outset, some table-setting is in order.  How exactly did we get here?

Why did the Supreme Court conclude in both *Johnson* and *Dimaya* that the

residual clauses before it were unconstitutionally vague, and what do the decisions

in those cases tell us about § 924(c)(3)'s own residual clause?  Here's how—and

why, and what.

## A

We begin with a deeper dive into *Johnson*.  As already explained briefly,

*Johnson* involved the ACCA, which prescribes a mandatory minimum 15-year

---

[3] In a 28 U.S.C. § 2255 proceeding—as always—we review questions of law, like those presented here, *de novo*.  *Devine v. United States*, 520 F.3d 1286, 1287 (11th Cir. 2008).

11

sentence for any person who already "has three previous convictions . . . for a violent felony . . . committed on occasions different from one another."  18 U.S.C. § 924(e)(1).  The ACCA goes on to define the term "violent felony" to mean any crime punishable by a term of imprisonment exceeding one year that—

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B).  Subsection (B)(i) of the ACCA's definitional provision is called (as we have called § 924(c)'s parallel provision) the "elements clause," while Subsection (B)(ii) contains both the "enumerated-offenses clause" and separately (and again like § 924(c)'s catch-all) the "residual clause."  *Beeman v. United States*, 871 F.3d 1215, 1218 (11th Cir. 2017).

In striking down the ACCA's residual clause as unconstitutionally vague, the Supreme Court in *Johnson* emphasized "[t]wo features."  135 S. Ct. at 2557. For one thing, the Court pointed to the statute's hazy "serious potential risk" standard, which it said "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."  *Id.* at 2558.  Far more problematic, the Court explained, was the fact that the ACCA's residual clause had long been construed to incorporate the categorical approach—which, the Court observed, entails a "speculative," "idealized" analysis that "ties the judicial assessment of risk to a

12

judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements," and thus "leaves grave uncertainty about how to estimate the risk posed by a crime." *Id.* at 2557–58. Indeed, the Court made clear that application of the categorical approach was the hinge on which its vagueness determination turned: "It is one thing," the Court stressed, "to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction" of the sort required by the categorical approach. *Id*. at 2558. Continuing in the same vein, the Court reiterated that "[a]s a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Id*. at 2561. But, the Court held, the categorical approach's focus on the "idealized ordinary case" requires an "abstract inquiry" that "offers significantly less predictability than one that deals with" actual facts. *Id*. (internal quotation marks and citation omitted).

**B**

Next, *Dimaya*. There, the Court considered a provision of the INA that renders an alien removable if he is "convicted of an aggravated felony at any time after admission." 8 U.S.C. § 1227(a)(2)(A)(iii). The INA goes on to define the term "aggravated felony" to include, by statutory cross-reference, "a crime of violence (as defined in section 16 of Title 18[)]." *Id*. § 1101(a)(43)(F). Section 16's definition of "crime of violence," in turn, reads a lot like the ACCA's

13

definition of "violent felony" at issue in *Johnson*:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.  Subsection (a) is commonly called (you guessed it) the "elements clause" and Subsection (b) the "residual clause."  *Dimaya*, 138 S. Ct. at 1211.

In *Dimaya*, the Supreme Court voided § 16's residual clause (again, as incorporated in the INA) as unconstitutionally vague, concluding that it shared the two features that had doomed the ACCA's residual clause in *Johnson*—namely, (1) a fuzzy "substantial risk" standard and (2) incorporation of the categorical approach to determining the violence of the underlying crime.  *Id.* at 1213–14. Significantly, though, just as in *Johnson*, the *Dimaya* Court stressed that § 16(b)'s vagueness problem resulted principally from the categorical approach: "The [*Johnson*] Court emphasized that [the 'serious potential risk' standard] alone would not have violated the void-for-vagueness doctrine: Many perfectly constitutional statutes use imprecise terms like 'serious potential risk' (as in ACCA's residual clause) or 'substantial risk' (as in § 16's).  The problem came from layering such a standard on top of the requisite 'ordinary case' inquiry" required by the categorical approach.  *Id.* at 1214 (citing *Johnson*, 135 S. Ct. at

14

2561).  As Justice Thomas summarized in his dissent—without pushback—"[t]he sole reason that the Court deem[ed] § 16(b) unconstitutionally vague is because it read[] the statute as incorporating the categorical approach," without which "the Court 'd[id] not doubt' the constitutionality of § 16(b)."  *Id.* at 1252 (Thomas, J., dissenting).

An important caveat about *Dimaya*'s application of the categorical approach to invalidate § 16's residual clause: Only a plurality of the Court concluded that the statute actually *requires* the categorical approach.  Justice Gorsuch, who provided the decisive fifth vote, concurred separately on the assumption—but not a determination—that § 16(b) incorporates the categorical approach.  *Id.* at 1232 (Gorsuch, J., concurring in part and concurring in the judgment) (stating that he was "proceed[ing] on the premise" that the categorical approach applied).  Justice Gorsuch emphasized that he "remain[s] open to different arguments about [Supreme Court] precedent and the proper reading of language like" that found in § 16(b), and that he "would address them in another case, whether involving the INA or a different statute, where the parties have a chance to be heard and we might benefit from their learning."  *Id*. at 1233.

## C

So what do *Johnson* and *Dimaya* portend for § 924(c), which again, as relevant here, makes it a federal offense to use, carry, or possess a firearm in

15

connection with a "crime of violence"—which again, as relevant here, means a felony offense that "by its nature, involves a substantial risk that physical force … may be used in the course of committing the offense," 18 U.S.C. § 924(c)(3)(B)?

Allow us first to state the obvious: Section 924(c)(3)'s residual clause is identical—in every jot and tittle—to § 16's, which the Supreme Court struck down in *Dimaya*. Next, the less obvious but no less true: While the panel decision in this case offered several distinctions between § 924(c)(3)'s residual clause and the ACCA's—which at the time had recently been invalidated in *Johnson*—the Supreme Court's intervening decision in *Dimaya* (in a portion of the opinion joined by a majority of the justices) demolished all of them. As already noted, the panel first emphasized that § 924(c)(3)'s residual clause refers not to the risk of "physical injury" but to the risk of "physical force," which it said was "much more definite." 861 F.3d at 1263. When the government asserted the same injury-force distinction in seeking to save § 16(b) in *Dimaya*, the Court flatly rejected it, holding that "this variance in wording cannot make ACCA's residual clause vague and § 16(b) not." 138 S. Ct. at 1221. Second, the panel thought that § 924(c)(3)(B)'s inclusion of the qualifying phrase "in the course of committing the offense"—which is missing from the ACCA—narrowed the statute's reach. 861 F.3d at 1266. Wrong, said the *Dimaya* Court in addressing the identical argument aimed at § 16's residual clause: "Th[at] phrase . . . cannot cure the

16

statutory indeterminacy *Johnson* described." 138 S. Ct. at 1220. Finally, the panel reasoned that § 924(c)(3)'s residual clause was clearer, in a constitutional sense, because it wasn't linked, as was the ACCA's, to a "confusing list" of enumerated offenses. 861 F.3d at 1266. Wrong again, *Dimaya* held with respect to § 16, which likewise lacks an enumerated-offenses clause: Even if one "[s]trip[s] away the enumerated crimes," the Court said, "textual indeterminacy" remains. 138 S. Ct. at 1221. In short, in the course of rebuffing the government's attempts to distinguish § 16's residual clause from the ACCA's, the *Dimaya* Court explicitly rejected the very same arguments that the panel in this case had adopted as a means of distinguishing § 924(c)(3)'s residual clause—calling them "minor linguistic disparities" that didn't "make[] any real difference." *Id.* at 1223.

Accordingly, it seems clear that if we are required to apply the categorical approach in interpreting § 924(c)(3)'s residual clause—as the panel did, per our earlier decision in *McGuire*, and as the Supreme Court did in voiding the residual clauses before it in *Johnson* and *Dimaya*—then the provision is done for. If, by contrast, we are *not* required to apply the categorical approach in interpreting § 924(c)(3)(B), then there is every reason to believe that the provision will survive, notwithstanding its incorporation of a "substantial risk" term—because, as the Supreme Court said in *Johnson* and then reiterated in *Dimaya*, there is no reason to "doubt the constitutionality of laws that call for the application of a qualitative

17

standard such as 'substantial risk' to real-world conduct." *Johnson*, 135 S. Ct. at 2561 (quoted in *Dimaya*, 138 S. Ct. at 1214).

## III

That stark divergence—in which the categorical approach dooms § 924(c)(3)'s residual clause, while a conduct-based interpretation salvages it— tees up the rule of "constitutional doubt." Simply stated, that canon of construction provides that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247 (2012).

As the Supreme Court has explained it, the constitutional-doubt canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Under the canon, "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Indeed, the Supreme Court has held that courts are "*obligated* to construe [a] statute to avoid [constitutional] problems" if it is "fairly possible" to do so. *I.N.S. v. St. Cyr*, 533 U.S. 289, 300 (2001) (citations omitted) (emphasis added). That is particularly true where (as here) absent a

18

reasonable saving construction, a statute might be unconstitutionally vague. *See United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909) (noting that courts have a "plain duty" to adopt any "reasonabl[e]" interpretation of a statute that avoids vagueness concerns).

*The* question here, therefore, is whether § 924(c)(3)'s residual clause is in fact "susceptible of multiple interpretations," *Jennings*, 138 S. Ct. at 836—and more particularly, whether it is "plausible," *Clark*, 543 U.S. at 381, or "fairly possible," *St. Cyr*, 533 U.S. at 300, to interpret the clause to incorporate the (statute-preserving) conduct-based approach. Ovalles contends that the constitutional-doubt canon doesn't apply here because, she says, "the text of § 924(c)(3)(B) is not open to competing, plausible interpretations"—it can be understood *only*, she insists, to require the categorical approach. Appellant's En Banc Br. at 23; *accord* Dissenting Op. of J. Pryor at 140 (asserting that a conduct-based reading "does not … even approach plausible"). For the reasons explained below, we disagree.

## A

In assessing whether § 924(c)(3)'s residual clause truly *compels* the categorical approach, we begin at the beginning: Where did this "categorical approach" come from? It's certainly not, it seems to us, the most intuitive way of thinking about a particular crime's risk of violence. Surely the usual means of

19

considering that issue would be to account for all of the specific circumstances surrounding the offense's commission—*i.e.*, the actual facts.  If you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, "Well, tell me how it went down—*what happened*?"  How, then, did we get to the point where, in certain circumstances, reviewing courts are required to ignore the real-world facts in favor of a sterile academic inquiry into what the *Johnson* Court called "speculative," "idealized," "judge-imagined abstraction[s]"?  135 S. Ct. at 2557–58.  And what are the considerations that have impelled the Supreme Court to conclude that certain statutes require application of the categorical approach?

That story follows.

**1**

The Supreme Court initially conceived the categorical approach in *Taylor v. United States*, 495 U.S. 575 (1990).  The question there was whether the reference to "burglary" in the ACCA's enumerated-offenses clause meant burglary as defined by each of the 50 states' separate laws or, instead, burglary in some "generic" sense.  *Id.* at 579–80.  In concluding that the ACCA referred to "generic" burglary, the Court rejected not only the idea that the definition of "violent felony" should vary from state to state, but also the notion that the government, in seeking to prove the violence of the underlying crime, could introduce evidence about the

20

"particular facts" of the defendant's conduct, and instead adopted what the Court dubbed—and we still call—a "categorical approach." *Id*. at 598–602. In explaining why the ACCA's enumerated-offenses clause requires the categorical approach, the *Taylor* Court emphasized two factors—one textual, the other practical.

First, the Court concluded that when read in context, § 924(e)(2)(B)(ii) "most likely refers to the elements of the statute of conviction, not to the facts of each defendant's conduct." *Id.* at 600–01. The reason, the Court explained, is that the language of the ACCA's operative provision, § 924(e)(1), "refers to 'a person who ... has three previous convictions' for—not a person who has committed— three previous violent felonies or drug offenses." *Id.* at 600. Congress's targeted focus on "convictions" rather than conduct, the Court reasoned, indicated that it "intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.*

Second, the *Taylor* Court stressed that in the ACCA context, "the practical difficulties and potential unfairness of a factual approach [would be] daunting." *Id.* at 601. In particular, the Court worried about the amount of evidence that might need to be introduced at a sentencing hearing in order to reconstruct the circumstances underlying a defendant's prior (and often long-since-passed)

21

convictions. *Id.* Relatedly, the Court anticipated a Sixth Amendment problem that later decisions would amplify―namely, that judicial factfinding at sentencing about the real-world facts of crimes that led to prior convictions could "abridg[e a defendant's] right to a jury trial[.]" *Id.*; *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In short, the *Taylor* Court feared that if the parties could introduce evidence bearing on the violence of the defendant's past crimes, then sentencing proceedings might devolve into full-blown mini-trials (hence the impracticability) in which judges, rather than juries, were doing the factfinding (hence the Sixth Amendment concern). *See* 495 U.S. at 601–02.

For these reasons—the text's focus on "convictions" and the impracticability (and unfairness) of effectively re-litigating the seriousness of stale crimes long after the fact—the *Taylor* Court concluded that for purposes of deciding whether a prior conviction constitutes a "violent felony," the "only plausible interpretation" of § 924(e)(2)(B)(ii) is that it "generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense," and not to the

actual circumstances of the defendant's crime. *Id.* at 602.[4]

## 2

The Supreme Court next applied the categorical approach in *Leocal v. Ashcroft*, 543 U.S. 1 (2004), which held that a DUI conviction under Florida state law did not constitute a "crime of violence" within the meaning of 18 U.S.C. § 16, as that statute's definition applies in the INA. The Court there concluded that § 16's language, like the ACCA's, "requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the defendant's] crime." 543 U.S. at 7. In so doing, the *Leocal* Court didn't provide a detailed explanation. It simply stated that in both § 16's elements and residual clauses, "the statute directs our focus to the 'offense' of conviction"—and with respect to the residual clause in particular, noted its use of the phrase "by its nature." *Id.* at 7–8. *See* 18 U.S.C. § 16(b) (defining "crime of violence" to mean an "offense that is a felony and that, by its nature, involves a substantial risk" of physical force); 8 U.S.C. § 1227(a)(2)(A)(iii) (rendering deportable an alien "convicted of" an aggravated felony, which under 8 U.S.C. § 1101(a)(43)(F) includes a "crime of violence" as defined in 18 U.S.C. § 16).

---

[4] Although *Taylor* involved the ACCA's enumerated-offenses clause, the Supreme Court later extended the categorical approach (albeit without explanation) to the ACCA's residual clause. *See James v. United States*, 550 U.S. 192 (2007), *overruled by Johnson*, 135 S. Ct. at 2563.

**3**

That, for present purposes, brings us (back) to *Johnson*, in which, as already explained, the Supreme Court applied the categorical approach in the course of invalidating the ACCA's residual clause. *See* 135 S. Ct. at 2557–61. The *Johnson* Court insisted on the categorical approach—and refused a dissenting justice's suggestion that it consider the actual facts of the defendant's underlying crimes— for three reasons. *Id.* at 2561–62. First, the Court noted that "the Government ha[d] not asked [it] to abandon the categorical approach in residual-clause cases" in favor of a conduct-based approach. *Id.* at 2562. Second, relying on and quoting its earlier decision in *Taylor*, the Court highlighted the ACCA's operative clause's focus on "convictions": "*Taylor* explained that the relevant part of the [ACCA] refers to a 'person who … has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." *Id*. (internal quotation marks and citation omitted). "This emphasis on convictions," the *Johnson* Court reiterated—again echoing *Taylor*—"indicates that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.* (internal quotation marks and citation omitted). Third, and yet again channeling *Taylor*, the *Johnson* Court underscored—at least in the context of a statute, like the ACCA, that predicates a

sentence enhancement on prior crimes—the "utter impracticability" of requiring a court "to reconstruct, long after the original conviction, the conduct underlying that conviction." *Id.*

**4**

Last came *Dimaya*, in which the Court applied the categorical approach in striking down § 16's residual clause—again, at least as that provision is incorporated by the INA.  A four-justice plurality concluded that § 16(b) incorporates the categorical approach for a handful of (now increasingly familiar) reasons.  First, as in *Johnson*, the plurality noted that the government hadn't advocated a conduct-based approach: "To begin where *Johnson* did, the Government once again 'has not asked us to abandon the categorical approach in residual-clause cases.'" *Dimaya*, 138 S. Ct. at 1217 (quoting *Johnson*, 135 S. Ct. at 2562).  Second, the plurality emphasized that the categorical approach was adopted "in part to avoid the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries." *Id.* (internal quotation marks and citation omitted).

Third, the plurality explained that "[b]est read," the text of § 16's residual clause incorporates the categorical approach. *Id.*  Quoting the Court's earlier decision in *Nijhawan v. Holder*, 557 U.S. 29, 34 (2009), the plurality stated:

> Simple references to a 'conviction,' 'felony,' or 'offense,' . . . are
> 'read naturally' to denote the 'crime as *generally* committed.'  And

25

> the words 'by its nature' in § 16(b) make that meaning all the clearer. The statute, recall, directs courts to consider whether an offense, *by its nature,* poses the requisite risk of force.  An offense's 'nature' means its 'normal and characteristic quality.'

*Dimaya*, 138 S. Ct. at 1217 (internal citations omitted).  Fourth, and relatedly, the plurality said that "the same conclusion follows if we pay attention to language that is *missing* from § 16(b)."  *Id.* at 1218.  In particular, the plurality reasoned, "the absence of terms alluding to a crime's circumstances, or its commission, makes a [conduct]-based interpretation an uncomfortable fit."  *Id.*

Finally, following *Taylor* and *Johnson*, the plurality stressed the "utter impracticability" of applying a conduct-based approach to a statute, like § 16(b), that requires consideration of prior convictions—in particular, the "daunting difficulties of accurately reconstructing, often many years later, the conduct underlying a conviction."  *Id.* (internal quotation marks omitted).

As already noted, Justice Gorsuch concurred separately in *Dimaya*, explaining that he was "proceed[ing] on the premise"—without definitively concluding—that as used in the INA, § 16(b) incorporates the categorical approach.  *Id.* at 1232 (Gorsuch, J., concurring in part and concurring in the judgment).  He gave several reasons for his circumspection: (1) "because no party [had] argued for a different way to read" the provision at issue; (2) because Supreme Court precedent (by which he presumably meant *Leocal*) "seemingly require[d]" application of the categorical approach to § 16(b); and (3) "because the

26

government itself ha[d] conceded (repeatedly) that the law compels" the categorical approach in immigration-related § 16(b) cases. *Id.* He emphasized, though, that he would "remain open" in future cases "to different arguments about our precedent and the proper reading of language like" that found in § 16(b). *Id.* at 1233.

\* \* \*

So . . . what are the takeaways? What factors have led the Supreme Court to conclude that a statute requires the categorical approach? The decisions interpreting the ACCA and § 16 reveal that the Court has historically applied the categorical approach to those statutes' residual clauses for the following reasons:

1. because the government never asked the Court to consider a conduct-based approach (*Johnson*, *Dimaya*);

2. because the text of those statutes' operative provisions focused not on conduct, but rather on "convictions"—and thus, the Court reasoned, solely on formal legal elements (*Taylor*, *Johnson*);

3. because those statutes' definitional provisions used terms and phrases like "offense," "felony," and "by its nature," which the Court concluded pointed toward a categorical (rather than conduct-based) inquiry (*Leocal*, *Dimaya*);

4. because those statutes lacked any reference to the underlying crime's commission or circumstances (*Dimaya*);

5. because applying the categorical approach would avoid the impracticability of requiring sentencing courts to engage in after-the-fact reconstructions of the circumstances underlying prior convictions (*Taylor*, *Johnson*, *Dimaya*); and

6. because applying the categorical approach would avoid the Sixth

27

Amendment issues that could arise from sentencing courts making findings of fact that properly belong to juries (*Taylor*, *Johnson*, *Dimaya*).

The decisive question, it seems to us, is whether those considerations require us to interpret § 924(c)(3)'s own residual clause to incorporate the categorical approach—or whether, instead, the clause can "plausibly" be read to incorporate the conduct-based approach. For reasons explained below, we conclude that § 924(c)(3)(B) can at the very least plausibly be read to bear a conduct-based interpretation, and we therefore hold, pursuant to the canon of constitutional doubt, that because the conduct-based reading spares the residual clause from the near-certain death to which the categorical approach would condemn it, the conduct-based approach must prevail. In so doing, we join the Second Circuit, which also recently concluded—likewise applying the constitutional-doubt canon—that § 924(c)(3)(B) should be interpreted to embody the conduct-based approach. *See United States v. Barrett*, __ F.3d ___, 2018 WL 4288566, at *9–14 (2d Cir. Sept. 10, 2018).

**B**

Although it's not particularly elegant—in fact, it's downright clunky and more than a little repetitive—there's really not a better way to assess whether the Supreme Court's own stated reasons for adopting the categorical approach in the ACCA and immigration-related § 16 contexts likewise compel a categorical

28

interpretation of § 924(c)(3)(B) than simply to march through them, one by one.

**1**

In applying the categorical approach in both *Johnson* and *Dimaya*, the Supreme Court "first" and most prominently noted that the government hadn't advocated a conduct-based interpretation. *See Johnson*, 135 S. Ct. at 2562; *Dimaya*, 138 S. Ct. at 1217 (plurality opinion); *id.* at 1232 (Gorsuch, J., concurring in part and concurring in the judgment). Frankly, this seems like an odd place to start in interpreting a statute—it's not particularly, well, *interpretive*—but be that as it may, the Supreme Court has "beg[u]n" with it, *see id*. at 1217 (plurality opinion), so we will too.

Suffice it to say that things are very different here. In the wake of *Johnson* and *Dimaya*—and the ensuing drumbeat suggesting that application of the categorical approach likewise imperils § 924(c)(3)'s residual clause—the government has expressly (and at length) urged us to abandon the categorical approach to § 924(c)(3)(B) in favor of a conduct-based interpretation. *See* Appellee's En Banc Br. at 12–43. We have here, therefore, what the Supreme Court lacked in both *Johnson* and *Dimaya*, and what the panel lacked in *McGuire*—namely, the benefit of the full "adversarial testing" that is so "crucial to sound judicial decisionmaking," *Dimaya*, 138 S. Ct. at 1232 (Gorsuch, J.,

29

concurring in part and concurring in the judgment).[5]

## 2

A second basis that the Supreme Court has highlighted in applying the categorical approach—derived from the text of the ACCA's operative provision, and specifically its reference to "convictions"—is likewise inapplicable here. As already noted, the Court in *Johnson* (relying on and quoting its earlier decision in *Taylor*) emphasized that the ACCA's operative clause "refers to a person who … has three previous convictions for—not a person who has committed—three previous violent felonies or drug offenses." 135 S. Ct. at 2562 (internal quotation marks and citation omitted). The statute's focus on "convictions," the Court said, demonstrates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.* (internal quotation marks omitted); *see also Barrett*, __ F.3d ___, 2018 WL 4288566, at *10 (emphasizing that, "[i]n rejecting a conduct-specific approach, the [*Taylor*] Court cited the statutory text, which specifically referred to 'convictions' rather than conduct").

Section 924(c)'s operative provision nowhere refers to "convictions." *See*

---

[5] Although the parties in *McGuire* dickered over whether a pure categorical approach or a "modified" categorical approach should govern § 924(c)(3)(B), they agreed that *some* form of categorical approach applied. No one urged the Court to apply a conduct-based approach. *See McGuire* Appellant's Br. at 17–19; *McGuire* Appellee's Br. at 17–18.

18 U.S.C. § 924(c)(1)(A). Quite the opposite, in fact—it refers to *conduct*: It prescribes an increased term of imprisonment for "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." *Id.* That's not dispositive, of course—§ 924(c)'s operative provision also applies to the statute's elements clause, which all seem to agree incorporates the categorical approach. But it does demonstrate that § 924(c) lacks one of the key textual hooks that has traditionally buttressed the Supreme Court's application of the categorical approach to statutory residual clauses.

**3**

Now, in fairness, there is some textual evidence that, on balance, might be thought to favor interpreting § 924(c)(3)(B) to incorporate the categorical approach. But it does not, we conclude, truly *compel* a categorical interpretation, especially when weighed against other textual and practical considerations.

In *McGuire*, we applied the categorical approach to § 924(c)(3)'s residual clause because, we said, "of the statute's terms." 706 F.3d at 1336. In particular, we noted that the residual clause's text "asks whether [the defendant] committed 'an offense' . . . that '*by its nature*, involves a substantial risk that physical force against the person or property of another may be used.'" *Id.* at 1336–37 (quoting 18 U.S.C. § 924(c)(3)(B)). We now re-examine whether that language—and in

31

particular, the statute's use of the term "offense" and the phrase "by its nature"—mandates the categorical approach. We conclude that it does not.

**a**

In support of its determination that § 16's residual clause requires the categorical approach, the *Dimaya* plurality relied on the Court's earlier observation in *Leocal* that § 16(b) "directs our focus to the 'offense' of conviction . . . rather than to the particular facts." *Dimaya*, 138 S. Ct. at 1217 (quoting *Leocal*, 543 U.S. at 7). "Simple references to a 'conviction,' 'felony,' or 'offense,'" the plurality observed, "are 'read naturally' to denote the 'crime as *generally* committed.'" *Id.* (quoting *Nijhawan*, 557 U.S. at 34).

Ovalles's position finds some support in § 924(c)(3)'s definition of "crime of violence," which incorporates two of the three terms—"offense" and "felony"—that the *Dimaya* plurality highlighted: "[T]he term 'crime of violence' means an offense that is a felony . . . ." 18 U.S.C. § 924(c)(3). There are important counterweights, though. First, as already explained, § 924(c) nowhere uses the word "conviction," the term that the Supreme Court has historically (going all the way back to *Taylor*) emphasized as a key textual driver of the categorical approach. Second, even as to "offense" and "felony," all the plurality said in *Dimaya*—echoing the Court's earlier decision in *Nijhawan*—was that those terms are "naturally" read to refer to generic crimes, not that they are *necessarily* so read.

32

And indeed, on the very same page from which the *Dimaya* plurality took its "read naturally" quote, *Nijhawan* explains "the linguistic fact" that "in ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like" *can go either way*—"sometimes [they] refer to a generic crime . . . and sometimes [they] refer to the specific acts in which an offender engaged on a specific occasion."  557 U.S. at 33–34; *see also id*. at 32 (holding that statutory provision using the term "offense" called for application of a conduct-based, rather than categorical, approach); *United States v. Hayes*, 555 U.S. 415, 426 (2009) (same); *Barrett*, __ F.3d ___, 2018 WL 4288566, at *13 (emphasizing *Nijhawan*'s conclusion that "words such as 'crime,' 'felony,' and 'offense' can be used in both respects").[6]

---

[6] The dissent thinks it inconceivable that that the word "offense" could require the categorical approach for cases arising under § 924(c)(3)'s elements clause and yet, at the same time, permit a conduct-based approach for cases arising under the residual clause.  *See* Dissenting Op. of J. Pryor at 127, 134–35.  It cites *Nijhawan* for the proposition that "where . . . Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations"—and from that premise reasons that because the term "offense" supports application of the categorical approach to the elements clause, it "must" do so with respect to the residual clause, as well.  *Id*. at 26 (quoting *Nijhawan*, 557 U.S. at 39).  But *Nijhawan* itself refutes the dissent's position.  First, and most obviously, the dissent says almost nothing in response to the *Nijhawan* Court's explanation of "the linguistic fact"—quoted in text above—that "in ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like sometimes refer to a generic crime . . . and sometimes refer to the specific acts in which an offender engaged on a specific occasion."  557 U.S. at 33–34.  Second, and more deeply, the dissent ignores the fact that in his opinion for the Court, Justice Breyer marched methodically through a number of adjacent statutory provisions that use the word "offense" to describe the underlying crimes and concluded that in some of them the "offense" should be established categorically, *see Nijhawan*, 557 U.S. at 37 (citing, *e.g.*, 8 U.S.C. § 1101(a)(43)(E), (H), (I), and (J)), while in others the "offense" could be demonstrated through attention to the underlying conduct and circumstances, *see id.* at 37–38 (citing, *e.g.*, 8 U.S.C. § 1101(a)(43)(K)(ii), (M)(ii), (N), and (P)).  "The upshot" here is the same as in *Nijhawan*: The terms "offense" and "felony"

33

All things considered, therefore, § 924(c)(3)'s use of the terms "offense" and "felony"—particularly when combined with the absence of the word "conviction"—would be a pretty thin reed on which to base a conclusion that the residual clause requires the categorical approach.

**b**

The strongest piece of evidence in favor of applying the categorical approach to § 924(c)(3)'s residual clause, it seems to us, is the provision's use of the phrase "by its nature": "[T]he term 'crime of violence' means an offense that is a felony and . . . that *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B) (emphasis added).

In *Leocal*, the Court relied in part on § 16(b)'s use of the same "by its nature" phrase to conclude that the statute "requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."  543 U.S. at 7.  The plurality in *Dimaya* likewise pointed to the "by its nature" language—at least as a secondary consideration, saying that it made the case for applying the categorical approach to § 16's residual clause "all the clearer."  138 S. Ct. at 1217.  Quoting *Webster's Third New International*

---

do not have invariable meanings that—all other considerations notwithstanding—always and everywhere require the categorical approach.  557 U.S. at 38.

*Dictionary* for the proposition that "[a]n offense's 'nature' means its 'normal and characteristic quality,'" the *Dimaya* plurality reasoned that "§ 16(b) tells courts to figure out what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion." *Id.* at 1217–18 (internal citation omitted).

That is undoubtedly a reasonable interpretation of § 16(b)'s language—which, again, § 924(c)(3)'s residual clause mirrors. But importantly here—where the constitutional-doubt canon is in play—it is not a *necessary* interpretation. There are other reasonable understandings—especially of § 924(c)(3)(B), with respect to which other interpretive considerations point in the other direction. *Webster's Third*, for instance—the same dictionary that the *Dimaya* plurality cited in support of its categorical-approach interpretation of the "by its nature" language, alternatively defines the word "nature" to mean "the essential character or constitution of something." *Webster's Third New International Dictionary* 1507 (2002). The *Oxford Dictionary of English* similarly defines "nature" as "the basic or inherent features, character, or qualities of something." *Oxford Dictionary of English* 1183 (3d ed. 2010). It seems to us at the very least plausible that the "something[s]" to which the term "nature" alludes could be particular acts rather than (or in addition to) the "judge-imagined abstraction[s]," *Johnson*, 135 S. Ct. at 2558, that underlie the categorical approach. *See Barrett*, __ F.3d ___, 2018 WL

35

4288566, at \*13 ("[N]othing in these definitions indicates whether the offense whose inherent characteristics are to be considered is the generic crime or the particular one charged.").

So, as Justice Thomas noted in *Dimaya*, "[o]n the one hand, the statute might refer to the metaphysical 'nature' of the offense and ask whether it ordinarily involves a substantial risk of physical force." *Dimaya*, 138 S. Ct. at 1254 (Thomas, J., dissenting). So too, though, "[o]n the other hand, the statute might refer to the underlying facts of the offense that the offender committed; the words 'by its nature,' 'substantial risk,' and 'may' would mean only that an offender who engages in risky conduct cannot benefit from the fortuitous fact that physical force was not actually used during his offense." *Id.* "The text can bear either interpretation," and "[i]t is entirely natural to use words like 'nature' . . . to refer to an offender's actual underlying conduct." *Id.*

To be clear, it's no answer to say, "Sure, but Justice Thomas *lost* in *Dimaya*." As an initial matter, he was objecting there to a *plurality's* (not a majority's) interpretation—and in particular its interpretation of a *different* statute, § 16(b), that lacks many of the textual, contextual, and practical features that we conclude permit a conduct-based interpretation of § 924(c)(3)'s residual clause. Moreover, and in any event, Justice Thomas's linguistic observation about the alternative meanings of the word "nature" remains—and indeed, finds support in

36

dueling dictionary definitions.  Especially in light of the inapplicability of other reasons for applying the categorical approach to § 924(c)(3)(B), we simply aren't convinced that the phrase "by its nature" requires application of the categorical approach here.

**4**

In addition to focusing on what the controlling statutes *say* in assessing the categorical-approach issue, the Supreme Court has emphasized what they *don't say*.  In *Dimaya*, for instance, the plurality reasoned that "the absence" from § 16 "of terms alluding to a crime's circumstances, or its commission, makes a [conduct]-based interpretation an uncomfortable fit."  138 S. Ct. at 1218.

But again, § 924(c) is different.  Not only (as already explained) does the statute's operative provision refer exclusively to conduct, but its definitional provision (*i.e.*, the residual clause itself) also contains conduct-based language—namely, its requirement that the risk of force arise "in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).

**5**

Textual indicia aside, the Supreme Court has also emphasized practical considerations in deciding between categorical and conduct-based interpretations. As already explained, in initially devising the categorical approach in *Taylor*—and thereafter applying it in *Johnson* and *Dimaya*—the Supreme Court underscored the

37

"utter impracticability" of applying a conduct-based approach retrospectively to determining the violence of prior crimes. *E.g.*, *Johnson*, 135 S. Ct. at 2562. In particular, the Court in *Taylor* fretted about the prospect that mounds of evidence would need to be introduced at sentencing in order to reconstruct the circumstances underlying long-since-passed convictions—potentially turning sentencing proceedings into de facto mini-trials. *See* 495 U.S. at 601–02. That "look-back" concern (our term, not the Supreme Court's) has continued to animate the Court's application of a categorical approach in the ACCA and § 16 contexts. As the plurality summarized in *Dimaya*: "This Court has often described the daunting difficulties of accurately 'reconstruct[ing],' often many years later, 'the conduct underlying [a] conviction.'" 138 S. Ct. at 1218 (quoting *Johnson*, 135 S. Ct. at 2562, and citing *Taylor*, 495 U.S. at 601–02); *see also Barrett*, __ F.3d ___, 2018 WL 4288566, at *12 ("[T]he mandate for a categorical approach to residual definitions of violent crimes has developed in a singular context: *judicial* identifications of what crimes (most often, state crimes) of *prior* conviction fit federal definitions of violent crimes so as to expose a defendant to enhanced penalties or other adverse consequences in *subsequent* federal proceedings.").

Importantly, the look-back problem doesn't arise with respect to § 924(c), which serves an altogether different function from the statutes at issue in *Johnson* and *Dimaya* and operates differently in order to achieve that function. The ACCA

38

identifies "*previous* convictions" for the purpose of applying a recidivism-based sentencing enhancement to three-time felons who later possess firearms in violation of 18 U.S.C. § 922(g). *See* 18 U.S.C. § 924(e)(1) (emphasis added). Similarly, § 16(b)—as incorporated by the INA—classifies certain *prior* convictions as "crime[s] of violence" for the purpose of rendering aliens removable. *See* 18 U.S.C. § 16; 8 U.S.C. § 1101(a)(43)(F); 8 U.S.C. § 1227(a)(2)(A)(iii).[7] Section 924(c), by contrast, operates entirely in the present—it creates a new and distinct offense for any person who "during and in relation to any crime of violence ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). So, unlike in the ACCA and § 16 contexts—where courts have to look backwards in time to consider past crimes remote from (and wholly unconnected to) the charged

---

[7] A point of clarification: The dissent charges—as if it were a bad thing—that our opinion "focuses solely on § 16's incorporation into the INA." Dissenting Op. of J. Pryor at 110; *see also id.* at 123 n.8. But of course it does—by design and with good reason. We have so "qualif[ied our] references to § 16(b)," *id*. at 110, because *Dimaya*'s holding is likewise limited. *See* 138 S. Ct. at 1210–12, 1213–16, 1223. *Dimaya*'s reasoning only covers—and, frankly, only makes sense in the context of—§16(b)'s incorporation into the INA. Think about it: If the Court had meant to impose the categorical approach on *all* of § 16(b)'s applications—even those in which the incorporating statutes address contemporaneous crimes—then why would the plurality have so heavily emphasized the look-back problem and the "daunting difficulties of 'reconstructing'" *prior* convictions? 138 S. Ct. at 1218. Perhaps even clearer is crucial-fifth-vote-caster Justice Gorsuch's insistence that *he* certainly wasn't prepared to venture beyond § 16(b)'s incorporation into the INA. *See id*. at 1232–33 (Gorsuch, J., concurring in part and concurring in the judgment) (emphasizing that he "remain[s] open to different arguments about [Supreme Court] precedent and the proper reading of language like" that found in § 16(b), and that he "would address them in another case, whether involving the INA or a different statute"). So yes, our focus is trained on § 16(b) as incorporated into the INA—just as the *Dimaya* plurality's and Justice Gorsuch's were.

39

offense, § 924(c)(3)'s definition of a "crime of violence" is never applied to an unrelated prior crime or conviction.  Instead, in § 924(c) cases, the firearms offense and the predicate "crime of violence" go hand-in-hand; they inherently arise out of the same event.  By dint of the statute's plain language, the gun-related conduct must occur "during," "in relation to," or "in furtherance of" the crime of violence, and with respect to that underlying offense the actionable risk of force must occur specifically "in the course of committing" it.  In short, it's all one big ball of wax—the crimes are typically (as here) charged in the same indictment, and if they are tried, they are considered by the same jury.  The "utter impracticability" that *Taylor*, *Johnson*, and *Dimaya* identified—what we have called the look-back problem—simply isn't an issue.  *See Barrett*, __ F.3d ___, 2018 WL 4288566, at *12 ("Section 924(c)(3) . . . is not concerned with prior convictions.  It pertains only to § 924(c)(1) crimes of *pending* prosecution.").

**6**

Relatedly, echoing the earlier decision in *Taylor*, the *Dimaya* plurality acknowledged that the Court "adopted the categorical approach in part to avoid the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries."  138 S. Ct. at 1217 (internal quotation marks and citation omitted).  Its point was that in reconstructing the circumstances underlying a prior crime in order to assess its risk of violence, a

40

reviewing court could well run afoul of the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Apprendi*, 530 U.S. at 490. *See Taylor*, 495 U.S. at 601 (expressing concern that judicial factfinding during a sentencing hearing about the real-world facts of crimes that led to prior convictions could "abridg[e a defendant's] right to a jury trial").

Yet again, that isn't a concern here. For starters, because the jury in a § 924(c) case—unlike in, say, an ACCA case—is considering contemporaneous gun-related and predicate offenses, its role already necessarily entails consideration of the entire course of conduct charged as the underlying "crime of violence." Moreover, and significantly, the government here has conceded that whether the defendant's predicate offense constitutes a "crime of violence" within the meaning of § 924(c)(3)'s residual clause should be treated as a mixed question of fact and law to be resolved by a jury. *See* Appellee's En Banc Br. at 33–34 (citing *United States v. Gaudin*, 515 U.S. 506, 509–10, 522–23 (1995)). In particular, the government admits that under a conduct-based approach, a § 924(c)(3)(B) conviction requires a jury separately to find (or the defendant to admit through a plea) not only (1) that the defendant committed the underlying federal offense, (2) that the defendant used, carried, or possessed a firearm, and (3) that any use,

carriage, or possession of the firearm occurred during and in relation to (or in furtherance of) the federal offense, but also—and importantly—(4) that the federal offense was in fact a "crime of violence."  As has the Supreme Court in similar circumstances, we conclude that the government's concession that, absent a plea, it must prove and a jury must find all four elements—including that the underlying offense qualifies as a "crime of violence"—"eliminat[es] any constitutional concern."  *Nijhawan*, 557 U.S. at 40; *see also Barrett*, __ F.3d ___, 2018 WL 4288566, at *12 ("The Sixth Amendment concern is avoided because the trial jury, in deciding whether a defendant is guilty of using a firearm 'during and in relation to any crime of violence,' 18 U.S.C. § 924(c)(1)(A), can decide whether the charged predicate offense is a crime of violence as defined in § 924(c)(3)(B), *i.e.*, whether the felony offense 'by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense,' 18 U.S.C. § 924(c)(3)(B).").[8]

---

[8] We are unpersuaded by Ovalles's assertion (which the dissent echoes, *see* Dissenting Op. of J. Pryor at 148–49) that a conduct-based approach would require hopelessly complex and ineffective jury instructions about the crime-of-violence element.  The district court can simply instruct jurors that they must find beyond a reasonable doubt that the underlying offense—the defendant's commission of which they must already have found in order to satisfy the first element—"involve[d] a substantial risk that physical force against the person or property of another may [have] be[en] used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).  There is nothing remarkable about asking jurors to make that sort of risk determination—and, if necessary, requiring judges to instruct jurors on the meaning of terms like "substantial" and "physical force."  That's exactly how similar questions have been resolved for centuries and are resolved every day in courts throughout the country.  *See Gaudin*, 515 U.S. at 511–15; *see also, e.g.*, Ala. Code § 13A-6-2(a)(2) ("A person commits the crime of murder if he

* * *

So where does all of this leave us?  With something of a mixed bag, frankly. While some of the factors to which the Supreme Court has pointed in adopting and applying the categorical approach might be thought (on balance) to favor a similar interpretation of § 924(c)(3)(B), others cut pretty decisively in the opposite direction, toward a conduct-based approach.  And in constitutional-doubt land, the tie (or the toss-up, or even the shoulder-shrug) goes to the statute-saving option— which, here, is the conduct-based interpretation.  So to be clear, we needn't—and don't—conclude that textual, contextual, and practical considerations *compel* a conduct-based reading of § 924(c)(3)'s residual clause.  Nor, for that matter, do we even need to find that § 924(c)(3)(B) is *best* read to incorporate a conduct-based approach.  Reasonable minds—say, for instance, the minds of the (putatively)

---

or she . . . recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person."); Conn. Gen. Stat. § 53a-112(a)(1)(A) ("A person is guilty of arson in the second degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion and . . . such act subjects another person to a substantial risk of bodily injury . . . ."); Mo. Stat. § 565.120(1) ("A person commits the offense of kidnapping in the second degree if he or she knowingly restrains another unlawfully and without consent so as to interfere substantially with his or her liberty and exposes him or her to a substantial risk of serious physical injury.").

Nor are we particularly troubled by Ovalles's argument that allowing jurors to consider a defendant's use or possession of a firearm will inevitably transform every underlying offense into a "crime of violence" within the meaning of § 924(c)(3).  The government concedes that it must *separately* prove—and that jurors should be charged that they must *separately* find—(1) that the federal offense was "a crime of violence" and (2) that the defendant used, carried, or possessed a firearm in the course of committing the underlying offense.  District courts should caution jurors that they may not find that the underlying offense involved a substantial risk of physical force *solely* because the defendant possessed a gun.

reasonable judges who join this opinion—can and will disagree about that. It is enough for us to conclude—as we think is indisputable—that § 924(c)(3)(B) is at least "plausibl[y]" (or "fairly possibl[y]") understood to embody the conduct-based approach. *See Clark*, 543 U.S. at 381; *St. Cyr*, 533 U.S. at 300.[9] Accordingly, it is our "plain duty" to adopt the conduct-based approach as the proper interpretation of § 924(c)(3)'s residual clause. *See Delaware & Hudson Co.*, 213 U.S. at 407.[10]

We therefore overrule *McGuire* to the extent that it requires application of the categorical approach to determine whether an offense constitutes a "crime of violence" within the meaning of § 924(c)(3)(B) and hold that the crime-of-violence determination should be made, instead, using a conduct-based approach.

---

[9] Needless to say, we reject the dissent's charge that we have "reach[ed]" out to "effectively rewrite[]" § 924(c)(3)'s residual clause in order "to avoid having to strike it down." Dissenting Op. of J. Pryor at 124, 137. To the contrary, we have simply acknowledged that the interpretive question is a close one and, accordingly—and pursuant to time-honored canons of construction—saved it from the trash heap. It is the dissent, by contrast, that doggedly insists on the one and only reading of § 924(c)(3)(B) that guarantees its invalidation.

[10] One brief word in conclusion: The dissent repeatedly criticizes our reliance on what it calls "extra-textual factors" in determining whether § 924(c)(3)(B) can plausibly be read to bear a conduct-based interpretation. In particular, the dissent objects to the first, fifth, and sixth factors examined above. *See* Dissenting Op. of J. Pryor at 103, 119–20, 124, 139–40, 143–44. The reason, the dissent says, is that under the Supreme Court's recent decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), practical considerations are categorically (pun intended) off-limits in determining whether a statute can reasonably be interpreted in a particular manner. The argument is difficult to discern, frankly, given that *Dimaya*—in which the plurality emphasized *the very same considerations*—post-dates *Jennings* by almost two months. In any event, for better or worse, these are the considerations that the Supreme Court has highlighted, and as the dissent says, "[w]e are not free to ignore the Supreme Court's decisions." Dissenting Op. of J. Pryor at 126 n.9. *See also, e.g.*, *Barrett*, __ F.3d ___, 2018 WL 4288566, at *9–14 (evaluating the same factors in holding that § 924(c)(3)'s residual clause should be interpreted to incorporate the conduct-based approach).

## IV

Having jettisoned the categorical interpretation in favor of the conduct-based approach for cases arising under § 924(c)(3)'s residual clause, we can make quick work of the contention that the clause is unconstitutionally vague in the light of *Dimaya*. It is not. The Supreme Court has repeatedly explained—and again all here agree—that the vagueness problem that plagued the ACCA and § 16, and that is asserted here, is a function of the "speculative," "idealized," "abstract" inquiries required by the categorical approach. *Johnson*, 135 S. Ct. at 2557–58, 2561. Accordingly, if § 924(c)(3)(B) is interpreted to embody a conduct-based approach—as we have held it should be—there is no reason whatsoever to "'doubt [its] constitutionality.'" *Dimaya*, 138 S. Ct. at 1214 (quoting *Johnson*, 135 S. Ct. at 2561); *see also Barrett*, __ F.3d ___, 2018 WL 4288566, at *10 (emphasizing that under *Johnson* and *Dimaya*, "no constitutional vagueness inheres in a substantial-risk definition of a crime of violence when applied to case-specific conduct").

## V

That leaves us only to apply § 924(c)(3)(B)'s conduct-based approach to Ovalles's case. Given the stipulated facts before us—embodied in a written plea agreement and a detailed colloquy—doing so is remarkably straightforward.

It is common ground here that in order to convict Ovalles on the § 924(c)

charge, the government would need to prove (or Ovalles would need to plead to) four distinct elements: (1) that Ovalles actually committed the underlying federal offense—here, the attempted carjacking; (2) that the attempted-carjacking offense constitutes a "crime of violence" within the meaning of § 924(c)(3); (3) that Ovalles knowingly used, carried, or possessed a firearm; and (4) that any use or carriage of the firearm occurred during and in relation to, or that any possession of the firearm was in furtherance of, the attempted carjacking.  *See* 18 U.S.C. § 924(c)(1)(A).  The only element in dispute here is the second: Did Ovalles's attempted-carjacking offense, *as she has admitted it actually occurred*, constitute a "crime of violence"—*i.e.*, did her own acknowledged conduct "involve[] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"?  Easy.  Of course it did.

As it pertained to the attempted-carjacking count, the information charged Ovalles with "attempt[ing] to take a motor vehicle . . . from the person and presence of another, by force, violence and intimidation" with "the intent to cause death and serious bodily harm."  Ovalles then executed a written plea agreement acknowledging that she understood each charge in the information—including the attempted-carjacking charge—and that "she [was] pleading guilty because she is in fact guilty of the crimes [as] charged."  If attempting to steal a car "by force, violence and intimidation" and with "the intent to cause death and serious bodily

46

harm" (as Ovalles has admitted she did) doesn't involve a "substantial risk" that physical force may be used, then it's hard to imagine what does.

Here, though, there's no need for imagination—the real-life details of Ovalles's crime, all of which she has admitted, confirm it. We won't restate in full the government's factual proffer recounting Ovalles's involvement in the three-day carjacking spree. Suffice it to say that, in general, the proffer demonstrated that Ovalles and her co-conspirators robbed a grocery store, successfully carjacked three automobiles by force, and attempted to carjack a fourth. With respect to the attempted carjacking, in particular—which, again, serves as the predicate offense for Ovalles's § 924(c) conviction—the proffer detailed that Ovalles and her co-conspirators approached a family getting out of their minivan, demanded the keys, hit the family's 13-year-old child in the face with a baseball bat, and then, in making their escape, fired an AK-47 assault rifle at the family and a Good Samaritan who had come to their aid. *See supra* at 6–7.

Especially when layered on top of Ovalles's admission to the overtly violent charge in the information, the government's detailed factual proffer—with which Ovalles repeatedly said she had no "material disagreement"—leads inexorably to the conclusion that the attempted carjacking at issue here constitutes a "crime of violence" within the meaning of § 924(c)(3)(B). Based on the facts to which she has expressly stipulated, there simply can be no serious dispute that Ovalles

47

recognized that her conduct posed a very real "risk" that physical force "may" be used—just, as it turns out, it was.

## VI

Accordingly, we hold as follows:

1.    The question whether a predicate offense constitutes a "crime of violence" within the meaning of 18 U.S.C. § 924(c)(3)(B) should be determined using a conduct-based approach that accounts for the actual, real-world facts of the crime's commission, rather than a categorical approach.

2.    To the extent that our decision in *United States v. McGuire*, 706 F.3d 1333 (11th Cir. 2013), required use of the categorical approach in making the crime-of-violence determination under § 924(c)(3)(B), it is overruled.

3.    As interpreted to embody a conduct-based approach, § 924(c)(3)(B) is not unconstitutionally vague.

4.    In light of the particular circumstances of its commission, all of which Ovalles has expressly admitted, her attempted-carjacking offense was a "crime of violence" within the meaning of § 924(c)(3)(B).

The case is **REMANDED** to the panel for proceedings consistent with this opinion.

WILLIAM PRYOR, Circuit Judge, joined by ED CARNES, Chief Judge, and TJOFLAT, NEWSOM, and BRANCH, Circuit Judges, concurring:

How did we ever reach the point where this Court, sitting en banc, must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK-47 at her family is a crime of violence? It's nuts. And Congress needs to act to end this ongoing judicial charade.

I join the majority opinion in full, but I write separately to explain why our resolution of this appeal forecasts how Congress should address the vexing issue of how to punish violent recidivists under laws like the Armed Career Criminal Act[1]: by restoring the traditional role of the jury. The caselaw about how to punish recidivists has confounded the federal courts for decades and has made the resolution of this appeal tricky, but our decision also suggests a way out of the mess. Although our decision involves a contemporaneous crime and not a prior conviction, our conclusion that a jury may make findings about a defendant's violent conduct applies with equal force to recidivist statutes. Indeed, the modern abandonment of the jury's traditional role of making findings about prior convictions has created more problems than it has solved.

---

[1] 18 U.S.C. § 924(e).

### A.    *Recidivist Wars*

Empirical research proves that Congress has good reason to punish recidivists with long sentences of imprisonment. A recent study by the United States Sentencing Commission found that "[c]areer offenders, as a group, tend to recidivate at a higher rate than non-career offenders."[2] More specifically, "almost two-thirds . . . of career offenders released between 2004 and 2006 were rearrested" in the eight-year period after their release, while just under "one-half . . . of non-career offenders released in 2005 were rearrested" in the same period.[3] And a defendant's criminal history as calculated under the Sentencing Guidelines is a strong predictor of future encounters with the justice system.[4] Offenders without any criminal history points are rearrested at a rate of 30.2 percent.[5] This rate jumps to 63.3 percent for offenders with five criminal history points and catapults to 81.5 percent for offenders with more than 10 criminal history points.[6] Relatedly, offenders with the lowest criminal history category are

---

[2] U.S. Sentencing Comm'n, *Report to the Congress: Career Offender Sentencing Enhancements* 39 (2016).

[3] *Id.*

[4] *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 5, 18–19, 27 (2016).

[5] *Id.* at 18.

[6] *Id.*

rearrested at a rate of 33.8 percent, while offenders with the highest criminal history category are rearrested at a rate of 80.1 percent.[7]

Among career offenders, violent offenders, not surprisingly, pose the greatest risk to the public. For example, "drug trafficking only" career offenders recidivate at a rate of 54.4 percent, while "violent [crime] only" career offenders recidivate at a rate of 69 percent.[8] The median drug trafficker recidivates after 26 months, while the median violent offender recidivates after only 14 months.[9] The median drug trafficker commits two "[r]ecidivism [e]vents," while the median violent offender commits three.[10] And when a drug trafficker reoffends, he is most likely to commit another drug trafficking offense, while a violent offender is most likely to commit robbery.[11] Indeed, even "mixed" career offenders who have at least one violent offense[12] recidivate at a rate of 69.4 percent and are most likely to commit assault when they recidivate.[13]

Past offenses involving a firearm are also a strong predictor of future crimes.[14] For example, "[o]ffenders whose federal offense involved firearms [are]

---

[7] *Id.* at 19.

[8] U.S. Sentencing Comm'n, *Report to the Congress*, *supra* note 2, at 42.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *See id.* at 38.

[13] *Id.* at 42.

[14] *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders*, *supra* note 4, at 20.

most likely to be rearrested" at a rate of 68.3 percent, and "[o]ffenders who received an enhanced sentence for a weapon . . . ha[ve] higher recidivism rates than other offenders."[15] In short, criminals with an affinity for guns and violence are the least likely to change their ways.[16]

That recidivists merit longer sentences is hardly a new discovery. Over a century ago, the Supreme Court explained that "[t]he propriety of inflicting severer punishment upon old offenders has long been recognized in this country and in England."[17] Accordingly, "[s]tatutes providing for such increased punishment were enacted in Virginia and New York as early as 1796, and in Massachusetts in 1804; and there have been numerous acts of similar import in many states."[18]

In more recent years, Congress has moved to protect public safety by enacting federal crimes that provide lengthy terms of imprisonment for

---

[15] *Id.*

[16] *Id.*; *see also* U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 12 (2017) ("Offenders convicted of a firearms offense had the highest rearrest rate (68.4%]), followed by offenders convicted of a violent offense (64.1%) . . . .").

[17] *Graham v. West Virginia*, 224 U.S. 616, 623 (1912).

[18] *Id.* (collecting cases); *see also Spencer v. Texas*, 385 U.S. 554, 566 n.9 (1967) (citing data "that 62% of prisoners committed to federal prisons in the year ending June 30, 1965, had been previously committed"); *People v. Gowasky*, 155 N.E. 737, 739 (N.Y. 1927) (reviewing the history of recidivism statutes); Nancy J. King, *Sentencing and Prior Convictions: The Past, the Future, and the End of the Prior-Conviction Exception to* Apprendi, 97 Marq. L. Rev. 523, 533–34 & nn.52–62 (2014).

recidivists.[19] The Armed Career Criminal Act, for example, provides a 15-year mandatory minimum sentence for a criminal convicted of unlawfully possessing a firearm or ammunition who has "three previous convictions . . . for a violent felony or serious drug offense."[20] The Act defines a "serious drug offense" in terms of convictions under certain federal and state laws that provide a maximum sentence of 10 or more years of imprisonment.[21] And it defines a "violent felony" to include crimes that (1) have "the use, attempted use, or threatened use of physical force" as an "element"[22]—the so-called "elements clause"; (2) are "burglary, arson, or extortion, [or] involve[] use of explosives"[23]—the "enumerated offenses clause"; or (3) "otherwise . . . present[] a serious potential risk of physical injury to another"[24]—the "residual clause."

## B.     The Residual Clause Strikes Back

As thoroughly chronicled in the majority opinion, years of litigation about federal recidivist statutes have weakened the penalties created by Congress. But

---

[19] *See, e.g.*, H.R. Rep. No. 98-1073, at 2 (1984) (relying on "extensive studies on recidivism" to justify an earlier version of the Armed Career Criminal Act). *See generally* U.S. Sentencing Comm'n, *Mandatory Minimum Penalties for Firearms Offenses in the Federal Criminal Justice System* (2018).

[20] 18 U.S.C. § 924(e)(1).

[21] *Id.* § 924(e)(2)(A).

[22] *Id.* § 924(e)(2)(B)(i).

[23] *Id.* § 924(e)(2)(B)(ii).

[24] *Id.*, *invalidated by Johnson v. United States*, 135 S. Ct. 2551 (2015).

these developments have not benefited all offenders. Recidivist drug traffickers who possess a firearm are still subject to the 15-year mandatory minimum under the Armed Career Criminal Act. But after the demise of the residual clause in *Johnson v. United States*,[25] violent recidivists who possess a firearm—the ones akin to the violent career offenders who recidivate at a rate nearly 15 percentage points higher than recidivist drug traffickers and who tend to commit violent crimes when they do so—sometimes escape the mandatory minimum if their earlier offenses lacked a legal "element" that involves physical force, regardless of how the offender actually committed the offense. For example, an offender may have been convicted of "sexual abuse in the first degree . . . by forcible compulsion" under Alabama law for a crime that was actually violent.[26] But because the Supreme Court of Alabama has adopted a "water[ed] . . . down" interpretation of the statute that "means that [the statute] does not categorically include as an element the use, attempted use, or threatened use of physical force," the conviction will not count as a crime of violence because "the true facts matter little, if at all, in this odd area of the law."[27]

The same problem may exist for other offenses that can technically be committed in nonviolent ways—but rarely, if ever, are—such as kidnapping, arson,

---

[25] 135 S. Ct. 2551 (2015).

[26] Ala. Code § 13A-6-66(a)(1).

[27] *United States v. Davis*, 875 F.3d 592, 600, 604 (11th Cir. 2017).

and other sex crimes. Criminals who have committed violent crimes may escape the mandatory minimum sentence of the Armed Career Criminal Act because sentencing judges must "close [their] eyes" to everything but the legal definitions of prior convictions.[28] In essence, the so-called categorical approach "divorces what a habitual offender actually did from the punishment they are meant to receive."[29] "The bizarre results" occasioned by this approach "are hard to grasp" because "the doctrine is not based in reality, but rather relies on the legal fiction that crimes are [merely] comprised of a set of elements, as opposed to the underlying criminal conduct."[30]

I do not mean to suggest that the residual clauses of the Armed Career Criminal Act or of the federal definition of a crime of violence in recidivist statutes[31] should have survived—at least not in their original forms that required the sentencing judge to decide whether the offender's criminal history qualified him for an increased punishment. Judges have rightfully complained that the categorical approach has taxed judicial economy. "The dockets of . . . all federal

---

[28] *Id.* at 595.

[29] Sheldon A. Evans, *Punishing Criminals for Their Conduct: A Return to Reason for the Armed Career Criminal Act*, 70 Okla. L. Rev. 623, 626 (2018).

[30] *Id.* at 645

[31] *See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (invalidating 18 U.S.C. § 16(b) as incorporated into the Immigration and Nationality Act for purposes of determining if an alien was previously convicted of an aggravated felony).

courts are now clogged with [ACCA] cases,"[32] and perhaps "no other area of law has demanded more of [the courts'] resources."[33] And as the Supreme Court explained in *Johnson*, the two-step process demanded by the categorical approach, in which the sentencing judge imagined the "ordinary case" of a crime and then decided "whether that abstraction present[ed] a serious potential risk of physical injury," was vague and confusing.[34] The residual clause produced several circuit splits over whether certain crimes were sufficiently violent.[35] Indeed, the justices could not agree whether fleeing in a vehicle from law enforcement or drunk driving qualified as violent crimes,[36] eventually leading the Supreme Court to conclude that "trying to derive meaning from the residual clause . . . [was] a failed enterprise."[37] And even the elements clause has created confusion, with members of this Court disagreeing about whether crimes like attempted murder, attempted armed robbery, robbery, aggravated assault, and felony battery are violent crimes.[38]

---

[32] *United States v. Vann*, 660 F.3d 771, 787 (4th Cir. 2011) (Agee, J., concurring).

[33] *United States v. Aguila-Montes de Oca*, 655 F.3d 915, 917 (9th Cir. 2011), *abrogated by Descamps v. United States*, 570 U.S. 254 (2013).

[34] 135 S. Ct. at 2557.

[35] *See id.* at 2560 (collecting cases).

[36] *See Sykes v. United States*, 564 U.S. 1, 36 (2011) (Kagan, J., dissenting) (opining that fleeing in a vehicle is not a violent felony); *Begay v. United States*, 553 U.S. 137, 156 (2008) (Alito, J., dissenting) (opining that drunk driving is a violent felony).

[37] *Johnson*, 135 S. Ct. at 2560.

[38] *See, e.g.*, *Hylor v. United States*, ___ F.3d ____, No. 17-10856, slip op. at 10–13 (11th Cir. July 18, 2018) (Jill Pryor, J., concurring) (opining that attempted murder and attempted armed

The problems with the categorical approach also cannot necessarily be remedied by having the sentencing judge make findings about the underlying facts of prior convictions. The Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury."[39] And the specific details of a recidivist's past crimes go beyond the simple "fact of [his] prior conviction."[40] Indeed, some members of the Supreme Court have opined that, under the Sixth Amendment, even the bare fact of a prior conviction should be proved to a jury.[41]

## C.    Return of the Jury

---

robbery are not violent felonies); *United States v. Lee*, 886 F.3d 1161, 1165–71 (11th Cir. 2018) (Jordan, J., concurring) (opining that prior Eleventh Circuit decisions holding that robbery is a violent felony were wrongly decided);*United States v. Vail-Bailon*, 868 F.3d 1293, 1308 (11th Cir. 2017) (en banc) (Wilson, J., dissenting) (opining that battery is not a violent felony); *Vail-Bailon*, 868 F.3d at 1315 (Rosenbaum, J., dissenting) (same); *United States v. Golden*, 854 F.3d 1256, 1257–60 (11th Cir. 2017) (Jill Pryor, J., concurring) (opining that a prior Eleventh Circuit decision holding that aggravated assault is a violent felony was incorrect); *In re Colon*, 826 F.3d 1301, 1306–08 (11th Cir. 2016) (Martin, J., dissenting) (opining that aiding and abetting a Hobbs Act robbery is not a crime of violence).

[39] *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

[40] *Id.*; *see also Mathis v. United States*, 136 S. Ct. 2243, 2252 (2016) (citing "serious Sixth Amendment concerns" about judicial factfinding); *Taylor v. United States*, 495 U.S. 575, 601 (1990) (expressing concern that judicial factfinding about earlier offenses would "abridg[e a defendant's] right to a jury trial"); King, *Sentencing and Prior Convictions*, *supra* note 18, at 550–58, 562–63 (explaining constitutional concerns about the role of judges).

[41] *See, e.g.*, *Dimaya*, 138 S. Ct. at 1254 (Thomas, J., dissenting) ("In my view, if the [g]overnment wants to enhance a defendant's sentence based on his prior convictions, it must put those convictions in the indictment and prove them to a jury beyond a reasonable doubt."); *Almendarez-Torres v. United States*, 523 U.S. 224, 267 (1998) (Scalia, J., dissenting) ("[I]t is . . . 'unfair,' of course, to deprive [a] defendant of a jury determination . . . on the critical question of [a] prior conviction.").

The combination of the need to punish violent recidivists and the problem of judicial factfinding about prior convictions yields an obvious solution for Congress: rewrite the Armed Career Criminal Act and other recidivist statutes to require that the government must prove to a jury beyond a reasonable doubt that the defendant has previously been convicted of a felony the actual commission of which involved the use, attempted use, or threatened use of physical force against another person. For example, in the case of a defendant with a prior conviction under Alabama law for first-degree sexual abuse by forcible compulsion, the prosecution could introduce evidence that the defendant in fact used violent force to subdue his victim. This evidence might include certified charging documents, stipulations, plea agreements, factual proffers, and verdict forms from the past prosecution, as well as traditional evidence such as witness testimony and physical evidence.

Tasking the jury with determining recidivism is consistent with the common law. "Habitual offender laws like the ACCA enjoy a long tradition in this country that dates back to colonial times."[42] And "[a]t common law, the fact of prior convictions *had* to be charged in the same indictment charging the underlying crime . . . and submitted to the jury for determination along with that crime."[43] In

---

[42] Evans, *Punishing Criminals for Their Conduct*, *supra* note 29, at 628.
[43] *Almendarez-Torres*, 523 U.S. at 261 (Scalia, J., dissenting) (collecting authorities).

58

1967, the Supreme Court acknowledged that "[t]he common-law procedure for applying recidivist statutes . . . , which requires allegations and proof of past convictions in the current trial, is, of course, the simplest and best known procedure."[44] And earlier decisions of state courts left little doubt that "a verdict of the jury finding the prior conviction . . . [was] essential to the power of the court to impose the increased punishment" absent a statute that displaced the common law.[45]

"[T]he right to have a jury decide prior-offense status . . . was the law in virtually every federal and state jurisdiction, from the Founding past World War II."[46] For example, a former Texas recidivism statute provided enhanced penalties when the prosecutor proved to the jury that the offender "ha[d] been before convicted of the same [felony] offense . . . or one of the same nature."[47] And a jury finding was more than a formality. Under a former Indiana statute, "the previous convictions, sentences, and imprisonments [had to] be described specifically, and the jury [had to] find that the defendant was convicted, sentenced, and imprisoned

---

[44] *Spencer*, 385 U.S. at 566.

[45] *State v. Findling*, 144 N.W. 142, 143 (Minn. 1913) (collecting cases); *see also* King, *Sentencing and Prior Convictions*, *supra* note 18, at 566–98 (collecting extensive data on historic state practices); Anthony M. Radice, *Recidivist Procedures: Prejudice and Due Process*, 53 Cornell L. Rev. 337, 341 n.19 (1968); Harold Dubroff, Note, *Recidivist Procedures*, 40 N.Y.U. L. Rev. 332, 333 (1965).

[46] King, *Sentencing and Prior Convictions*, *supra* note 18, at 553.

[47] 1925 Tex. Crim. Stat. art. 62; *see also Spencer*, 385 U.S. at 556 n.1 (citing Tex. Penal Code Ann. art. 62 (West 1952)); King, *Sentencing and Prior Convictions*, *supra* note 18, at 566–98 (collecting state laws).

in the instances described, and not otherwise."[48] Indeed, in *Kelley v. State*,[49] the Supreme Court of Indiana held that the prosecution could not rely on "a certified transcript of a judgment . . . [that did] not describe the crime for which [the defendant] was convicted, but merely recite[d]" that the defendant was sentenced to between one and seven years of imprisonment.[50]

The common-law method for proving prior convictions ordinarily permitted the prosecutor to rely on a broad array of evidence if the defendant refused "to stipulate as to the prior conviction[] and thereby relieve the State of the necessity of . . . adducing proof before the jury of such prior convictions."[51] For example, in *Crocker v. State*,[52] after a defendant accused of "robbery with a prior conviction for robbery" contested the fact of his first conviction, the prosecutor introduced "records from the penitentiary," "testimony of one of the officers involved in the prior case," and a "comparison of finger prints of the [defendant] with the finger prints taken in connection with the prior offense."[53] And in *Dozier v. State*,[54] the

---

[48] *Kelley v. State*, 185 N.E. 453, 455 (Ind. 1933) (quoting Burns' Ann. Ind. Stat. § 2340 (1926)).

[49] 185 N.E. 453 (Ind. 1933).

[50] *Id.* at 455; *cf. Carter v. Commonwealth*, 11 Ky. Op. 92, 93 (Ky. 1881) ("The fact that the accused had been previously indicted for a felony, describing the nature of the offense, in a court having jurisdiction, that he was assigned and pled to the indictment . . . , etc., are facts necessary to be alleged.").

[51] *Crocker v. State*, 385 S.W.2d 392, 394 (Tex. Crim. App. 1964).

[52] 385 S.W.2d 392 (Tex. Crim. App. 1964).

[53] *Id.* at 393.

[54] 318 S.W.2d 80 (Tex. Crim. App. 1958).

jury was tasked with weighing "certified copies of the judgment and sentence,"

"records of the Texas Department of Correction, including fingerprints," and

"expert testimony identifying [the fingerprints] as identical with those of the

[defendant]."[55] Factfinding by juries was considered essential to recidivism

statutes.

And still today, there are states that require factfinding by juries to sentence

an offender under their own recidivist statutes. Under Indiana's current habitual

offender statute,[56] "habitual offender proceedings are treated as substantive

criminal trials. The State must prove the allegations beyond a reasonable doubt" to

a jury.[57] The test for determining whether a prior conviction from another

jurisdiction qualifies as a predicate offense under Indiana's statute does not turn on

the elements of the offense, but on whether the acts that resulted in the out-of-state

conviction would have constituted a predicate offense "if they had been committed

in Indiana."[58]

California also uses a conduct-based approach in cases in which it is not

possible to determine whether an offense committed in another jurisdiction would

qualify as a predicate felony through an inspection of the elements of the offense

---

[55] *Id.* at 82.

[56] Ind. Code § 35-50-2–8.

[57] *Moore v. State*, 769 N.E.2d 1141, 1146 (Ind. Ct. App. 2002); *see also Seay v. State*, 698 N.E.2d 732, 733–34 (Ind. 1998) (describing the role of the jury in Indiana habitual-offender proceedings).

[58] *Weiss v. State*, 903 N.E.2d 557, 561 (Ind. Ct. App. 2009).

alone.[59] Although California law permits judges to make the factual findings required to determine that the conduct that resulted in an out-of-state conviction would have been a predicate offense if committed in the state, a California court "may not rely on its own independent review of record evidence to determine what conduct 'realistically' led to the defendant's conviction," but must instead rely on "those facts that were already necessarily found by a prior jury in rendering a guilty verdict or admitted by the defendant in entering a guilty plea."[60]

Within our own Circuit, Alabama[61] and Georgia[62] likewise require the state to prove that the conduct underlying an offender's prior out-of-state conviction would have been a predicate offense under the state's recidivist statute if committed in the state, although both Alabama[63] and Georgia[64] permit judges to make the requisite factual findings. So in advocating a return to the jury's traditional role in determining recidivism at the federal level, I am not advancing a

---

[59] *See People v. Gallardo*, 407 P.3d 55, 57 (Cal. 2017).

[60] *Id.*

[61] *See Skinner v. State*, 987 So. 2d 1172, 1175 (Ala. Crim. App. 2006) ("In determining whether an out-of-state conviction will be used to enhance punishment pursuant to the [Alabama habitual-offender statute], the conduct upon which the foreign conviction is based must be considered and not the foreign jurisdiction's treatment of that conduct.").

[62] *See Walker v. Hale*, 657 S.E.2d 227, 230 (Ga. 2008) (holding that an out-of-state crime qualifies as a predicate offense under Georgia's recidivist statute if "the same offense, if committed in this State, would constitute a serious violent felony" as defined under the statute).

[63] *See* Ala. R. Crim. P. 26.6(a) ("Except in death penalty cases and in cases involving offenses committed prior to January 1, 1980, the judge shall impose the sentence in all cases.").

[64] *See Brown v. State*, 670 S.E.2d 400, 402 (Ga. 2008) (holding that the right to trial by jury is not violated by the Georgia repeat-offender statute's requirement that the judge make findings of prior convictions).

62

proposal untested by contemporary experience. I am instead proposing a solution that has proved workable in practice in several states.

Some may object that jurors' knowledge of past convictions will lead them to engage in propensity reasoning,[65] but the Supreme Court long ago held that the "use of prior convictions in [a] . . . criminal trial . . . [is not] so egregiously unfair upon the issue of guilt or innocence as to offend" the guarantee of due process of law.[66] In any event, the details of past convictions are unlikely to reach the jury.[67] To begin, about 97 percent of federal prosecutions end in guilty pleas.[68] And those few defendants who go to trial can stipulate to their past convictions and limit any proceedings to the charged offenses.[69]

---

[65] *See, e.g.*, Dubroff, *supra* note 45, at 337 (citing the "prejudice engendered by proving guilt for the present offense simultaneously with the issue of recidivism" under the common-law method).

[66] *Spencer*, 385 U.S. at 559; *see also id.* at 560 ("Such statutes . . . have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, *ex post facto* laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities.").

[67] *See generally* Nancy J. King, *Juries and Prior Convictions: Managing the Demise of the Prior Conviction Exception to* Apprendi, 67 SMU L. Rev. 577 (2014) (outlining procedures that preserve the right to a jury trial in recidivism proceedings while limiting prejudice to defendants).

[68] *See* U.S. Sentencing Comm'n, *2017 Sourcebook of Federal Sentencing Statistics* fig. C, https://www.ussc.gov/research/sourcebook-2017.

[69] *See Pitcock v. State*, 367 S.W.2d 864, 865 (Tex. Crim. App. 1963) (explaining that under a recidivism statute, "should the appellant again offer to fully stipulate as to the prior conviction, the state should not be allowed to introduce evidence on this point"), *overruled on other grounds by Lehman v. State*, 792 S.W.2d 82 (Tex. Crim. App. 1990) (en banc); *cf. Old Chief v. United States*, 519 U.S. 172, 174 (1997) (explaining that in a federal prosecution of a felon for possession of a firearm, 18 U.S.C. § 922(g)(1), a district court abuses its discretion if it allows the government to "prove the element of prior conviction" when a defendant "offer[s] to concede th[at] fact").

The supposed unfairness to defendants of admitting proof of prior convictions is the same concern that motivated the failed experiment of allowing judges to assess recidivism. When the Supreme Court decided *Spencer v. Texas*[70] in 1967 and upheld the common-law jury method against a challenge under the Fourteenth Amendment,[71] the majority opined that it "might well agree" that other methods of assessing recidivism, such as "leaving that question to the court," would be "faire[r]" than placing a defendant's criminal history before the jury.[72] Justice Stewart also wrote in his concurring opinion that, "[i]f the Constitution gave [him] a roving commission to impose upon the criminal courts of [the states his] own notions of enlightened policy, [he] would not join the [majority] opinion" because other "recidivist procedures . . . are far superior to those utilized [under the common law]."[73] And then-contemporary academic commentators critiqued the common-law method and identified alternatives, including "determination of [recidivist] status by the judge."[74] But here we are. The cure of judicial factfinding has proved worse than the disease it was supposed to treat.

---

[70] 385 U.S. 554 (1967).

[71] *Id.* at 559.

[72] *Id.* at 566–67.

[73] *Id.* at 569 (Stewart, J., concurring); *see also id.* (observing that many states had recently modified or abandoned the common-law method).

[74] David S. Sidikman, Note, *The Pleading and Proof of Prior Convictions in Habitual Criminal Prosecutions*, 33 N.Y.U. L. Rev. 210, 215–16 (1958) (capitalization omitted) (explaining that judicial assessment "should be preferred over the common-law" method and that "a jury trial should not be considered essential where the issue is conviction of prior offenses"); *cf.* Radice,

Another objection might be that compiling evidence of prior convictions will be burdensome. But with the advent of electronic records and other advantages of modern technology, the task of reconstructing the details of prior convictions will today be far easier than it was under the original common-law procedure and, over time, will become easier still.[75] Because most state and federal prosecutions end in guilty pleas, the relevant details of prior convictions ordinarily will be preserved in factual proffers and other plea records.[76] And in the light of the rapid rate at which many violent offenders recidivate, other relevant evidence likely will be fresh.[77]

In any event, Congress has some options for ensuring that all violent recidivists remain subject to the mandatory minimum penalty. As explained above, the elements clause may fail to capture offenders who commit broadly defined crimes in violent ways. But the facts of their prior crimes, when ascertainable, should not be immune from consideration when they commit new crimes.

---

*supra* note 45, at 340–41 & n.21 (critiquing the common-law method, but also acknowledging that judicial factfinding "deprives the defendant of a jury trial on the issue").

[75] *Cf. Crocker*, 385 S.W.2d at 393 (explaining that the prosecution introduced "records from the penitentiary," "testimony of one of the officers involved in the prior case," and fingerprint evidence); King, *Sentencing and Prior Convictions*, *supra* note 18, at 561 (discussing how technology has improved the identification of repeat offenders).

[76] *See* Bureau of Justice Assistance, U.S. Dep't of Justice, *Plea and Charge Bargaining* 1 (2011) ("[A]bout 90 to 95 percent of both federal and state court cases are resolved through [plea bargaining].").

[77] *See* U.S. Sentencing Comm'n, *Report to the Congress*, *supra* note 2, at 42 (finding a "[m]edian [t]ime to [r]ecidivism" of 14 months).

That this country comprises 50 states with different criminal codes all but ensures that a formalist approach to defining a crime of violence—administered only by judges—will be either over- or underinclusive and almost certainly will be vulnerable to persistent litigation like that which felled the residual clause. For example, a recent bill introduced in the United States Senate proposes to apply the mandatory minimum to defendants with "[three] or more previous serious felony convictions," namely "any conviction . . . for an offense . . . punishable by imprisonment for a statutory maximum term of not less than 10 years."[78] But this definition is both too narrow and too broad. It would exclude the offense of "felony battery" under Florida law,[79] a third-degree felony with a maximum term of imprisonment of five years,[80] even though this crime requires the infliction of "great bodily harm, permanent disability, or permanent disfigurement."[81] It also would exclude convictions for "domestic battery by strangulation" under Florida law[82] and for "assault[ing] another and inflict[ing] substantial bodily harm" under Minnesota law.[83] But it would include the Florida offense of "[u]nlawful

---

[78] Restoring the Armed Career Criminal Act, S. 3335, 115th Cong. § 2 (2018).

[79] Fla. Stat. § 784.041(1).

[80] *Id.* § 775.082(3)(e).

[81] *Id.* § 784.041(1)(b).

[82] *Id.* § 784.041(2)(a).

[83] Minn. Stat. § 609.223 subd. 1.

possession or use of a fifth wheel,"[84] a second-degree felony with a maximum term of imprisonment of 15 years.[85] It would include a conviction under Utah law for "the intentional sale of five or more unlawful telecommunication devices within a six-month period,"[86] also a second-degree felony with a maximum term of imprisonment of 15 years.[87] And it would include the Massachusetts offense of knowing possession of "ten or more pieces of false money . . . with intent to utter or pass the same as true," a crime punishable by a life sentence.[88] In the light of the substantial recidivism differences between violent and nonviolent offenders, Congress should ensure that their punishments are based on the nature of their past convictions and not the potential sentences for those convictions.

Make no mistake—Congress must eventually do something. The need to punish violent recidivists is just as strong today as it was when the Supreme Court decided *Spencer* over 50 years ago.[89] The only question is what Congress should do. Restoring the common-law role of the jury is the right place to start.

---

[84] Fla. Stat. § 812.0147.

[85] *See id.* § 775.082(3)(d).

[86] Utah Code § 76-6-409.8(2).

[87] *Id.* § 76-3-203(2).

[88] Mass. Gen. Laws ch. 267, § 17.

[89] *See Spencer*, 385 U.S. at 566 n.9 (reporting "62% of prisoners committed to federal prisons in the year ending June 30, 1965, had been previously committed.").

MARTIN, Circuit Judge, dissenting:

As United States Circuit Judges, we have been given great power and privilege. And our positions call upon us to decide the fate of many people who have neither. In a nation that incarcerates a larger percentage of its population than almost all others, federal judges devote much time to examining (and reexamining) the sentences imposed on people serving time in our federal and state prisons. The interpretation the majority of this en banc Court gives to the sentencing statute at issue here, which gives no relief for Irma Ovalles, presents the opportunity to review the development of this Circuit's sentencing jurisprudence in recent years. My review reveals a body of law that has relentlessly limited the ability of the incarcerated to have their sentences reviewed. Decisions of this Court have left only a narrow path to relief for those serving sentences longer than the law now allows. Yet this narrow path is not mandated by decisions of the Supreme Court or by Acts of Congress. Indeed, this Court has withheld relief from prisoners even when precedent counsels otherwise.

As did my colleagues in the majority, I begin with the landmark Supreme Court decision in Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551 (2015). Having read the majority opinion, the reader is surely aware that in Johnson, the United States Supreme Court invalidated part of the Armed Career Criminal Act (ACCA), a sentencing statute designed to punish violent repeat offenders more

68

harshly.  Id. at 2557.  The question before the Court in Johnson was not whether violent repeat offenders should be punished more harshly.  Rather, the question was how to decide who is a violent repeat offender.  Id. at 2555.  In Johnson, the Court held that one definition the statute used to identify violent repeat offenders was so vague, and so susceptible to divergent meanings, that relying on it to lengthen people's prison sentences violated the protections guaranteed by the U.S. Constitution.  Id. at 2557.  As a result, the Supreme Court struck down the part of ACCA known as the residual clause.  This ruling called into question the sentences of thousands of federal prisoners sentenced under ACCA and other, similarly worded statutes—including the one that was the basis for Irma Ovalles's sentence. After Johnson, it was the job of the Eleventh Circuit, and all inferior federal courts, to review the lawfulness of these sentences.

Yet at every turn, this Court erred in ways that stopped prisoners from getting their sentences reviewed and prevented people who had meritorious claims from getting relief.  Ms. Ovalles's case is a "successor" to Johnson, Maj. Op. at 2, and it is the latest in this line of decisions.  Judge Jill Pryor's dissent shows how the majority strays from the plain text of the statute and from Supreme Court precedent.  I fully join her opinion.  I write separately to provide the context of the Eleventh Circuit's response to Johnson.  This is not the first time this Court has mistakenly applied Johnson, nor the first time our mistake will leave an unlawful

69

sentence intact.  Indeed, today's en banc decision, like others before it, promises to have lasting effects for many prisoners.

## I.    JOHNSON AFTERMATH

When the Supreme Court invalidates a statute that was the basis for sentences being served by thousands of federal prisoners, the first question becomes, who benefits?  Do we simply quit relying on this unconstitutional statute for those who will be sentenced in the future, or do we go back and give relief to those who were sentenced under the flawed statute in the past?  There are rules governing who gets relief.  See generally Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989).  Generally, people sentenced under a flawed statute more than a year before the Supreme Court announces a new rule like the one in Johnson get relief based on the new rule (retroactive relief) if the Supreme Court has told us they can. See 28 U.S.C. § 2255(f)(3), (h); In re Henry, 757 F.3d 1151, 1157–60 (11th Cir. 2014).

One statutory tool for a person seeking relief from an unlawful federal prison sentence is found in 28 U.S.C. § 2255.  Provisions of this statute were intended to (and do) limit opportunities for prisoners to get courts to review problems with their sentences.  Prisoners may contest their sentences once as a matter of right under § 2255, but they must do it within one year of their sentences becoming final.  Id. § 2255(f).  This one-year statute of limitations goes by quickly

70

indeed for most federal prisoners, who are routinely sentenced to serve decades-long prison terms.  Section 2255 does allow prisoners to bring a second or successive challenge to their sentences after that first year, but it is much harder.  For starters, prisoners seeking relief when they are years into serving their sentence must first come to a court of appeals to get permission.  Id. §§ 2244(b)(3)(A), 2255(h).  There are other barriers to getting a second chance at relief in federal court, but for purposes of this discussion, perhaps the most important is that the statute gives inmates no ability to contest a decision from a panel of this Court telling them they cannot file a second or successive petition.  Id. § 2244(b)(3)(E) ("The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.").  For this "seeking permission" process, prisoners are stuck with the answer we give them, whether our answer is right or wrong.

As one would expect, after the Supreme Court decided Johnson, thousands of prisoners tried to get permission from our Court (and others) to challenge their sentences.  This is understandable because many of them had been sentenced under a statute they now knew was, in part, unconstitutional.  To the best of my knowledge, our Court applied Johnson to give relief to inmates exercising their direct appeal rights, and to those who were within the one-year time limit for

71

bringing their first collateral attack.  E.g., Mays v. United States, 817 F.3d 728, 736–37 (11th Cir. 2016) (applying Johnson to a first § 2255 motion); United States v. Braun, 801 F.3d 1301, 1307–08 (11th Cir. 2015) (applying Johnson on direct appeal).

However, prisoners who were already more than a year into serving sentences impacted by Johnson have had a hard time getting their cases considered in the Eleventh Circuit.  Shortly after Johnson was decided, this Circuit declined to allow the Supreme Court's new rule in Johnson to serve as the basis for a second or successive motion under § 2255.  In re Franks, 815 F.3d 1281, 1283 (11th Cir. 2016), abrogated by Welch v. United States, 578 U.S. __, 136 S. Ct. 1257 (2016); In re Rivero, 797 F.3d 986, 989 (11th Cir. 2015), abrogated in part by Welch, 136 S. Ct. 1257 (2016); see 28 U.S.C. §§ 2244(b)(2)(A), 2255(h).  Our Court denied permission for § 2255 filings by long-ago sentenced inmates because the Supreme Court did not say Johnson applied retroactively to them.  As a member of this Court who believed Supreme Court precedent required broader review of sentences imposed under ACCA, this Court's decision to the contrary was especially dismaying because the government urged us to give retroactive relief to these inmates.  The government filed a statement in these cases saying:  "[T]he Court should grant authorization to file second or successive § 2255 motions where a defendant makes a prima facie showing that, in light of Johnson, he was

72

erroneously sentenced under the Armed Career Criminal Act." Franks, 815 F.3d at 1289 (Martin, J., dissenting) (quotation marks omitted and alteration adopted).

As I discussed in my dissent in Franks, the Supreme Court's decisions in Schriro v. Summerlin, 542 U.S. 348, 351, 124 S. Ct. 2519, 2522 (2004) (holding "[n]ew substantive rules generally apply retroactively"), and Bousley v. United States, 523 U.S. 614, 620–21, 118 S. Ct. 1604, 1610 (1998) (determining a rule that narrowed the scope of a criminal statute by interpreting its terms is substantive and applied retroactively), "logically dictate the retroactivity of Johnson." Franks, 815 F.3d at 1288 (Martin, J., dissenting) (quotation marks omitted). When the Supreme Court struck down ACCA's residual clause as unconstitutionally vague in Johnson, it narrowed the scope of that statute's reach. Id. Thus, the rule it announced "necessarily carr[ied] a significant risk that a defendant . . . faces a punishment that the law cannot impose upon him" and as such, should have been applied retroactively. Summerlin, 542 U.S. at 352, 124 S. Ct. at 2522–23 (quotation marks omitted). Nevertheless, this Circuit ruled in In re Rivero that no cases logically dictated Johnson's retroactivity. Rivero, 797 F.3d at 989.

In Rivero, this Circuit held that no cases dictated Johnson's retroactivity in part because "Johnson did not hold that Congress could not impose a punishment for the same prior conviction in a statute with less vague language." Id. Our Court

73

distinguished Bousley as involving a rule that was "the product of statutory interpretation," and not "a new rule of constitutional law." Id. at 991.

Turns out we were wrong. Just shy of a year after Johnson issued, the Supreme Court decided Welch v. United States, 578 U.S. ___, 136 S. Ct. 1257 (2016), commanding that inmates be given Johnson relief retroactively—and rejecting this Court's reasons for concluding Johnson did not apply retroactively. In holding Johnson was retroactive, the Supreme Court pointed to Bousley, where it concluded an interpretation narrowing the sweep of a criminal statute applies retroactively, "even though Congress could (and later did) . . . amend[] the statute." Welch, 136 S. Ct. at 1267. By that same logic, the Welch Court held, Johnson announced a retroactively applicable substantive rule. The Court also observed, quite rightly, that "[t]reating decisions as substantive if they involve statutory interpretation, but not if they involve statutory invalidation, would produce unusual outcomes" and is an "arbitrary distinction [that] has no place in the Teague framework." Welch, 136 S. Ct. at 1268. In short, the Supreme Court rejected this Court's attempt to distinguish Bousley.

Fortunately, the Supreme Court was quick to correct this Court's erroneous decision on retroactivity—Welch issued just over eight months after Rivero and three months after Franks. But in the meantime our Court had turned away dozens of prisoners seeking authorization to file second or successive § 2255 motions

74

based on <u>Johnson</u>.  <u>See</u> <u>In re Robinson</u>, 822 F.3d 1196, 1198–1201 (11th Cir.

2016) (Martin, J., concurring in judgment).  And because such applications must

be filed within one year of when the Supreme Court announced the new rule in

<u>Johnson</u>, <u>see</u> <u>Dodd v. United States</u>, 545 U.S. 353, 359, 125 S. Ct. 2478, 2482–83

(2005), all prisoners seeking the retroactive benefit of <u>Johnson</u> in their case had

only about two months to file an (or another) application.

Thus, in a compressed timeframe, the Court began reviewing thousands of

applications from inmates seeking to file a second or successive § 2255 petition

based on <u>Johnson</u>'s retroactivity.  The statute requires these applications to make a

"prima facie" showing that they are entitled to relief.  28 U.S.C. §§ 2244(b)(3)(C),

2255(h).  I will now review how this Circuit has implemented this statutory

requirement for <u>Johnson</u> applications.

II.    INSTITUTING MERITS REVIEW OF APPLICATIONS SEEKING
       AUTHORIZATION TO FILE SECOND OR SUCCESSIVE § 2255
       MOTIONS RAISING <u>JOHNSON</u> CLAIMS

Again, when prisoners apply to circuit courts for authorization to file a

second or successive habeas motion, the governing statute limits our review of the

application to determining only whether the prisoner has made a "prima facie

showing" that his proposed motion "contain[s] . . . a new rule of constitutional law,

made retroactive to cases on collateral review by the Supreme Court, that was

previously unavailable."  28 U.S.C. §§ 2244(b)(3)(C), 2255(h).  I had occasion to

discuss more fully in my concurrence in In re Williams, 898 F.3d 1098, 1107 (11th Cir. 2018) (Martin, J., specially concurring), why a prima facie showing is "a less demanding standard" than what is required to appeal from a District Court's ruling on a habeas petition. And the standard for appealing a District Court's habeas ruling "does not require a showing that the appeal will succeed." Welch, 136 S. Ct. at 1263 (quotation marks omitted).

Up until the rush of Johnson filings, this Court only reviewed filings from prisoners asking for permission to bring a second or successive petition to see whether the prisoner had made a prima facie case. We did this because, again, this is the task the statute assigns us. See, e.g., In re Moss, 703 F.3d 1301, 1303 (11th Cir. 2013) (explaining that the panel's conclusion that the prisoner had made a prima facie showing was "a limited determination" and the District Court would need to do a de novo review); see also Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1357–58 (11th Cir. 2007) (holding that District Courts must review de novo whether a petitioner has actually satisfied the requirements to file a second or successive application because the statute "restricts us to deciding whether the petitioner has made out a prima facie case of compliance with the § 2244(b) requirements"); In re Joshua, 224 F.3d 1281, 1282 n.2 (11th Cir. 2000) (stating the merits of a prisoner's claim are "not relevant to whether [he] can obtain permission to bring a second or successive § 2255 motion to vacate").

76

Before the rush of Johnson filings, we also recognized the practical challenges of conducting a merits review by looking only at the filings asking for permission to bring the action:

> When we make that prima facie decision we do so based only on the petitioner's submission.  We do not hear from the government. We usually do not have access to the whole record.  And we often do not have the time necessary to decide anything beyond the prima facie question because we must comply with the statutory deadline.  See § 2244(b)(3)(D) (requiring a decision within 30 days after the motion is filed).

Jordan, 485 F.3d at 1357–58.  Beyond the limitations mentioned in Jordan, our Court also requires prisoners to use a form designed for prisoners seeking to file a second or successive petition.  In re Saint Fleur, 824 F.3d 1337, 1342 & n.1 (11th Cir. 2016) (Martin, J., concurring).  This "form gives prisoners very little space to explain their claims."  Id. at 1342 n.1; see Williams, 898 F.3d at 1101–02 (Wilson, J., specially concurring).  The mandatory form also prohibits prisoners from attaching any "separate petitions, motions, briefs, arguments, etc."  Saint Fleur, 824 F.3d at 1342 n.1 (Martin, J., concurring) (quotation marks omitted); see Williams, 898 F.3d at 1101–02 (Wilson, J., specially concurring).

Yet after Johnson, this Court began doing exactly what we had previously explained the constraints on our prima facie review would not permit: deciding the merits of a prisoner's Johnson claim.  See, e.g., In re Thomas, 823 F.3d 1345, 1349 (11th Cir. 2016).  And the Court did this based on the limited filings, which the

77

prisoner understood was just a permission-seeking document intended to allow him to present the merits of his claims in District Court.

The questions that come up about sentences after Johnson are complicated. Every ACCA sentence is based on the individual criminal history of the people serving them. Under ACCA, a prisoner who had in the past committed three or more crimes that qualified as either a "serious drug crime" or a "violent felony" got a sentence that had to be at least fifteen years long. 18 U.S.C. § 924(e). Most are longer. Yet ACCA allows no more than a ten-year sentence for a prisoner who had fewer than three such earlier criminal convictions. Id. § 924(a)(2). Thus, the devil is in the details. Johnson required the federal courts to do the tedious work of examining the criminal histories of people who have been convicted of violating a seemingly endless list of state crimes, defined by many different states in many different ways. In many cases, this Court undertook this complicated review based merely on the prisoner's application to file a second or successive § 2255 motion.

In so doing, this Court effectively reimposed sentences on these inmates here at the court of appeals level, without ever allowing more thorough District Court review. We turned away prisoners seeking District Court review by ruling that their criminal history that had qualified for a fifteen-year plus sentence still qualified them for the longer sentence under a part of ACCA that survived Johnson. See, e.g., In re Hires, 825 F.3d 1297, 1301–02 (holding Florida robbery

78

and Florida aggravated assault qualify as ACCA predicates under the elements clause).

As it turned out, the language the Supreme Court invalidated in Johnson also appeared in other federal sentencing statutes, so our Court began to get filings from prisoners sentenced under those statutes as well.  For example, prisoners like Ms. Ovalles also sought to challenge sentences imposed under 18 U.S.C. § 924(c), the statute at issue in this case.  Section 924(c) contains language very similar to that declared unconstitutional in Johnson and "identical" to that declared unconstitutional in Sessions v. Dimaya, 138 S. Ct. 1204 (2018).  Maj. Op. at 16. In some § 924(c) cases where the prisoner merely sought leave to present claims in District Court, this Court decided on the merits—sometimes as a matter of first impression—that a particular state crime still qualified as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A), which does not contain the language found unconstitutional in Johnson.  See, e.g., In re Saint Fleur, 824 F.3d 1337, 1340–41 (holding, for the first time, that substantive Hobbs Act robbery is a crime of violence under 18 U.S.C. § 924(c)(3)(A)).[1]

_____

[1] In Saint Fleur, I agreed with the panel opinion that Mr. Saint Fleur's § 924(c) conviction "look[ed] to be valid despite Johnson." Saint Fleur, 824 F.3d at 1341 (Martin, J., concurring). In hindsight I regret participating in merits reviews of sentences like Mr. Saint Fleur's at this stage. But even facing the flood of requests to file second or successive petitions, I realized at the time I was "increasingly wary of deciding whether to grant leave to file a second or successive § 2255 petition based on a conclusion that the applicant's proposed claim will fail on the merits." Id. By the time Saint Fleur was decided, I had come to realize that making these merits rulings on

Also as a result of Johnson's holding that the language of ACCA was unconstitutional, it should have surprised no one that our Court would begin to see challenges to sentences imposed under identical language in the U.S. Sentencing Guidelines. USSG § 4B1.2(a).  Yet here again, where prisoners sought to challenge their sentences under this guideline, our Court denied them the chance to present their claims in District Court.  In a direct appeal from a sentencing, with full adversarial testing, this Court said Johnson did not apply because the sentences were imposed under a Guideline system that was advisory.  United States v. Matchett, 802 F.3d 1185, 1193–96 (11th Cir. 2015) ("The vagueness doctrine, which 'rest[s] on [a] lack of notice' . . . does not apply to advisory guidelines.").[2] This is how the process should work.  But then another panel of this Court, faced with a prisoner's application to file a second or successive petition, denied Johnson relief even to those who had been sentenced under the mandatory Guidelines.  See In re Griffin, 823 F.3d 1350, 1353–56 (11th Cir. 2016) (extending Matchett, 802 F.3d at 1193–96 (11th Cir. 2015) to sentences imposed under the mandatory Guidelines).

---

such thin pleadings, and with no adversarial testing was the wrong approach.  I was also coming to understand that some of our merits rulings were wrong, and there was little to no recourse for inmates who got bum rulings.

[2] Though I advocated that Johnson applied to the advisory guidelines, see In re Clayton, 829 F.3d 1254, 1256 (Martin J., concurring in the result), our Court's holding to the contrary carried the day.  See Beckles v. United States, 580 U.S. __, 137 S. Ct. 886 (2017).

During this time, many panels, including some I served on, chose to publish our rulings on these applications. See, e.g., In re Smith, 829 F.3d 1276 (11th Cir. 2016); In re Colon, 826 F.3d 1301 (11th Cir. 2016); Hires, 825 F.3d at 1297; Saint Fleur, 824 F.3d at 1337; In re Hines, 824 F.3d 1334 (11th Cir. 2016). Under Eleventh Circuit precedent, published rulings are binding on all future panels facing the same issue. United States v. St. Hubert, 883 F.3d 1319, 1328–29 (11th Cir. 2018) (holding published orders on applications to file second or successive habeas motions are binding on all future appellate panels).[3] Some of these panel opinions were decided over dissent, "which would ordinarily require oral argument under this circuit's rules." Williams, 898 F.3d at 1109 n.4 (citing 11th Cir. R. 34-3(b)(3)) (Martin, J., specially concurring).

In a short time span, our Court got thousands of authorization applications raising Johnson claims. But once any panel published a decision holding an inmate's past conviction still counts as a predicate conviction under the ACCA, it became easier to dispose of new filings. A panel receiving a new application to file a second or successive petition could quickly cite to a published decision rejecting someone else's application based on its declaration that the two had identical predicate convictions that had been ruled a "violent felony" even after

---

[3] Judge Wilson and I discussed this issue in greater depth in our concurring opinions in Williams, 898 F.3d at 1100 (Wilson, J., specially concurring); id. at 1105 (Martin, J., specially concurring).

Johnson.  Unfortunately, several of these published merits decisions were just plain wrong.  That means not only did the mistaken decision deny relief for the inmate who brought the case, but it will continue to require denial of relief for others who would rightly be entitled to it.

### III.    EXAMPLES OF INCORRECT MERITS DECISIONS ON SECOND OR SUCCESSIVE APPLICATIONS

In the rush to conduct these merits reviews of applications to file a second or successive habeas petition within the 30-day statutory time frame, based only on a form filed by a usually uncounseled prisoner, it should come as no surprise that our Court made some mistaken rulings.  I think it worthwhile to discuss three examples of such mistakes in more detail here, to aid in understanding the impact of this Court's chosen method for responding to prisoners seeking relief after Johnson.  Unless we overrule them en banc or the Supreme Court corrects our errors, the merits decisions we made under the constraints I have discussed will continue to bar relief for prisoners with meritorious claims.

### A. Florida Robbery and Aggravated Assault

In In re Hires, a panel denied Mr. Hires authorization to file a second or successive habeas motion based on an earlier conviction imposed on him in Florida.  825 F.3d at 1297.  In reviewing Mr. Hires's application, the panel first looked to Turner v. Warden Coleman FCI, 709 F.3d 1328 (11th Cir. 2013), abrogated on other grounds by Johnson, 135 S. Ct. 2551, to rule that a conviction

for Florida aggravated assault qualified as a "violent felony" under ACCA's elements clause. Hires, 825 F.3d at 1301. Second, it relied on United States v. Dowd, 451 F.3d 1244 (11th Cir. 2006), to say that Florida armed robbery also qualified as a violent felony under the elements clause. Hires, 825 F.3d at 1301–02. Pointing to Turner and Dowd, the panel held Mr. Hires had three prior convictions that still qualified as violent felonies "without regard to the ACCA's residual clause" and denied his application. Id. at 1301–02, 1303–04. But the panel need not have followed Dowd, which failed to apply the categorical approach, as Supreme Court precedent requires. Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001) ("Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.").

To be clear, Turner was also wrongly decided. In United States v. Golden, 854 F.3d 1256 (11th Cir. 2017), Judge Jill Pryor concurred separately to explain why Turner's holding about Florida aggravated assault was wrong. Golden, 854 F.3d at 1258 (Jill Pryor, J., concurring). To summarize, Turner incorrectly applied our precedent in United States v. Palomino Garcia, 606 F.3d 1317 (11th Cir. 2010), and overlooked our precedent in United States v. Rosales-Bruno, 676 F.3d 1017 (11th Cir. 2012). Golden, 854 F.3d at 1258. Although Judge Jill Pryor called for

83

the Court, sitting en banc, to reconsider Turner, see Golden, 854 F.3d at 1258–59,

we have not yet done so and I've seen no indication we will anytime soon.

Instead, we continue to apply Turner to deny prisoners relief.  See, e.g., Hylor v.

United States, 896 F.3d 1219, 1223 (11th Cir. 2018).  But Turner at least was

binding on the Hires panel.  See Golden, 854 F.3d at 1257 (panel opinion)

(concluding Turner is binding even if flawed).

As for Florida armed robbery, in Dowd, this Court summarily stated in one

sentence that Florida armed robbery "is undeniably" a violent felony and cited to

ACCA's elements clause.  451 F.3d at 1255.  I had an opportunity in United States

v. Seabrooks, 839 F.3d 1326 (11th Cir. 2016), to point out that Dowd's one-

sentence reasoning was not adequate, let alone a proper application of Supreme

Court precedent, in light of the Supreme Court's more recent decisions explaining

how to apply the categorical approach.  Seabrooks, 839 F.3d at 1348–49 (Martin,

J., concurring in the judgment).[4]  Yet, only three weeks after the panel's fractured

---

[4] I did understand at the time, however, that this Court's decision in United States v. Lockley, 632 F.3d 1238 (11th Cir. 2011), controlled the outcome of Mr. Seabrooks's case.  Seabrooks, 839 F.3d at 1350–52.  In holding that Florida attempted robbery qualified as a "crime of violence" under the elements clause of Guideline § 4B1.2(a), Lockley determined that the "least culpable conduct sufficient to support a robbery conviction" under Florida law was "taking by putting the victim in fear."  Seabrooks, 839 F.3d at 1350 (citing Lockley, 632 F.3d at 1244).  The Lockley panel decided that "'[p]utting in fear,' per Florida law, involves an act causing the victim to fear death or great bodily harm."  632 F.3d at 1244.  Mr. Seabrooks sought to distinguish Lockely by arguing that "sudden snatching," not "putting in fear," was the least culpable conduct under Florida law.  Seabrooks, 839 F.3d at 1350–51.  My review of Florida Supreme Court decisions made me believe that, at the time of Mr. Seabrooks's conviction, sudden snatching would not have been a sufficient basis for an attempted robbery conviction.

decision in Seabrooks, another panel applied Dowd as binding precedent and ruled that all Florida armed robbery convictions are categorically violent felonies for ACCA purposes. See United States v. Fritts, 841 F.3d 937, 940, 943–44 (11th Cir. 2016). Fritts also cited Hires and other published cases dealing with second or successive petitions to support its conclusion that Florida armed robbery qualifies as a violent felony under the elements clause. Id. at 940 (citing Hires, 825 F.3d 1297, In re Thomas, 823 F.3d 1345, 1349 (11th Cir. 2016), and In re Moore, 830 F.3d 1268, 1271 (11th Cir. 2016)). Fritts is wrongly decided, and the Supreme Court is now set to review our holding in that case. See United States v. Stokeling, 684 F. App'x 870, 872–76 (11th Cir. 2017) (Martin, J., concurring) (unpublished), cert. granted 138 S. Ct. 1438 (2018); see also United States v. Lee, 886 F.3d 1161, 1166–69 (11th Cir. 2018) (Jordan, J., concurring); United States v. Geozos, 870 F.3d 890, 901 (9th Cir. 2017) (holding Florida robbery and Florida armed robbery are not categorically violent felonies for ACCA purposes and ordering release of prisoner). In the meantime, however, this Court continues to rely on Fritts to bar inmates' claims for relief. See, e.g., Hylor, 896 F.3d at 1223.

B. Johnson's Applicability to the Mandatory Guidelines

---

See id. at 1351–52. (discussing change in Florida law in 1997). In another case, Judge Jordan showed that intermediate Florida courts were affirming robbery convictions despite conduct that did not involve an act causing the victim to fear death or great bodily harm, calling into question Lockley's soundness. See United States v. Lee, 886 F.3d 1161, 1166–69 (11th Cir. 2018) (Jordan, J., concurring).

As I've mentioned, the United States Sentencing Guidelines contained language identical to what the Supreme Court ruled unconstitutionally vague in the ACCA statute. This Court upheld guideline sentences imposed in reliance on this language under the advisory guideline regime. Matchett, 802 F.3d at 1196; see Beckles v. United States, 580 U.S. __, 137 S. Ct. 886, 890 (2017) (holding "the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause"). But I think this Court got it wrong in In re Griffin when it extended Matchett's ruling that there was no constitutional vagueness problem with advisory guidelines to hold sentences under the mandatory Guidelines were not unconstitutionally vague. See In re Griffin, 823 F.3d 1350, 1354–56. Cf. Cross v. United States, 892 F.3d 288, 299–302, 307 (7th Cir. 2018) (holding Johnson invalidated the residual clause of the mandatory career-offender Guideline and ordering resentencing). The Griffin panel's first mistake was concluding it was bound by Matchett, when in fact Matchett addressed a different question. See Griffin, 823 F.3d at 1354. Matchett was concerned solely with the advisory Guidelines. Nonetheless, citing Matchett, Griffin reasoned that "[t]he Guidelines—whether mandatory or advisory—cannot be unconstitutionally vague because they do not establish the illegality of any conduct and are designed to assist and limit the discretion of the sentencing judge." Id. But this is not what Matchett said. Matchett recognized that the vagueness doctrine, and thus Johnson,

86

applied to "criminal statutes that define elements of a crime or fix punishments."

Matchett, 802 F.3d at 1194 (emphasis added) (citing Johnson, 135 S. Ct. at 2557).

The Griffin panel failed to consider that the Supreme Court has equated the

mandatory Guidelines with laws that fix sentences.  See, e.g., United States v.

Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750 (2005) ("Because [the Guidelines]

are binding on judges, [the Court] ha[s] consistently held that the Guidelines have

the force and effect of laws." (emphasis added)).  Booker also rejected the idea that

"[t]he availability of a departure in specified circumstances" was enough to make a

mandatory Guideline range advisory.  See 543 U.S. at 234, 125 S. Ct. at 750.

The Griffin panel also said, "Due process does not mandate notice of where,

within the statutory range, the guidelines sentence will fall."  823 F.3d at 1354.

But this too is wrong.  In Beckles v. United States, 580 U.S. ___, 137 S. Ct. 886

(2017), the Supreme Court told us that the vagueness doctrine did not apply to the

post-Booker advisory Guidelines precisely because "'the due process concerns that

require[d] notice in a world of mandatory Guidelines no longer' apply."  Id. at 894

(quoting Irizarry v. United States, 553 U.S. 708, 714, 128 S. Ct. 2198, 2202 (2008)

(alterations adopted and emphasis added)).

This Court alternatively held in Griffin that Welch did not make Johnson

retroactive on all collateral challenges.  The Griffin panel said Johnson was

retroactive only where it applied to result in "a substantive change of law [by]

alter[ing] the statutory range of permissible sentences." Griffin, 823 F.3d at 1355. The panel noted that application of Johnson to the Sentencing Guidelines would result only in "changes in how the sentencing procedural process is to be conducted." Id. In short, the Griffin panel accepted Johnson as a substantive rule in the ACCA context, but characterized it as a procedural rule in the Sentencing Guideline context. This cannot be right.

Welch explained that a new rule "has a procedural function" if it "alters only the procedures used to obtain the conviction." 136 S. Ct. at 1266. A new rule has a "substantive function" if it "alters instead the range of conduct or class of persons that the law punishes." Id. Johnson is clearly a substantive rule as applied to the mandatory Guidelines because if the residual clause in the career-offender Guideline is void for vagueness, then the range of conduct that Guideline reaches is necessarily narrowed. See id. To the extent Griffin relied on a distinction between statutes promulgated by Congress and Guidelines issued by the Sentencing Commission, that is a distinction without a difference for the time when the Guidelines were mandatory. See United States v. R.L.C., 503 U.S. 291, 297, 112 S. Ct. 1329, 1334 (1992) (rejecting the idea that "the statutory character of a specific penalty provision gives it primacy over administrative sentencing guidelines," noting "the mandate to apply the Guidelines is itself statutory" (citing 18 U.S.C. § 3553(b)).

Even with these flaws in <u>Griffin</u>, it is binding precedent in our Circuit, and we are required to deny leave to file a second or successive petition to any prisoner seeking relief from a sentence imposed under the mandatory guideline system.

### C. Florida Manslaughter

My third example of a merits decision that missed the mark came in <u>In re Burgest</u>, 829 F.3d 1285 (11th Cir. 2016). Here, the panel denied Mr. Burgest permission to file a second or successive motion based on <u>Griffin</u>. <u>Id.</u> at 1287. The panel then went on to consider—even though the case had already been decided against Mr. Burgest—whether a conviction for Florida manslaughter qualified as a "crime of violence" under the career-offender Guideline. <u>Id.</u> The commentary to the career-offender Guideline defined "crime of violence," in part, by listing several included offenses, which list included "manslaughter." <u>See</u> USSG § 4B1.2 cmt. n.1. On this basis alone, the <u>Burgest</u> panel held that Florida manslaughter was a crime of violence. <u>See</u> 829 F.3d at 1287.

But <u>Burgest</u>'s reasoning ignored Eleventh Circuit precedent that requires us to apply the categorical approach when deciding whether a prior conviction is a qualifying offense for sentencing enhancement purposes. <u>See</u> <u>Lockley</u>, 632 F.3d at 1241–42 (noting "robbery" is enumerated as a "crime of violence" in the Guideline commentary to § 4B1.2 and stating "[w]here, as here, the Guidelines specifically designate a certain offense as a 'crime of violence,' we compare the elements of

the crime of conviction to the generic form of the offense as defined by the States, learned treatises, and the Model Penal Code"). When it failed to use the categorical approach, the panel merely relied on the label Florida uses. This practice was explicitly rejected by this Court in Palomino Garcia. See 606 F.3d at 1327–29 (rejecting the government's argument that a 16-level enhancement under Guideline § 2L1.2 should be affirmed merely because the State called the offense "aggravated assault" and the Guideline definition enumerated "aggravated assault" as a "crime of violence"). A blind reliance on how any given state law labels a crime leads to prisoners who engaged in similar conduct being sentenced differently. That is because conduct criminalized in one state may not be in another. For example, if Florida labeled the act of crossing the street outside of the crosswalk "manslaughter," that would be enough for the Burgest panel to conclude jaywalking was a "crime of violence." Our precedent should have stood to defeat this result.

Where other circuits used the categorical approach, they found that Florida's manslaughter statute encompasses more acts than those captured in the generic definition. See United States v. Mendoza-Padilla, 833 F.3d 1156, 1159–60 (9th Cir. 2016) (relying on the federal generic definition of manslaughter as well as the Fifth Circuit's survey of all 50 states in United States v. Dominguez-Ochoa, 386 F.3d 639, 645–46 (5th Cir. 2004)); United States v. Garcia-Perez, 779 F.3d 278,

90

284 & nn. 23–24, 289 (5th Cir. 2015) (relying on the generic definition developed in Dominguez-Ochoa and United States v. Bonilla, 524 F.3d 647 (5th Cir. 2008), which also included discussions of treatises and the Model Penal Code).  The Fifth Circuit decided that Florida manslaughter can be committed "by act, by procurement, or by culpable negligence."  Garcia-Perez, 779 F.3d at 284; see Fla. Stat. § 782.07(1).  That court then examined Florida case law to find that a long line of cases, left unaddressed by more recent ones, "establishes that something less than recklessness as to death is required to prove act manslaughter."  Garcia-Perez, 779 F.3d at 287.  Through this process, the Fifth Circuit concluded that Florida manslaughter "falls outside the definition of generic contemporary manslaughter," which requires "either intent to kill or recklessness."  Id. at 284, 289.  Thus, for inmates seeking sentencing relief in the Fifth Circuit, a past conviction for manslaughter from Florida does not defeat their claim.  This is true in the Ninth Circuit as well.  Mendoza-Padilla, 833 F.3d at 1159–62.

Hires, Griffin, and Burgest are examples of how this Court's approach to second or successive applications has harmed prisoners serving long sentences imposed under ACCA or the Sentencing Guidelines.  The Court's approach in these cases disregarded our own precedent and rules in search of a quick end to the flood of applications filed by prisoners raising Johnson claims.  How did this happen?  For one thing, I believe the Court tried to get to the merits of these cases

too fast.  The statute for reviewing these applications sets a 30-day limit for ruling on them.  28 U.S.C. § 2244(b)(3)(D).  Once our Court decided to get to the merits at the mere "seeking permission" stage, we should have joined seven of our sister circuits and held that the 30-day timeframe was not mandatory.  See In re Johnson, 814 F.3d 1259, 1262 n.1 (11th Cir. 2016) (listing cases).  I was on a panel that did just that, id. at 1262, but our panel opinion was vacated by the Court in an en banc order without opinion. 815 F.3d 733 (vacating the panel opinion and taking the case en banc); see also No. 16-10011, slip op. (11th Cir. April 21, 2016) (granting the request to file a second or successive petition but leaving the panel opinion vacated).

Our nation has experienced an explosion in its prison population over the last twenty years or so.[5]  The Supreme Court's decision in Johnson required federal judges to take a close look at the sentences of thousands of people incarcerated in federal prison.  For many inmates, we did not.  In our haste, this Court made mistakes (myself included) that always seemed to work against the prisoner.  Yet this Court has not just failed to correct its mistakes.  It has also acted to set these incorrect decisions in stone.

IV.    BARRING MULTIPLE APPLICATIONS TO FILE § 2255 MOTIONS

---

[5] See E. Anne Carson, Bureau of Justice Statistics, Prisoners in 2016 1 (Aug. 7, 2018), https://www.bjs.gov/content/pub/pdf/p16.pdf.

During the two or so months after the Supreme Court decided Welch, some prisoners were savvy enough to apply to seek relief more than once. This Court then undertook to put an end to this practice, and in doing so, adopted an interpretation of AEDPA that is far removed from the text of the statute. And beyond our Court's departure from what the statute requires, it also overlooked Supreme Court precedent counseling a path quite different from what this Court chose.

Until recently, federal prisoners at least had the comfort of knowing that when they were denied leave to file second or successive habeas motions, that denial was without prejudice and "there [was] no rule against filing multiple applications for leave to file a successive § 2255 petition." See In re Anderson, 829 F.3d 1290, 1296 (11th Cir. 2016) (Martin, J., dissenting) (quoting In re Barber, No. 16-10107, slip. op. at 32 (11th Cir. Feb. 10, 2016) (Marcus, J., dissenting)). However, in the course of deciding the rush of filings after Johnson, a panel of this Court held that AEDPA requires courts of appeals to deny with prejudice "applications for leave to file a second or successive § 2255 motion presenting the same claims we have already rejected on their merits in a previous application." In re Baptiste, 828 F.3d 1337, 1340 (11th Cir. 2016) (construing 28 U.S.C. § 2244(b)(1)).

93

In order to reach this result, the Baptiste panel first determined § 2244(b)(1) applies to § 2255 motions, even though § 2244(b)(1) only expressly refers to petitions for habeas corpus relief filed by state prisoners under 28 U.S.C. § 2254. 828 F.3d at 1339.  For justification, the Baptiste panel said simply that "it would be odd indeed if Congress had intended to allow federal prisoners to refile precisely the same non-meritorious motions over and over again while denying that right to state prisoners."  Id.  But courts have no power to rewrite Acts of Congress because we think them "odd."  Second, Baptiste determined "§ 2244(b)(1) applies with equal force" to authorization applications pending before courts of appeal.  Id. The panel reasoned that reading the statute to prohibit only claims raised in earlier habeas petitions filed in District Court—what the Seventh Circuit said was the "natural reading" of the statute, Bennett v. United States, 119 F.3d 470, 471 (7th Cir. 1997)—"would treat frivolous applications more favorably than those that presented some arguable merit."  Baptiste, 828 F.3d at 1340 (citing Bennett).

Two of my colleagues have explained at length the problems with Baptiste, and I will not revisit them all here.  See In re Jones, 830 F.3d 1295, 1297–1305 (11th Cir. 2016) (Rosenbaum and Jill Pryor, JJ., concurring in result).  I add only that my best understanding is that Baptiste's interpretation is contrary to Supreme Court precedent.  In Magwood v. Patterson, 561 U.S. 320, 130 S. Ct. 2788 (2010), the Court interpreted § 2244(b)(1) and (b)(2) in the course of deciding what

94

"second or successive" meant as that phrase is used in those provisions.  561 U.S. at 330–31, 130 S. Ct. at 2796.  Magwood held those provisions "apply only to a 'habeas corpus application under § 2254,' that is, 'an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court.'"  561 U.S. at 332, 130 S. Ct. at 2797 (emphasis omitted) (quoting 28 U.S.C. § 2254(b)(1)).  The Supreme Court thus interpreted "application," as that word is used in §§ 2244(b)(1) and (b)(2) not to refer to a filing seeking authorization to file a second or successive habeas motion, but instead to refer to the actual habeas petition filed in the District Court.

The Supreme Court also explained in Magwood that § 2254's "requirement of custody pursuant to a state-court judgment distinguishes § 2254 from other statutory provisions authorizing relief from constitutional violations—such as § 2255, which allows challenges to the judgments of federal courts."  561 U.S. at 333, 130 S. Ct. at 2797.  And the Supreme Court has many times noted that Congress intended provisions of § 2254 to promote comity and federalism principles.  E.g., Cullen v. Pinholster, 563 U.S. 170, 185, 131 S. Ct. 1388, 1401 (2011).  There does indeed seem to be a reason for treating § 2254 and § 2255 prisoners differently beyond just the textual limitations.  That reason is federalism.  Baptiste's application of § 2244(b)(1) to § 2255 motions based on its "it would be odd" rule makes no mention of this difference.

95

Nonetheless, the judges of this Court are bound to apply Baptiste. The harm it does is not hard to see. For example, I will return briefly to Mr. Hires's case. In re Hires, 825 F.3d at 1297. After Welch, Mr. Hires filed an application seeking authorization to file a second or successive § 2255 motion. Id. at 1298. He wanted to raise the single claim that his ACCA sentence was invalid because it relied on the residual clause. See id. at 1298. The panel denied the application because it concluded Mr. Hires still had three qualifying predicate convictions, including Florida aggravated assault and Florida armed robbery. See id. at 1301–02. Yet as set out above, Hires applied erroneous precedent, which was not binding on the panel because of intervening Supreme Court decisions. Yet even if this Court or the Supreme Court had corrected our mistake in the short time between Welch and the one-year anniversary of Johnson, Mr. Hires would be barred by Baptiste from raising this Johnson claim in a new application. In fact, Mr. Hires did file another application for leave to file a second or successive petition after Welch. This Court denied it, citing Baptiste. In re Hires, No. 16-13813-J, slip op. at 2 (11th Cir. July 19, 2016). Thus, Baptiste ensures that Mr. Hires got one chance, and only one. He does not get another, even though this Court muffed his single opportunity by wrongly deciding his claim.

96

In this way, Baptiste requires a prisoner to bear all consequences of any mistake this Court makes in his case. It would be one thing if this were what AEDPA required of us. But it is not. Baptiste itself was wrongly decided.

To the extent that Baptiste was issued as a work-load management tool for the courts, it is not necessary. As discussed, AEDPA already allows a very narrow path for courts to revisit decisions on authorization applications. See 28 U.S.C. § 2244(b)(3)(E) (barring appeals, petitions for rehearing, and petitions for a writ of certiorari from the grant or denial of authorization to file a second or successive petition). In fact, the only approach this Court has identified is a decision to rehear the case nostra sponte by an en banc court. See In re Lambrix, 776 F.3d 789, 794 (11th Cir. 2015). And in any event, at some point all prisoners will encounter AEDPA's one-year deadline. See Dodd, 545 U.S. at 359, 125 S. Ct. at 2482–83. Thus, Baptiste effectively locks in erroneous holdings to the detriment of prisoners for the foreseeable future.

## V.    A FINAL ROADBLOCK TO RELIEF

I end with the Court's recent refusal to reconsider United States v. Beeman, 871 F.3d 1215 (11th Cir. 2017), denying r'hrg en banc 899 F.3d 1218 (11th Cir. 2018). In Beeman, a panel of this Court held that to prove a Johnson claim, a prisoner had to prove that "it was use of the residual clause that led to the sentencing court's enhancement of his sentence." 871 F.3d at 1221–22. Beeman

97

erred, in my view, when it limited the ways to prove this. Id. at 1224 n.5.

Beeman said this "historical fact" could be proved, among other ways, by pointing

to an express statement by the District Court at sentencing saying it was relying on

the residual clause or by pointing to precedent binding at the time of sentencing

showing that a crime qualified as an ACCA predicate only under the residual

clause. Id. at 1224 & nn.4-5.

Of course, before Johnson District Courts did not say at sentencing which

ACCA clause they relied on because nothing in the law required them to. See

Beeman, 899 F.3d at 1228 (Martin, J., dissenting from denial of rehearing en

banc). There is no exhaustive body of law from this Circuit before Johnson

specifying which among countless offenses from fifty states qualified as violent

crimes only under the residual clause. Also, up until Johnson was decided, few

defendants had reason to suspect the unconstitutionality of the residual clause, so

they had no reason to ask about the source of their enhanced sentence. After all,

the Supreme Court twice "rejected suggestions by dissenting Justices that the

residual clause violates the Constitution's prohibition of vague criminal laws,"

most recently in 2011. Johnson, 135 S. Ct. at 2556 (citing Sykes v. United States,

564 U.S. 1, 131 S. Ct. 2267 (2011) and James v. United States, 550 U.S. 192, 127

S. Ct. 1586 (2007)).

Beeman said its historical-fact test was necessary to preserve the "burden of proof." 871 F.3d at 1221–24. Not so. Other courts require prisoners to prove their claims by demonstrating that their prior conviction could not qualify as an ACCA predicate under the enumerated offenses and elements clauses. See United States v. Geozos, 870 F.3d 890, 896 (9th Cir. 2017); United States v. Winston, 850 F.3d 677, 682 (4th Cir. 2017). This alternative method for carrying the burden of proof in these cases does not lessen the burden in any way. See Beeman, 899 F.3d at 1226-29 (Martin, J., dissenting from denial of rehearing en banc). And we can determine whether a prior conviction counted as an ACCA predicate under the enumerated offenses and elements clauses. As the Supreme Court told us in Descamps v. United States, 570 U.S. 254, 260, 263, 133 S. Ct. 2276, 2283, 2285 (2013), the rules for evaluating predicate offenses under the enumerated offenses and elements clauses are "the same today as they have always been." Id. If the prior conviction could not qualify under these clauses, then of course the District Court must have relied on the residual clause at the prisoner's sentencing.

For those rare prisoners who somehow made it past this Court's review of their authorization applications and through the District Court's front doors, they will face one last, likely fatal, roadblock. District Courts will now decide whether prisoners should get the benefit of Johnson without being able to consider developments in that law intended to help them evaluate who qualifies as a violent

repeat offender.  In the end, of the thousands of inmates who filed authorization applications raising potentially meritorious Johnson claims, very few will ever get a full review of the merits of their claims and even fewer will get relief.  See Williams, 898 F.3d at 1107-08 (Martin, J., specially concurring).

## VI.    TODAY'S DECISION IN CONTEXT

As this review shows, our Court has made many missteps after Johnson.  It all began, in my view, when we started conducting merits review of prisoners' cases when all they wanted was permission to file a second or successive § 2255 motion in District Court.  We compounded that error when we started publishing those decisions, establishing them as precedent.  Then we locked in our mistakes by adopting an interpretation of § 2255, not in keeping with the text of the statute, to prevent prisoners from filing more than one application to file a second or successive petition, even where we wrongly denied their first.  And then we denied those prisoners who managed to get full District Court review of their sentences the ability to use current Supreme Court precedent to show they had been sentenced under the ACCA residual clause.  At every turn, our rulings put obstacles in the paths of prisoners trying to have their sentences reviewed.  These roadblocks mean some prisoners in our Circuit will serve unconstitutional sentences.

100

Today's majority en banc opinion decides that the Supreme Court's decisions in <u>Johnson</u> and <u>Dimaya</u> did not invalidate § 924(c)'s residual clause. Again, I fully join Judge Jill Pryor's dissent explaining why this is wrong. I note with regret that today's decision is but a piece of the precedent I reviewed here. This Court has mishandled the application of <u>Johnson</u> to many people who should have benefitted from it, and we do so again today.

My final observation about the majority's en banc ruling against Ms. Ovalles is to note that the majority opinion makes much of the fact that the government has asked us to abandon the categorical approach in interpreting § 924(c)(3)(B). <u>See</u> Maj. Op. at 29–30. Judge Jill Pryor's dissent explains why this consideration should not factor into our analysis of the statute at issue. Jill Pryor Dissent at 144–45. I would add that, when deciding whether <u>Johnson</u> was retroactive, we paid no heed to the government's concession that it was. <u>See</u> <u>supra</u> at 1–2. If we are going to defer to the government's view, we should do so whether it advocates for or against relief for the prisoner.

I respectfully dissent from the majority opinion, particularly as it evidences this Court's failure to properly review and correct unlawful sentences in the wake of <u>Johnson</u>.

JILL PRYOR, Circuit Judge, with whom WILSON, MARTIN, and JORDAN, Circuit Judges, join, dissenting:

This case is about 18 U.S.C. § 924(c), a frequently charged federal criminal statute, and how one recent Supreme Court case in particular, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), bears on our interpretation of this law. In *Dimaya*, the Supreme Court struck down as unconstitutional a statute, 18 U.S.C. § 16(b), containing the exact same clause as the one in § 924(c) that we must interpret in this case. The words in this clause were not incidental to the Supreme Court's decision; the decision was based on the Court's interpretation of the text. In my view, this should be the end of it. If § 16(b) is void for vagueness under the Due Process Clause, then so is the part of § 924(c) we analyze here. The majority agrees that if the method of statutory interpretation the Supreme Court used in *Dimaya* must be used in this case, then the part of § 924(c) under which appellant Irma Ovalles was convicted and sentenced must be stricken as unconstitutional. But the majority denies that we must use this method of statutory interpretation, even though the Supreme Court has told us that the language of § 16—and, by extension, the language of § 924(c)—"requires" it. *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004).

Before I get to why I think the majority is wrong, let me point out where we agree. We courts are loath to strike down acts of Congress—and appropriately so. When a law passed by Congress may be read to have more than one plausible

102

or "fairly possible" meaning, and one interpretation would cause the law to be upheld as constitutional while another would require it to be struck down, we are "obligated to construe the statute" so as to uphold it. *I.N.S. v. St. Cyr.*, 533 U.S. 289, 300 (2001). This is the canon of constitutional avoidance, or constitutional doubt, as the majority calls it. The Supreme Court recently clarified a significant limitation on the use of this rule of statutory construction, however: "In the absence of more than one plausible construction, the canon simply has no application." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (internal quotation marks omitted). Put differently, what courts may not do is assign a law a strained or unreasonable reading to save it from being declared unconstitutional. I disagree with the majority that the text of § 924(c) plausibly can be interpreted in a way other than how the Supreme Court interpreted the same language in *Dimaya* and *Leocal*. In making the case that it can, the majority is forced to rely on factors outside of the text—which Supreme Court precedent clearly says we may not do. *See Rodriguez*, 138 S. Ct. at 842-43; *see also Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018) (explaining that practical considerations "do not justify departing from [a] statute's clear text").

This case—with all its textual analysis, discussion of canons of statutory construction, and parsing of precedent—may come across like a purely academic exercise. In reality, it is anything but. People who are serving sentences of five

103

years to life under § 924(c) will get no relief from this Court even though the Supreme Court held that an *identically-worded statute* was so vague that its enforcement violated the right to due process under law.  For the reasons I explain in more detail below, I respectfully dissent.[1]

* * *

Section 924(c) makes it a federal crime to use or carry a firearm "during and in relation to any crime of violence or drug trafficking crime" or to possess a firearm in furtherance of such a crime.  18 U.S.C. § 924(c)(1)(A).  A "crime of violence," under the provision at issue in this case, is one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *Id*. § 924(c)(3)(B). The punishment for violating § 924(c) is from five years to life in prison, depending on the nature of the firearm and how it is used, carried, or possessed. When reviewing this same crime of violence definition in another federal statute, 18 U.S.C. § 16(b), in the face of a challenge that it was unconstitutionally vague, the Supreme Court in *Dimaya* applied the "categorical approach" to interpreting the statute.  *See Dimaya*, 138 S. Ct. at 1211 (citing *Leocal*, 543 U.S. at 7).  Relying

---

[1] After *Johnson* was decided but before the Supreme Court issued its decision in *Dimaya*, a panel of this court rejected Ms. Ovalles's constitutional vagueness challenge to the residual clause of § 924(c).  *See Ovalles v. United States*, 861 F.3d 1257 (11th Cir. 2017), *vacated, reh'g en banc granted*, 889 F.3d 1259 (11th Cir. 2018).  I held the mandate because I believed that *Johnson*'s reasoning applied with equal force to § 924(c)(3)(B).  After *Dimaya* was decided, our court *sua sponte* decided to rehear this case en banc.

104

on its precedent, including *Johnson v. United States*, 135 S. Ct. 2551 (2015), which interpreted similar language in another statute, the Armed Career Criminal Act ("ACCA"), the Court said that to qualify as a crime of violence, the crime must be one that categorically—that is, in the "ordinary case" rather than in the particular way that the defendant committed it—meets the statutory definition. When the court applied the categorical approach to § 16, it struck subsection (b) of the statute as void for vagueness. *Dimaya*, 138 S. Ct. at 1215-16.

No one disputes that if we must use the categorical approach to interpret § 924(c)(3)(B), the statute is unconstitutional. *See* Maj. Op. at 2. The majority argues that we should employ the canon of constitutional avoidance to save § 924(c)(3)(B) because the statute can plausibly be interpreted to incorporate a "conduct-based approach"—one that looks to the "real-world facts of the defendant's offense" instead of how the law defines the crime or what conduct is entailed in the ordinary case. Maj. Op. at 3. The problem with the majority's approach is that its alternative way of reading § 924(c)(3)(B) to permit a conduct-based approach is simply not plausible when we remain faithful to the text of the statute.

So how does the majority get there? Sifting through Supreme Court cases applying the categorical approach to ACCA and § 16, the majority identifies six factors that led the Supreme Court to apply the categorical approach in those

105

instances.  It then applies those factors to § 924(c)(3)(B) and—finding many of

them missing or inapplicable—determines that this statute plausibly could be read

differently.  But only three of the majority's factors concern the text.  And the

majority's analysis of its factors, both textual and extra-textual, is in my view

deeply flawed.  If we follow what the Supreme Court said about the *text* of the

other two statutes and apply it to § 924(c) as a whole and in context, we find that

§ 924(c)(3)(B) presents an even stronger case for applying the categorical approach

than the other statutes—so strong that no other reading is plausible.

## I.

To understand why the approach the Supreme Court used in *Dimaya*,

*Johnson*, and other precedent interpreting similarly-worded legislation controls the

outcome of this case, some background on that precedent and the other legislation

is unavoidable.  In this section I first discuss three statutes, all of which Congress

enacted or revised as part of an overhaul of the criminal code in the mid-1980s:

the statute at issue here, 18 U.S.C. § 924(c), particularly its definition of "crime of

violence"; a definition of "crime of violence" found in 18 U.S.C. § 16 that is

applied in numerous criminal and noncriminal contexts; and ACCA, 18 U.S.C.

§ 924(e).  Next I review a line of Supreme Court and circuit decisions that have

explained the necessity of construing these statutes using the categorical approach.

Finally, I discuss the decisions striking as unconstitutionally vague similar

language in ACCA and identical language in § 16, as well as decisions framing the

limits of the canon of constitutional avoidance. These decisions bear directly on

whether § 924(c)(3)(B) is unconstitutionally vague.

## A.    The Statutes

In the mid-1980s, Congress, as part of a movement to get tougher on crime,

passed the Comprehensive Crime Control Act of 1984 (the "CCCA"), which

overhauled the federal criminal code for the first time in over half a century. Pub.

L. No. 98-473, 98 Stat. 1976 (1984); *see also* S. Rep. No. 98-225, at 2 (1983)

(discussing the CCCA's purpose of "restor[ing] a proper balance between the

forces of law and the forces of lawlessness"). The CCCA "broadly reformed the

federal criminal code in such areas as sentencing, bail, and drug enforcement, and

. . . added a variety of new violent and nonviolent offenses." *Leocal*, 543 U.S. at 6.

The CCCA either enacted or revised all three of the statutes that are relevant to this

case: § 924(c), § 16, and ACCA. *See* Pub. L. No. 98-473, 98 Stat. 2136, 2138,

2185 (1984); *Leocal*, 543 U.S. at 6 (explaining § 16's enactment as part of the

CCCA); *United States v. Hill*, 863 F.2d 1575, 1579 (11th Cir. 1989) ("The

genealogy of [§] 924 traces back to the Armed Career Criminal Act of 1984, which

was enacted as a part of the Comprehensive Crime Control Act of 1984."),

*abrogated on other grounds by Taylor v. United States*, 495 U.S. 575 (1990); *infra*

note 2 (describing § 924(c)'s revision as part of the CCCA).

107

The statute at issue here, 18 U.S.C. § 924(c), revised in the CCCA,[2]

criminalizes and imposes mandatory enhanced sentences for using or carrying a

firearm "during and in relation to any crime of violence or drug trafficking crime"

or possessing a firearm in furtherance of such a crime.  18 U.S.C. § 924(c)(1)(A).

The "crime of violence or drug trafficking crime" must be committed "during"—

that is, at the same time as—the firearm use or possession.  "[D]rug trafficking

crime" is defined in § 924(c) as "any felony punishable under the Controlled

Substances Act" and a couple of other federal drug laws.  *Id.* § 924(c)(2).

"[C]rime of violence"—the focus of our inquiry—has a two part definition:

> For purposes of this subsection the term "crime of violence" means an
> offense that is a felony and—
>
> (A)    has as an element the use, attempted use, or threatened use of
>        physical force against the person or property of another, or
>
> (B)    that by its nature, involves a substantial risk that physical force
>        against the person or property of another may be used in the
>        course of committing the offense.

*Id.* § 924(c)(3).  Subsection (c)(3)(A) of this definition is known as the "elements

clause," and subsection (c)(3)(B) is known as the "residual clause."  This case is

about the residual clause.  The residual clause acts as a catchall for violent crimes

---

[2] "Prior to 1984, § 924(c) provided for the imprisonment of one who uses a firearm to commit any felony.  In 1984, as part of the [CCCA], Congress revised that rule and provided that the firearm penalty should apply only to those who engaged in a crime of violence."  *United States v. Cruz*, 805 F.2d 1464, 1470 (11th Cir. 1986) (citations and internal quotation marks omitted).  By revising § 924(c), Congress narrowed the text to fit the manner in which prosecutors typically had employed the statute since its enactment.  *Id.* at 1471.

108

that do not meet the elements clause definition, so long as those crimes satisfy the residual clause's criteria.

Section 924(c) is one of several CCCA statutes to address crimes of violence. Another is 18 U.S.C. § 16, which "provide[s] . . . a general definition of the term 'crime of violence' to be used throughout the [CCCA]," including "for defining the elements of particular [criminal] offenses." *Leocal*, 543 U.S. at 6. Like § 924(c), until recently §16 defined "crime of violence" using both an elements clause and a residual clause:

The term "crime of violence" means—

(a)    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b)    any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. Section 16's residual clause, § 16(b), which is "essentially identical to § 924(c)(3)'s residual clause at issue here," Maj. Op. at 10, was struck down as unconstitutional in *Dimaya*.

Since passage of the CCCA, § 16's general "crime of violence" definition "has . . . been incorporated into a variety of statutory provisions, both criminal and noncriminal." *Leocal*, 543 U.S. at 7. Section 16's definition also was incorporated into provisions of the Immigration and Nationality Act ("INA"), including a provision that permits deportation of a noncitizen convicted of an "aggravated

109

felony," which includes any "crime of violence" as defined in § 16.  8 U.S.C. § 1227(a)(2)(A)(iii); *see id.* § 1101(a)(43)(F).  I discuss this provision, which was the subject of the Supreme Court's decision in *Leocal*, in more detail later.  But I pause briefly to note that the majority focuses solely on § 16's incorporation into the INA, qualifying as such its references to § 16(b) at least half a dozen times, and omitting reference to all of the other ways in which § 16 is incorporated into the federal code.  The effect of this narrowing is that the majority focuses myopically on § 16 as applied to *prior* crimes, rather than as it is incorporated into offenses with other contemporaneously occurring elements.  The majority's distinction is an artificial one because we are required to "interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context."  *Leocal*, 543 U.S. at 11 n.8.

In fact, for the vast majority of instances where § 16's definition is incorporated into the criminal code, the "crime of violence" element is committed at the same time as the offense's other elements.  For example, 18 U.S.C. § 25 criminalizes and provides penalties for an adult "who intentionally uses a minor to commit a crime of violence," as that term is defined in § 16.  A person who violates § 25 commits the "crime of violence" element at the same time as the

110

offense's other elements.[3]  And so many incorporations of § 16 function very similarly to the incorporation of the "crime of violence" definition in § 924(c)(3)— the elements and residual clauses—into § 924(c)(1)—which contains the offense's other elements:  using, carrying, or possessing a firearm during (at the same time as) and in relation to (to facilitate) the predicate crime of violence or drug trafficking crime.[4]

---

[3] Other incorporations of § 16 in this manner abound.  *See, e.g.*, 18 U.S.C. § 119(a)(1) (criminalizing knowingly making public restricted personal information about certain persons performing official duties "with the intent to threaten, intimidate, or incite the commission of a crime of violence against that covered person" or a member of the person's family); 18 U.S.C. § 842(p)(2)(A) (forbidding the teaching or demonstrating of how to make an explosive device with the intent that the teaching "be used for, or in furtherance of, an activity that constitutes a Federal crime of violence"); 18 U.S.C. § 1952(a)(2) (criminalizing interstate travel with intent to "commit any crime of violence to further any unlawful activity"); 18 U.S.C. § 1956(a)(1), (c)(7)(B)(ii) (incorporating § 16's crime of violence definition into the money laundering statute); 18 U.S.C. § 1959(a)(4) (enhancing penalties for violent crime in aid of racketeering where a defendant threatens to commit a crime of violence); 18 U.S.C. § 2261(a)(1) (criminalizing interstate travel to commit a crime of violence against a domestic partner); 18 U.S.C. § 3663A(c)(1)(A)(i) (incorporating § 16's crime of violence definition into the Mandatory Victims Restitution Act, which requires an award of restitution if the defendant is convicted of a crime of violence).  Section 16 also is incorporated into the definitions of other noncriminal statutes.  *See, e.g.*, 34 U.S.C. § 30503(a)(1)(A) (providing, in the federal hate crimes statute, federal assistance for the prosecution of any "crime of violence"); 34 U.S.C. § 12361(d)(2)(A) (incorporating § 16's crime of violence definition into the definition of "crime of violence motivated by gender" in the Violence Against Women Act).

[4] I use "elements" here to describe the set of facts and circumstances the government must prove to obtain a conviction.  I recognize that the Supreme Court has characterized § 924(c) as having only two elements.  *See, e.g.*, *Smith v. United States*, 508 U.S. 223, 228 (1993) ("First, the prosecution must demonstrate that the defendant 'use[d] or carrie[d] a firearm.'  Second, it must prove that the use or carrying was 'during and in relation to' a 'crime of violence or drug trafficking crime.'" (quoting 18 U.S.C. § 924(c))).  But it is beyond dispute that, broken down, § 924(c) requires the government to prove five separate facts:  the defendant's (1) knowing (2) use or carrying of a firearm, (3) during, (4) and in relation to (5) a crime of violence or drug trafficking crime.  *See id.* at 238 (explaining that the government must prove both that the firearm was knowingly used or carried "during" *and* "in relation to" the predicate offense); 11th Cir. Pattern Jury Instructions 35.2 (18 U.S.C. § 924(c)(1)(A)).

Yet another (and for our purposes, the last) CCCA statute to address crimes of violence is ACCA.  ACCA, enacted as part of the CCCA, imposes a mandatory 15-year term of imprisonment on a person convicted of being a felon in possession of a firearm who previously was convicted of three serious drug offenses, violent felonies, or both.  ACCA defines "violent felony" like this:

> [A]ny crime punishable by imprisonment for a term exceeding one year . . . that—
>
> (i)    has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)   is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

*Id.* § 924(e)(2)(B).  Like § 924(c) and § 16, ACCA has an elements clause, subsection (i), and it had—until the Supreme Court struck it down as unconstitutionally vague—a residual clause, which in subsection (ii) began with "or otherwise . . . ."  The balance of subsection (ii) is known as the "enumerated crimes clause."

Section 924(c), § 16, and ACCA, all either enacted or revised as part of one comprehensive piece of legislation, are notably similar in their text.  All three statutes, until the majority's decision today, have been analyzed using the same "categorical approach."  I discuss this approach in the next subsection.

112

## B.    The Categorical Approach that Has Governed All Three Statutes

When Congress passed the CCCA, in which it revised § 924(c) to include a "crime of violence" definition and enacted § 16 and ACCA, it did so with the expressed intention to capture certain crimes—not conduct—as crimes of violence. *See generally Taylor*, 495 U.S. at 581-90, 601; *see also infra* at 40-41 (describing Senate Report expressing Congress's intent to capture certain "statutes," such as the federal bank robbery statute, in § 924(c)'s definition of "crime of violence"). The Supreme Court gave effect to Congress's expressed intent when the Court interpreted ACCA, which, again, imposes enhanced sentences when a defendant has been convicted of prior crimes that meet ACCA's definition of "violent felony."   The Court explained that ACCA "*always* has embodied a categorical approach to the designation of predicate offenses." *Taylor*, 495 U.S. 588 (emphasis added).[5]  To decide which prior crimes qualify as predicate offenses, the Supreme Court said, courts must look not to whether the defendant's actual conduct in committing the crime was violent, but rather to whether the statute creating the crime described a violent offense.  *See id.* at 600.

---

[5] The majority therefore is incorrect when it says that the Supreme Court "conceived" the categorical approach in *Taylor*, *see* Maj. Op. at 20, because in *Taylor* the Supreme Court explained that the statute "always" has embodied the categorical approach.  In other words, the categorical approach is not a pure judicial creation; rather, it is a judicial explanation of congressional intent.

113

When in *Taylor* the Supreme Court first described the categorical approach, it did so in the context of ACCA's enumerated crimes clause. The Court based its holding—that a categorical, rather than a factual or conduct-based, approach must be used—primarily on ACCA's text as a whole, but also on ACCA's legislative history and because construing it with a conduct-based approach would lead to practical problems in criminal proceedings. The Court first explained that ACCA's text "generally supports" a categorical approach because it refers to "convictions," not commissions of an offense, and because its elements clause refers to a statute's "element[s]," not to any particular facts or conduct. *Id.* "Read in this context," the Court said, the enumerated crimes clause should be read categorically. *Id.* at 600-01. Second, the Court noted, "the legislative history of [ACCA] shows that Congress generally took a categorical approach to predicate offenses." *Id.* at 601. Third, the Court observed that "the practical difficulties and potential unfairness of a factual approach are daunting." *Id.* Specifically, the Court worried that a conduct-based approach would lead to mini-trials where the government would seek to prove to a jury, and the defense would seek to rebut, the circumstances of prior—maybe even long prior—offenses. *Id.* at 601-02. The Court also doubted that a sentencing court, rather than a jury, would be able to make these findings because doing so might draw a Sixth Amendment challenge. *Id.* at 602.

114

After *Taylor*, the Supreme Court held that the categorical approach must be applied to ACCA's elements and residual clauses as well. *See Curtis Johnson v. United States*, 559 U.S. 133, 137 (2010) (applying the categorical approach to ACCA's elements clause); *James v. United States*, 550 U.S. 192, 208 (2007), *overruled on other grounds by Johnson*, 135 S. Ct. at 2551 (applying the categorical approach to ACCA's residual clause). As applied to a residual clause, essentially a catchall provision, the Court said that the categorical approach requires courts to decide "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents" a risk that satisfies the risk standard in the statute—in ACCA, "serious potential risk." *James* 550 U.S. at 208; *see Dimaya*, 138 S. Ct. at 1211 (explaining that the "ordinary case" analysis applies to § 16(b) such that courts must decide whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a risk that satisfies the risk standard in § 16(b)—"a substantial risk that physical force . . . may be used").

In contrast to its multi-factored reasoning in *Taylor*, when the Supreme Court first construed § 16, it applied the categorical approach based *solely* on the text of the statute, without reference to legislative history or practical concerns. And it said this construction was not merely optimal, but required. Specifically, in *Leocal*, a unanimous Supreme Court explained that "[i]n determining whether the petitioner's conviction falls within the ambit of § 16, the statute directs our focus to

115

the 'offense' of conviction." *Leocal*, 543 U.S. at 7 (construing § 16 as incorporated into the INA). The term "offense," the Court noted, was present in both § 16(a), the elements clause, and § 16(b), the residual clause. Additionally, for the residual clause, the Court emphasized that the "offense" was one that "*by its nature*" involved a substantial risk that physical force may be used. *Id.* (emphasis in original). The Supreme Court said, in no uncertain terms, that "[t]his language *requires* us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] petitioner's crime." *Id.* (emphasis added). This bears repeating: unanimously, and based on the statute's *text alone*, the Supreme Court said that the crime of violence definition in § 16 *requires* a categorical approach. As I mentioned above, the Court also noted that "[a]lthough [it was construing] § 16 in the deportation context, § 16 is a criminal statute, and it has both criminal and noncriminal applications." *Id.* at 11 n.8. The Court explained that it was required to "interpret the statute consistently, whether [it] encounter[ed] its application in a criminal or noncriminal context." *Id.*

When it came to construing § 924(c)(3), in *United States v. McGuire* this Court used the same textual analysis to explain why the categorical approach must be used. 706 F.3d 1333, 1336-37 (11th Cir. 2013). Justice O'Connor, sitting by designation with our Court, explained:

> We employ this categorical approach because of the statute's terms:
> It asks whether [the defendant] committed "an offense" that "has *as*

116

*an element* the use, attempted use, or threatened use of physical force against the person or property of another," or that "*by its nature*, involves a substantial risk that physical force against the person or property of another may be used."

*Id.* (emphasis in original) (quoting 18 U.S.C. § 924(c)(3)).  *McGuire* held that § 924(c), just like § 16, *by its terms* required a categorical approach.  Since *McGuire*, our Court has continued to apply the categorical approach to § 924(c)(3)(B) until today, and we have been in good company doing so.  All but two circuits apply the categorical approach to § 924(c).[6]

## C.    *Johnson*, *Dimaya*, **and the Role of the Canon of Constitutional Avoidance**

The majority agrees that if the categorical approach must be used, then based on *Dimaya* § 924(c)'s residual clause is unconstitutionally vague.  The question is whether the Supreme Court's decisions—spanning from 1990 to 2018—that the categorical approach must be applied to language like § 924(c)'s can be side-stepped due to the canon of constitutional avoidance.  In this section I discuss the Supreme Court's reasoning in these decisions.  I also discuss the evolution of the

---

[6] *See United States v. Taylor*, 848 F.3d 476, 491 (1st Cir. 2017); *United States v. Fuertes*, 805 F. 3d 485, 498 (4th Cir. 2015); *United States v. Buck*, 847 F.3d 267, 274 (5th Cir. 2017); *United States v. Gooch*, 850 F.3d 285, 290 (6th Cir. 2017); *United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016); *United States v. Prickett*, 839 F.3d 697, 698 (8th Cir. 2016); *United States v. Mendez*, 992 F.2d 1488, 1490 (9th Cir. 1993); *United States v. Salas*, 889 F.3d 681, 686 (10th Cir. 2018); *United States v. Eshetu*, 898 F.3d 36, 37 (D.C. Cir. 2018); *but see United States v. Barrett*, __ F.3d ___, 2018 WL 4288566 (2d Cir. Sept. 10, 2018) (applying a conduct-based reading of § 924(c)(3)(B) to uphold it); *United States v. Robinson*, 844 F.3d 137 (3d Cir. 2016) (holding, prior to *Dimaya* that a categorical approach should not be applied to § 924(c)).

canon of constitutional avoidance in this setting and how a minority of the Justices have advocated unsuccessfully for its use to save ACCA's and § 16(b)'s residual clauses.

After wrestling with ACCA's residual clause on several occasions, the Supreme Court in *Johnson* struck it as void for vagueness. 135 S. Ct. at 2557. The Court's majority explained that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." *Id.* "In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* at 2558. The Court concluded, "[b]y combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* It was, therefore, the necessity of applying the categorical approach that rendered ACCA's residual clause unconstitutionally vague.

Justice Alito dissented in *Johnson*.  He argued that the Court should have employed the canon of constitutional avoidance to save ACCA's residual clause by adopting a conduct-based approach like the majority adopts here.  *Id.* at 2578 (Alito, J., dissenting).  Justice Alito noted that ACCA's residual clause referred to "*conduct* that presents a serious potential risk of physical injury to another" and therefore plausibly could refer "to things done during the commission of an offense that are not part of the elements needed for conviction."  *Id.* (emphasis added).  The majority rejected his approach, noting that the government had not urged the Court to abandon the categorical approach and explaining that "*Taylor* had good reasons to adopt" it, including the statute's text and practical problems resulting from a conduct-based approach.  *See id.* at 2562 (majority opinion).

When *Johnson* was decided, though, it was an open question whether extra-textual factors—such as the government's concessions and practical considerations—could play a role in the decision whether to invoke the canon of constitutional avoidance to save a statute.  In *Zadvydas v. Davis*, the Supreme Court construed an INA statute providing that a noncitizen under an order of removal whom the government has not removed within the 90-day statutory removal period "'may be detained beyond the removal period.'"  533 U.S. 678, 682 (2001) (quoting 8 U.S.C. § 1231(a)(6)).  The Court, concerned that indefinite detention would raise serious due process concerns, read a limitation into the

statute:  the noncitizen could only be detained for a reasonable time.  *Id.* at 682, 689-90.  To define the reasonable time limitation on detention, a presumptive six months, the Court looked to extra-textual factors including Congressional intent, practical difficulties in obtaining removal in a shorter time, and the need to promote uniform administration in the federal courts.  *Id.* at 701.  So, at the time *Johnson* was decided, *Zadvydas* could have been read to permit considerations outside the text to play a role in whether the court should invoke the canon of constitutional avoidance.  *See, e.g.*, *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *reversed by Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018).

This year, however, the Supreme Court put any lack of clarity in *Zadvydas* to rest.  In *Rodriguez*, the Court clarified that "[t]he canon of constitutional avoidance comes into play *only* when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.  In the absence of more than one plausible construction, the canon simply has no application."  *Rodriguez*, 138 S. Ct. at 842 (emphasis added) (internal quotation marks and citation omitted).  The Court characterized its prior holding in *Zadvydas* as "a notably generous application of the constitutional-avoidance canon."  *Id.* at 843.  In *Zadvydas*, the *Rodriguez* majority explained, the Court had "detected ambiguity" in the statute's use of "may be detained" and only then looked to extra-textual considerations to determine a limitation on the length of detention that

120

would avoid a potential due process problem. *Id.* at 834. After *Rodriguez*, there can be no doubt that the *only* consideration relevant to the constitutional avoidance question is the text. Only if the text is ambiguous can the canon of constitutional avoidance be employed. And only if the canon of constitutional avoidance is employed can we examine extra-textual considerations.

Later in the term, the Supreme Court struck § 16's residual clause as unconstitutionally vague. *See Dimaya*, 138 S. Ct. at 1216 (majority opinion).[7] The Court reasoned that § 16(b), like ACCA's residual clause, first "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk." *Id.* at 1215. And "[n]othing in § 16(b) helps courts to perform that task, just as nothing in ACCA did." *Id.* Second, § 16(b) creates "uncertainty about the level of risk that makes a crime 'violent.'" *Id.* Section 16(b)'s "substantial risk" standard, the Supreme Court explained, is no more determinate than ACCA's "serious potential risk" standard. *Id.* Combined, the categorical approach and uncertain risk standard

---

[7] *Dimaya* resulted in a somewhat fractured decision. Justice Kagan, writing for a majority of the Court, struck § 16(b) as unconstitutionally vague. 138 S. Ct. at 1213-16, 1218-23 (majority opinion). She also wrote for a plurality of the Court to explain why the categorical approach must apply to that statute. *See id.* at 1216-18 (plurality opinion). Justice Gorsuch, who supplied the fifth vote to Justice Kagan's majority opinion, wrote separately to explain his view of the vagueness doctrine and noted that that he "proceeded on the premise" that the categorical approach applied to § 16(b) rather than "wip[ing] the precedential slate clean." *Id.* at 1232-33 (Gorsuch, J., concurring in part and concurring in the judgment). Chief Justice Roberts, in a dissent joined by Justices Kennedy, Thomas, and Alito, argued that § 16(b), read categorically, "does not give rise to the concerns that drove the Court's decision in *Johnson*" and therefore was constitutional. *Id.* at 1234-41 (Roberts, C.J., dissenting). Justice Thomas, joined by Justices Kennedy and Alito, argued in a separate dissent that the Court should have employed the canon of constitutional avoidance to save the statute. *Id.* at 1254-59 (Thomas, J., dissenting).

rendered § 16(b) more unpredictable and more arbitrary than due process can tolerate. *Id.* at 1215-16.

Again, as in *Johnson*, a dissent argued that the Court should have employed the canon of constitutional avoidance to save the residual clause. *Id.* at 1254-59 (Thomas, J., dissenting). Justice Thomas, joined by Justices Kennedy and Alito, announced that "[t]he text of § 16(b) does not require a categorical approach," *id.* at 1254, despite *Leocal*'s holding that the text of § 16(b) "requires" a categorical approach. *Leocal*, 543 U.S. at 7. A majority of the Justices—the plurality of four Justices plus Chief Justice Roberts in a separate dissent—rejected Justice Thomas's view that § 16(b) is amenable to more than one reading. The plurality, now constrained by *Rodriguez*, explained why the text of § 16(b) required a categorical approach: by referring to an "offense" that "by its nature" involves the risk that force may be used, said the plurality, the statute's text "demands" a categorical approach. *Id.* at 1217 (plurality opinion). Noting *Johnson*'s additional reasons for declining to adopt a conduct-based approach—including the government's concession that the categorical approach applied and potential practical problems with a conduct-based approach—the plurality explained that none of these things mattered because "§ 16(b)'s text creates no draw." *Id.* (citing *Leocal*, 543 U.S. at 7). The plurality concluded that "[t]he upshot of all of this *textual* evidence is that § 16's residual clause—like ACCA's, *except still more*

122

*plainly*—has no plausible fact-based reading."[8]  *Id.* at 1218 (emphasis added)

(internal quotation marks omitted); *see id.* at 1235-36 (Roberts, C.J., dissenting)

(reaffirming the validity of the Supreme Court's unanimous holding in *Leocal* and

applying the categorical approach to § 16(b)).

## II.

Section 924(c)'s residual clause is void for vagueness for precisely the same

reasons that its twin, § 16(b), is void for vagueness.  First, the categorical

approach—which the Supreme Court said must be applied to text identical to

§ 924(c)(3)(B)—requires courts to imagine the ordinary case of an offense.  And

"[n]othing [in the statute] helps courts to perform that task."  *Dimaya*, 138 S. Ct. at

1215 (majority opinion).  Second, the "substantial risk" standard in § 924(c)(3)(B)

is indeterminate at best, creating "uncertainty about the level of risk that makes a

crime 'violent.'"  *Id.*  Combined, these two features of § 924(c)(3)(B) create

"'more unpredictability and arbitrariness than the Due Process Clause tolerates.'"

*Id.* at 1216 (quoting *Johnson*, 135 S. Ct. at 2561).

The majority, in an attempt to salvage § 924(c)'s residual clause, tosses out

the categorical approach in the name of constitutional avoidance.  The majority

---

[8] Although *Dimaya* interpreted § 16(b) as incorporated into the INA specifically, the plurality expressly acknowledged that, "as we have said before, § 16(b) is a criminal statute with applications outside the immigration context," so there was "no ground for discovering a novel interpretation of § 16(b)," as applied to the INA.  138 S. Ct. at 1218 (plurality opinion).

acknowledges that the categorical approach must be applied to the definitions of drug trafficking crime and of crime of violence in § 924(c)(3)'s *elements* clause, but holds that a conduct-based approach at least plausibly applies to the definition of crime of violence in § 924(c)(3)'s residual clause.  In adopting a conduct-based approach to § 924(c)(3)(B)—and thus overruling in part our decision in *McGuire*—the majority contorts the plain text of the statute and reads similar structure and language differently within the same statute.  The majority does so in disregard of the Supreme Court's unequivocal statement in *Leocal* that language identical to § 924(c)(3)(B) *requires* a categorical approach—that is, it cannot plausibly be read another way.  And the majority does so in disregard of the Supreme Court's admonition that in deciding whether to employ the canon of constitutional avoidance we must look to a statute's text alone.  The majority effectively rewrites the statute to avoid having to strike it down.

To reach this result, the majority distills from *Taylor* and its progeny a multi-factor test for deciding whether we should apply the categorical approach to § 924(c)(3)(B).  Only three of the majority's six factors are text-based, and they appear seemingly on an even playing field with three other extra-textual "considerations."  Maj. Op. at 27-28.  Even if these extra-textual considerations mattered before *Rodriguez*, they do not matter now.  What we know now is that if a purely textual analysis leads to only "one plausible construction, the canon [of

124

constitutional avoidance] simply has no application." *Rodriguez*, 138 S. Ct. at 842 (internal quotation marks omitted). Below I explain why the majority's textual analysis, contained in three of its six factors, is incorrect and clearly in contravention of Supreme Court precedent. I then explain why the majority's explanation of its other extra-textual factors—which cannot be relevant factors at all—is flawed as well.

A.      **The Text of Section 924(c) Permits Only One Reading:  that the Categorical Approach Is Required.**

The question we must ask in this case is whether the text of § 924(c)(3)(B) plausibly can be read to support a conduct-based approach rather than a categorical one. If not, the inquiry ends, and § 924(c)(3)(B) is unconstitutional. The answer is that it cannot. Section 924(c)'s text, read as a whole, in its statutory context, and with the Supreme Court's guidance, cannot plausibly be read to permit a conduct-based approach to the residual clause.

First of all, the Supreme Court has already told us that a categorical approach is the only approach we can take to this text. In *Leocal*, the Supreme Court unanimously explained that the text of § 16(b)—"identical" to the language in § 924(c)(3)(B), Maj. Op. at 10, 16——"*requires* us to look to . . . the nature of the offense of conviction, rather than to the particular facts relating to [the] crime" because the text includes "offense" in conjunction with "by its nature." *Leocal*, 543 U.S. at 7 (emphasis added); *see Dimaya*, 138 S. Ct. at 1217-18 (plurality

125

opinion) (describing why § 16(b)'s language—specifically, "offense that is a felony and . . . that by its nature"—"has no plausible fact-based reading" (internal quotation marks omitted)); *id.* at 1235-36 (Roberts, C.J., dissenting) (reaffirming the validity of the Supreme Court's unanimous holding in *Leocal* that the categorical approach must be used to interpret § 16(b)).  The Supreme Court did not say that this text merely suggests a categorical approach, nor did it leave room for us to conclude that the text is amenable to more than one reading.  Instead, the Court said the text *requires* a categorical approach.  *Leocal*, 543 U.S. at 7; *see also Dimaya*, 138 S. Ct. at 1218 (plurality opinion) ("The upshot of all of this textual evidence is that § 16's residual clause—like ACCA's, except still more plainly— has no plausible fact-based reading." (internal quotation marks omitted)).[9]  Text cannot both require a categorical approach and also plausibly support a conduct-based approach.

_____

[9] When the majority says that "[o]nly a plurality of the [Supreme] Court concluded that [§ 16(b)] actually *requires* the categorical approach," Maj. Op. at 15, it fails to account for *Leocal*.  No doubt realizing this shortcoming, the majority rationalizes that "the *Leocal* Court didn't provide a detailed explanation" when it held that § 16(b)'s language requires a categorical approach.  Maj. Op. at 23.  But the Court did provide an explanation—a textual one.  *See supra* at 14-15.  We are not free to ignore the Supreme Court's decisions, whatever their level of detail.  Nor, for that matter, are we free to ignore *Leocal* even if we might question whether its unanimous proclamation that § 16 requires a categorical approach remains good law in light of *Dimaya*'s invalidation of § 16(b).  "The [Supreme] Court has told us, over and over again, to follow any of its decisions that directly applies in a case, even if the reasoning of that decision appears to have been rejected in later decisions and leave to that Court the prerogative of overruling its own decisions."  *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012) (internal quotation marks omitted).

126

The reasoning behind *Leocal*'s holding applies with at least equal force to § 924(c). To recap, § 924(c)'s "crime of violence" definition looks like this:

> For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). "[O]ffense that is a felony," language that required a categorical approach to § 16(b), is part of the definition of "crime of violence" in both the residual clause *and* the elements clause, and no one disputes that the latter requires a categorical approach. "[W]here . . . Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations." *Nijhawan v. Holder*, 557 U.S. 29, 39 (2009). Since "offense that is a felony" in the elements clause is categorical language, the same words in the adjoining residual clause must be, too. And we know from *Leocal* that "by its nature," present in § 16(b) and in § 924(c)(3)(B), is categorical language. *Leocal*, 543 U.S. at 7.

There is additional textual support for a categorical reading of § 924(c)(3)(B) beyond the "crime of violence" definition. The categorical approach also applies, without a doubt, to the other possible predicate offense, a

127

"drug trafficking crime." *See* 18 U.S.C. § 924(c)(2). That the categorical approach applies to the drug trafficking crime definition as well as the elements clause's crime of violence definition is evidence that the same approach must also apply to the residual clause's crime of violence definition. *Nijhawan*, 557 U.S. at 39; *see U.S. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." (internal quotation marks and citation omitted)).

The text of § 924 as a whole further supports a categorical reading of § 924(c). Section 924 also contains ACCA, § 924(e). The statutes are unique in establishing mandatory minimum sentences for federal firearms offenses. *See* U.S. Sentencing Comm'n, *Mandatory Minimum Penalties for Firearms Offenses in the Federal Criminal Justice System* 2 (2018). The Supreme Court has, without exception, construed ACCA (including, when it was in effect, its residual clause) to require a categorical approach. Taking an even broader look at the statutory scheme, we know that § 924(c), ACCA, and § 16 all were created or amended as part of the same legislative action, the CCCA. The use of very similar residual clauses in these statutes is more evidence still that Congress intended the same categorical meaning for § 924(c)(3)(B). *See Rodriguez*, 138 S. Ct. at 845 (rejecting construction of an immigration statute that was "incompatible with the rest of the

128

statute" and explaining that only one reading of the statute "makes sense in the context of the statutory scheme as a whole").

None of the majority's three text-based factors convinces me that § 924(c)(3)(B) plausibly can be read to support a conduct-based approach. Nor am I persuaded that we can divine the meaning of one clause of a statute by breaking it down word by word and isolating those words from their surrounding context. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 2, at 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). Indeed, by separating the text of § 924(c) into three "considerations" that are hardly separate ideas, the majority performs a sleight of hand that, the Supreme Court has told us on numerous occasions, has no place in textual analysis. *See, e.g.*, *Rodriguez*, 138 S. Ct. at 845. Even picked apart, though, the words do not support majority's interpretation.

The majority's three textual considerations or factors are: "the text of [ACCA's] operative provisions focused not on conduct, but rather on 'convictions'—and thus . . . solely on formal legal elements" (factor 2 of the majority's six-factor test); ACCA's and § 16's "definitional provisions used terms and phrases like 'offense,' 'felony,' and 'by its nature,' which . . . pointed toward a categorical (rather than conduct-based) inquiry" (factor 3); and "those statutes

lacked any reference to the underlying crime's commission or circumstances" (factor 4). Maj. Op. at 27.  I address them in turn.

### 1. The "Operative Provision" of Section 924(c) Does Not Permit a Conduct-Based Approach to the Residual Clause.

In its analysis of § 924(c)'s text, the majority first notes that what it deems *ACCA's* "operative provision"—"[a]ny person who violates [18 U.S.C. § 922(g)] and has three previous convictions . . . for a violent felony or a serious drug offense, or both"—refers to "convictions" rather than underlying conduct, yet there is no reference to "convictions" in § 924(c)'s "operative provision," § 924(c)(1). Rather, the majority says, § 924(c)(1) "refers to *conduct*," Maj. Op. at 30-31 (emphasis in original), pointing to the language that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," *id.* (quoting § 924(c)(1)(A)). According to the majority, this language offers strong support for applying a conduct-based approach to the statute's residual clause.

I find the majority's argument unpersuasive for at least two reasons.  First, setting aside for now comparisons to other statutes, the language in § 924(c)(1) that the majority insists "refer[s] exclusively to conduct," Maj. Op. at 37, cannot bear the weight the majority places on it.  Section 924(c)(1) makes it a federal crime to use, carry, or possess a firearm "during and in relation to" one of *three* categories of crimes:  drug trafficking crimes, elements-clause crimes of violence, or residual-

130

clause crimes of violence. If the "during and in relation to" language supported a conduct-based approach to the residual clause, it necessarily would do the same for the drug trafficking and elements-clause definitions. After all, the same words— "during and in relation to"—must be ascribed the same meaning for each category of crime listed in § 924(c), whether a drug trafficking crime, an elements- clause crime of violence, or a residual-clause crime of violence. "To give these same words"—["during and in relation to"]—"a different meaning for each category"— [the elements- and residual-clause definitions of crime of violence and the drug trafficking crime definition]—"would be to invent a statute rather than interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005). The Supreme Court emphatically has instructed that we cannot avoid a constitutional problem by inventing or reinventing a statute. *Rodriguez*, 138 S. Ct. at 843 ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases.").

Second, and relatedly, by comparing § 924(c)(3)(B) to ACCA the majority is in some sense setting up a straw man, because ACCA is not the best analogue to § 924(c)(3); § 16 is. As the *Dimaya* plurality noted, § 16's text, even "more plainly" than ACCA's, requires a categorical approach. *Dimaya*, 138 S. Ct. at 1218 (plurality opinion); *see id.* at 1235-36 (Roberts, C.J., dissenting) (reaffirming *Leocal*). So to compare and contrast ACCA's language with § 924(c)'s is a bit

131

disingenuous when a more similar statute exists.  The majority does not look to

§ 16(b) when examining this textual factor, perhaps because the majority confines

all discussion of § 16(b) to its incorporation into the INA, where it, like ACCA's

residual clause, defined a prior conviction.  But § 16(b) in its numerous other

applications functioned just as § 924(c)(3)(B) does, yet § 16(b) "require[d]" a

categorical approach.  *Leocal*, 543 U.S. at 7, 11 n.8; *see also Martinez*, 543 U.S. at

380, 392 (explaining that when construing the same statutory language in one of a

statute's many applications, "[t]he lowest common denominator, as it were, must

govern," such that any "construction called for by one of the statute's applications"

must apply to all applications).

A look at some examples of § 16's incorporation into the criminal code

proves both points.  By examining § 16's incorporation into the criminal code, we

see how conduct-based elements and categorical elements exist side-by-side

without the former allowing a conduct-based reading of the latter.  And we see just

how similar § 16(b)'s incorporations are to § 924(c)(3)(B)'s incorporation into

§ 924(c)'s "operative provision," and thus why § 16 is a better textual analogue for

§ 924(c)(3)(B) than ACCA is.

Let's take, for example, 18 U.S.C. § 25, which, as I mentioned in Part I.A.,

criminalizes an adult's intentional use of a minor to commit a crime of violence.

To convict a defendant under § 25, a jury must find that the defendant *intentionally*

132

used a minor to commit the crime of violence, an element that necessarily will require examination of the defendant's conduct.  But the "crime of violence" element of the statute necessarily is categorical, *see Leocal*, 543 U.S. at 7; it is unaffected by the mens rea element.  There are plenty of other examples.  Take 18 U.S.C. § 119(a), which makes it a crime to knowingly disclose to the public restricted personal information about certain persons (most often, witnesses or informants in federal criminal proceedings) when that information will be used to incite or facilitate a crime of violence against that person or her family member.  Section 119(a) contains several conduct-based elements, including that the defendant must make restricted information public, have knowledge that the information is restricted and is being made public, and have the intent either to personally incite the commission of a crime of violence against a covered person or her family member or that the personal information be used to facilitate the commission of a crime of violence.  These conduct-based elements appearing in crimes incorporating § 16's definition of crime of violence did not, to the Supreme Court, suggest a conduct-based approach for § 16(b), so they do not suggest a conduct-based approach for § 924(c)(3)(B), either.

> 2. *The Phrases "Offense that Is a Felony" and "By its Nature" Require a Categorical Approach to Section 924(c)'s Residual Clause.*

133

Next, the majority examines the words "offense," "felony," and "by its nature," concluding that although in some contexts they may signal a categorical reading, in this context they do not necessarily.  I am unpersuaded.

The majority says that "offense" plausibly can be read to refer to the defendant's conduct, pointing to other contexts in which "offense" denotes conduct.  In the case the majority relies primarily upon, *Nijhawan*, the Supreme Court recognized "the linguistic fact" that in ordinary speech words such as "offense" or "felony" can refer to a person's conduct rather than a statute of conviction.  557 U.S. at 33-34.  No dispute there.  But the far more important lesson from *Nijhawan* is that *context*—the words surrounding "offense" or "felony"—drives those words' meaning in any particular provision.  And here, the context could not be clearer:  "offense that is a felony" applies *both* to the elements clause *and* to the residual clause; in that context, "offense that is a felony" must be categorical.[10]  *Nijhawan* offers direct support for this.  In *Nijhawan*, the Supreme Court held that one definition of "aggravated felony" in the INA, 8 U.S.C. § 1101, requires courts to examine the specific facts and circumstances of a crime as it was committed.  557 U.S. at 36-39.  Unlike § 924(c)'s three predicate offense definitions, the definitions of "aggravated felony"—of which there are many,

---

[10] At the same time, the majority ignores the highest and best guidance we have—the Supreme Court's unanimous statement in *Leocal* that the precise words we are tasked with interpreting in this case require a categorical approach.

134

including "crime of violence" as defined in § 16—contain some that clearly require an examination of underlying conduct. *Id.* at 36-38. Specifically at issue in *Nijhawan* was the "aggravated felony" definition found in subsection (a)(43)(M)(i). That subsection, and the one following it, collectively defined "aggravated felony" as:

> an *offense* that—
>
> (i)    involves fraud or deceit *in which* the loss to the victim or victims exceeds §10,000; or
>
> (ii)   is described in section 7201 of Title 26 (relating to tax evasion) *in which* the revenue loss to the Government exceeds $10,000[.]

8 U.S.C. § 1101(a)(43)(M) (emphasis added). The Supreme Court explained that the second of these definitions has to refer to the actual circumstances of the petitioner's offense because "[t]here is no offense 'described in section 7201 of title 26' that has a specific loss amount as an element." *Nijhawan*, 557 U.S. at 38 (quoting 8 U.S.C. § 1101(a)(43)(M)(ii)). Because the "offense . . .in which" language *necessarily* refers to the circumstances of the petitioner's actual conduct in subsection (a)(43)(M)(ii), the language must be read the same way for subsection (a)(43)(M)(i). The Court explained that where "Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations." *Id.* at 39. In *Nijhawan*, it was

135

"offense"—in the prefatory phrase—and "in which"—present in both subsections—that required interpreting both subsections to apply to conduct.

As I explained above, applying this same logic to § 924(c)(3) compels a categorical reading of the statute. Like subsection (a)(43)(M)'s "offense . . . in which" language, the prefatory phrase "offense that is a felony" in § 924(c) is incorporated into the definitions for *both* the elements clause *and* the residual clause. If we start with the uncontroversial proposition that "offense that is a felony" is categorical in the elements clause and then apply the Supreme Court's reasoning in *Nijhawan*, we must conclude that Congress intended "offense that is a felony" to be categorical for both crime of violence definitions in § 924(c)(3). *See Nijhawan*, 557 U.S. at 39.[11]

Aside from its reading of "offense," the majority appears to acknowledge that the phrase "by its nature" is best read to require a categorical approach. But,

---

[11] The majority also cites *United States v. Hayes*, 555 U.S. 415, 426 (2009), for the proposition that the Supreme Court has employed a conduct-based approach rather than a categorical approach to a statutory term using the word "offense." *Hayes* did not, however, reject a categorical approach in favor of a factual approach. Instead, *Hayes* held that the definition of "misdemeanor crime of domestic violence" in 18 U.S.C. § 921(a)(33)(A) has two distinct elements, one of which is categorical—an elements clause crime of violence definition—and one that requires that "a person who has a specified domestic relationship with the victim" have "committed" the "offense." *Id.* There was never a suggestion that the "committed" element could be interpreted categorically—it is necessarily based on who actually committed the offense and that person's relationship with the victim. So § 921(a)(33)(A)'s conduct-based element operates independently of its categorical element. The same is true for § 924(c)'s conduct-based elements and categorical (crime of violence or drug trafficking crime) element. *See supra* Part II.A.1. (explaining why § 924(c)'s conduct-based elements do not support reading the residual clause as conduct-based).

136

says the majority, Justice Thomas, in dissent in *Dimaya*, makes some good points about the meaning of the word "nature" that make a conduct-based reading possible. "Nature," the majority says, might mean "the essential character or constitution of something," and that "something" might be "particular acts" rather than the elements of a crime of conviction. Maj. Op. at 35. The problem with the majority's argument is that the text of § 924(c) tells us precisely what that "something" is: when the statute says "by *its* nature," *its* clearly refers to "offense that is a felony."[12] And for the reasons I just explained, "offense that is a felony" must be read categorically. Isolating the word "nature" and claiming that it is amenable, out of context, to more than one meaning does little to inform the meaning of § 924(c)(3)(B) when § 924(c) is read as a whole.

The majority also credits Justice Thomas's suggestion that "the words 'by its nature,' 'substantial risk,' and 'may' would mean only that an offender who engages in risky conduct cannot benefit from the fortuitous fact that physical force was not actually used during his offense." Maj. Op. at 36 (quoting *Dimaya*, 138 S. Ct. at 1254). Taken separately, I agree that these words and phrases could mean that. But together? No way.

---

[12] In holding that ACCA's residual clause must be read with a categorical approach and defined by the "ordinary case" of an offense, the Supreme Court described an offense that would fall within the residual clause as one "that, *by its nature*, presents a serious risk of injury to another"—categorical language—even though ACCA does not contain that phrase. *James*, 550 U.S. at 209.

137

Again, the residual clause defines "crime of violence" as "an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force . . . may be used" during commission of the offense. 18 U.S.C. § 924(c)(3)(B). The "substantial risk" requirement on its own means that an offender who engages in risky conduct cannot benefit from the fact that force was not actually used, so the addition of "may" would serve no purpose other than to abstract the defendant's actual conduct one step further. Of course, we cannot read words out of a statute in the name of constitutional avoidance. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (emphasizing that courts must "avoid a reading [of a statute] which renders some words altogether redundant").

### 3. Section 924(c)(3)(B)'s "In the Course of Committing the Offense" Language Does Not Support a Conduct-Based Approach.

Third, in its reach to find another meaning in the statute, the majority considers as a factor the presence or absence of "any reference to the underlying crime's commission or circumstances," a factor that it says it distills from *Dimaya*. Maj. Op. at 27. The majority argues that § 924(c)'s residual clause "is different" from § 16(b) because § 924(c)(3)(B) says "in the course of committing the offense," which it deems to be "conduct-based language." *Id.* at 37. This is flat wrong—both statutes contain "in the course of committing the offense." Therefore, the statutes are not different at all. And if this temporal language

138

somehow suggested a conduct-based approach, it likewise would do so for the identically worded § 16(b), and we know from *Leocal* that that is not the case.

We also know from the Supreme Court's decisions applying the categorical approach to ACCA that the fact that the risk must arise in the course of committing the offense does not admit of a conduct-based approach. In *James*, the Supreme Court explained that the "risk" that triggered ACCA's residual clause must arise "while the crime is in progress"—that is, in the course of committing the offense. *James*, 550 U.S. at 203. Although ACCA's residual clause "lacked an express temporal limit," the limit was built into the case law such that "the analyses under ACCA's residual clause and § 16(b) coincide[d]." *Dimaya*, 138 S. Ct. at 1219-20 (majority opinion). Because we know ACCA's residual clause and § 16(b) require a categorical approach, we also know that the statutes' temporal limitations, explicit or implicit, do not plausibly suggest a conduct-based approach; otherwise, the majorities in *Johnson* and *Dimaya* would have had to accede to the dissenters' suggestions that they employ the canon of constitutional avoidance. To the contrary, the Supreme Court has explained that the categorical approach necessitates a temporal limitation because "the riskiness of a crime in the ordinary case depends on the acts taken during [the crime's] commission." *Id.* at 1220. Section 924(c)(3)(B)'s "in the course of committing the offense," then, is categorical language, not conduct-based language.

139

*    *    *

The majority's strained reading of § 924(c)'s residual clause does not, in my view, even approach plausible. Under *Rodriguez*, we must end the analysis there. The statute cannot be construed to avoid a plain violation of due process. And yet, "[u]nable to find sure footing in the statutory text, the [g]overnment and [the majority] pivot away from the plain language and raise a number of practical concerns. These practical considerations are meritless and do not justify departing from the statute's clear text." *Pereira*, 138 S. Ct. at 2118.

**B.    The Majority's Extra-textual Factors Do Not Support Application of a Conduct-Based Approach.**

Even if we could set aside the text of the statute (which of course we may not do), the majority's three "practical considerations" lacking a textual hook support no different reading of § 924(c)'s residual clause. To review, these three practical considerations are because: in *Johnson* and *Dimaya* the government "never asked the Court to consider a conduct-based approach" (factor 1); "applying the categorical approach would avoid the impracticability of requiring sentencing courts to engage in after-the-fact reconstructions of the circumstances underlying prior convictions" (factor 5); and "applying the categorical approach would avoid the Sixth Amendment issues that could arise from sentencing courts making findings of fact that properly belong to juries" (factor 6). Maj. Op. at 27-28.

Before I get into the majority's factors, I pause to note that although the majority claims to have distilled its factors from *Taylor* and its progeny, absent from the majority's consideration is one of *Taylor*'s three reasons for applying the categorical approach to ACCA: that "the legislative history of the enhancement statute shows that Congress generally took a categorical approach to predicate offenses." 495 U.S. at 601. Because § 924(c)(3)(B) is amenable to only one plausible reading, I would no more wade into legislative history than I would explore the majority's extra-textual factors. But if we were to peek at the legislative history of § 924(c), it—like ACCA's legislative history—supports a categorical approach only. As part of the CCCA, Congress "completely revised" § 924(c). S. Rep. 98-225, at 313 (1983). Before the revision, the Supreme Court had interpreted § 924(c) to exclude certain potential predicate criminal "statutes," like the federal bank robbery statute and the assault-on-a-federal-officer statute, which contained penalty enhancements of their own. *Id.* Congress then amended § 924(c) to include these statutes. In so doing, the Senate expressly acknowledged the Supreme Court case law as the motivating factor for its revision. Even more importantly, as it acknowledged that case law the Senate itself referred to crimes in terms of categories: statutes, not conduct.

The Senate stated that the purpose of its revision was to "ensure that all persons who commit federal crimes of violence, including those crimes *set forth in*

141

*statutes* which already provide for enhanced sentences for their commission with a dangerous weapon, receive a mandatory sentence." *Id.* (emphasis added). The Senate sought to do so in response to the Supreme Court's body of cases that had "negated [§ 924(c)]'s use in cases *involving statutes*, such as the bank robbery statute and assault on a federal officer statute." *Id.* at 312 (emphasis added). Congress explained that "[t]hese are precisely *the type of* extremely dangerous offenses for which a mandatory punishment for the use of a firearm is most appropriate," so it overrode the court decisions to ensure that certain *statutes* fell within the purview of § 924(c). *Id.* (emphasis added); *see also United States v. Robinson*, 844 F.3d 137, 148 (3d Cir. 2016) (Fuentes, J., concurring in judgment) ("The Senate report discussion of Section 924(c) included comments on which precise offenses are 'crime[s] of violence' under the statute, but never which facts would qualify a conviction as a 'crime of violence' and which facts would disqualify the same conviction.").

Relatedly, our court and nearly every other federal court in the nation has consistently applied the categorical approach to § 924(c)(3), and Congress has not once sought to intervene—despite the fact that, as evidenced by the above legislative history, Congress previously has substantially revised the statute in response to the federal courts' construction of it. "The claim to adhere to case law is generally powerful once a decision has settled statutory meaning" because

142

"unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what [a] [c]ourt has done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989), *quoted with approval in Shepard v. United States*, 544 U.S. 13, 23 (2005). "If Congress had wanted judges to look into a felon's actual conduct, it presumably would have said so." *Dimaya*, 138 S. Ct. at 1218 (plurality opinion) (internal quotation marks omitted); *see also id.* at 1233 (Gorsuch, J., concurring) (noting that Congress "remains free . . . to write a new residual clause that affords the fair notice lacking here.").

The canon of constitutional avoidance "rest[s] on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts. The canon is thus a means of giving effect to congressional intent, not of subverting it." *Martinez*, 543 U.S. at 380 (internal citations omitted). Here, we know Congress's intent.

I now turn to the majority's extra-textual factors.

### 1. Whether the Government Has Asked Us to Abandon the Categorical Approach Has No Relevance to the Constitutional Avoidance Analysis.

The first factor the majority considers is that here, unlike in *Johnson* and *Dimaya*, the government has argued for a conduct-based approach: "[T]he government has expressly (and at length) urged us to abandon the categorical approach to § 924(c)(3)(B) in favor of a conduct-based interpretation." Maj. Op. at

29. First, this description strikes me as incomplete at best. For years, and even after *Johnson*, the government consistently has urged that we apply a categorical approach to § 924(c). It was only after our court invited the government to argue for abandonment of the categorical approach in supplemental panel briefing and en banc briefing in this case that the government changed course. And even then, in its en banc brief the government's primary argument was not that we should overrule *McGuire*, but rather that we should affirm Ms. Ovalles's § 924(c) conviction on the ground that her predicate offense satisfies the elements clause. *See* En Banc Br. of the Appellee USA at ii. The government argued only in the alternative that we should overrule *McGuire* insofar as it held that a categorical approach must be applied to § 924(c)'s residual clause.

Second, and more importantly, as the majority itself observes, this factor is not really "interpretive," *id.* at 29; and so it is "an odd place to start in interpreting a statute." *Id.* Under *Rodriguez* it is clear that the government's suggestion (or lack of it) that we should apply a conduct-based approach to a statute is irrelevant to whether the text of the statute plausibly can be read to permit such an approach.

    *2. The Majority's Practical Problems and Sixth Amendment Factors in Reality Constitute One Irrelevant Factor that Fails to Support the Majority's Position.*

The majority's fifth factor—the supposed lack of practical problems associated with a conduct-based approach—is yet another variety of extra-textual

144

consideration that the Supreme Court in *Rodriguez* told us we cannot consider. *See*

*Rodriguez*, 138 S. Ct. at 843. In any event, the majority's fifth and sixth

considerations (the need to avoid Sixth Amendment issues that could arise from

sentencing courts making findings that juries are required to make) are not separate

issues; instead they are two sides of the same coin. Here's why.

It certainly was possible to apply a conduct-based approach to ACCA's

residual clause and § 16(b) and still comply with the Sixth Amendment. *See*

W. Pryor Concurrence at 8-9. Take ACCA's residual clause, for example. Say a

defendant convicted of burglary three times in 2013 was charged in 2014 with

being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). He

elected to have his case tried to a jury. The government could secure an ACCA

enhancement based on these burglary convictions so long as it proved to the jury

beyond a reasonable doubt that the defendant's commission of the burglaries

involved a serious potential risk of injury. (Maybe in each case the defendant was

still inside a home when the homeowners returned, and the homeowner in each

case could testify to that before the jury.) Securing the defendant's ACCA-

enhanced sentence should be relatively straightforward (if somewhat time-

consuming) because the prior convictions were close in time to the § 922(g)

charge. Now assume those burglary convictions were 10 years old. Maybe the

government could scrape together enough evidence to prove the risk element of

145

those long-ago crimes beyond a reasonable doubt, maybe not.  But this is not a Sixth Amendment problem.  It is a practical problem for the prosecution that arises because of the Sixth Amendment jury trial right.  Applying a conduct-based approach to ACCA would not have violated the Sixth Amendment; it merely would have led to fewer ACCA-enhanced sentences because the government's burden to prove old facts to a jury could turn out to be difficult to satisfy in practice.[13]

The same is true for § 16(b) as incorporated by the INA—a conduct-based approach would merely lead to fewer removals.  If a factfinder was tasked with determining whether a noncitizen had committed a crime with conduct that involved a substantial risk that physical force may be used, the factfinder's ability to make this finding could well depend on how long ago the crime was committed.

The majority's fifth and sixth factors, then, amount to one concern:  that given the Sixth Amendment's dictates there may be serious practical hurdles to proving prior convictions.

Turning to that concern, the majority distinguishes ACCA and § 16, on the one hand, from § 924(c), on the other, because by requiring the examination of

---

[13] The majority describes its concerns in terms of avoiding sentencing-judge-found facts, but of course the same concern exists in the § 924(c) context:  even under a conduct-based approach, the Sixth Amendment would not permit sentencing judges to find the facts necessary to secure a conviction.  Thus, the real concern is whether it is practical to have a jury find the facts necessary to determine whether the defendant has committed a crime of violence.

146

prior convictions the two former statutes pose these practical hurdles, while the latter does not.  Yes, it may be difficult to reconstruct the facts underlying the predicate convictions because of the passage of time and possible loss of witnesses and records; conversely, because § 924(c) is always applied to a contemporaneous offense, there is no such practical difficulty.  This is true for ACCA and § 16 as incorporated into the INA.  But what of § 16 in its numerous other applications?  Many other, primarily criminal, statutes incorporate the "crime of violence" definition in § 16 as an element that must satisfied at the same time as the statute's other elements.  In those applications, no reconstruction of old facts is necessary because, as with § 924(c)—and I use the majority's words here—"it's all one big ball of wax."  Maj. Op. at 40.  As I emphasized above, "§ 16 is a criminal statute, and it has both criminal and noncriminal applications," so we cannot solely look to its applications in the INA when examining whether it is similar to or different from § 924(c).  *Leocal*, 543 U.S. at 11 n.8.  Despite the lack of practical problems with § 16(b)'s contemporaneous criminal applications, the Supreme Court did not invoke the canon of constitutional avoidance to save § 16(b).  I see no reason why the same rationale would justify application of the canon here.

And, contrary to the majority's suggestion, practical problems do abound with a conduct-based approach to § 924(c)(3)(B), even if those problems are not completely coextensive with problems that might arise by using a conduct-based

147

approach to ACCA's residual clause and § 16(b) as incorporated into the INA. As amici curiae the National Association of Criminal Defense Lawyers and Families Against Mandatory Minimums explain: "Under a fact-based approach, whether the charged predicate offense satisfies § 924(c)(3) would turn not on *whether* the defendant committed the predicate offense, but *how* he committed it." Br. of Amici at 11. In some § 924(c)(3)(B) cases (like my ACCA residual clause example above), proof of what made the defendant's conduct risky (that is, how he committed the predicate offense) will not be essential to satisfy the elements of the predicate offense. In those cases, will prosecutors know whether the offense ultimately will satisfy the residual clause, so as to facilitate informed charging decisions? Will defendants and defense counsel know whether the charged predicate will satisfy the residual clause, so as to enable informed plea bargaining decisions? I doubt it.

What's more, given the abstract nature of the residual clause inquiry I am not nearly as confident as the majority is that instructions can be fashioned to guide juries appropriately on—or that juries are well equipped to decide—what kind of conduct satisfies § 924(c)'s residual clause. Under a conduct-based approach, which the majority concedes must be based on facts found by a jury looking at the defendant's conduct, the jury's inquiry is divorced, in at least four ways, from the conduct it is tasked with examining. First, the jury must ignore any conduct that

148

forms the basis for other charged offenses and focus only on the conduct involved in committing the § 924(c) predicate offense.  This could prove difficult if, to use as an example Ms. Ovalles's case—in which she and her codefendants robbed a store, carjacked three vehicles, and attempted to carjack a fourth—the predicate offense (the attempted carjacking) occurred alongside other criminal conduct. Then, the text of § 924(c)(3)(B) provides two additional abstractions:  "substantial risk" that physical force "may" be used.  The majority says no problem—juries routinely decide what kind of conduct satisfies a substantial risk standard or what constitutes physical force.  But "substantial risk" is only one abstraction.  How does a jury decide whether conduct presents a substantial risk that physical force "may" be used?  That is, how does a jury decide what conduct satisfies an abstraction ("may") of already abstract conduct ("substantial risk")?  The majority has no answer for this.[14]  Fourth, and further abstracting a jury's inquiry is that a defendant's use, carrying, or possession of a gun is insufficient, without more, to satisfy the risk standard in § 924(c)'s residual clause—or else the crime of violence element would be meaningless.  A jury therefore must decide whether a defendant's predicate offense conduct only, separate and independent from the

---

[14] It is no answer to say that the word "may" in the statute does not create an inquiry distinct from the jury's inquiry about "substantial risk" because "[i]t is our duty to give effect, if possible, to every clause and word of a statute."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).  In crafting jury instructions, a district court, remaining mindful of this rule, would have to explain how a "substantial risk" that physical force "may" be used is distinct from a "substantial risk" that physical force *will* be used.

149

defendant's possession of a gun, presented a substantial risk that physical force may be used, that doubly abstract standard.  We presume that juries follow instructions, true, but we cannot presume that a jury will be able to make sense of an inquiry this abstracted from the facts of the case.  Nor can we presume, given these realities, that a district court will be able to provide sufficiently concrete instructions to guide the jury.[15]

Finally, the majority's ultimate disposition of Ms. Ovalles's appeal proves my point about practical difficulties by highlighting another problem with a conduct-based approach:  appeals.  The majority, sitting as an appellate court, affirms Ms. Ovalles's § 924(c)(3)(B) conviction even though Ms. Ovalles did not admit, and no fact-finder found, that her conduct created a substantial risk that physical force may have been used in the course of committing the predicate offense of attempted carjacking.  The majority decides as a matter of law that the risk element has been satisfied by examining the elements of the predicate offense to which she pled guilty.  *See* Maj. Op. at 45-47 (explaining that Ms. Ovalles's plea to the elements of attempted carjacking satisfy the elements clause and that "the

---

[15] That is not all.  Deeming the § 924(c)(3) inquiry a fact question for the jury rather than a question of law for the court easily could lead to inconsistent verdicts across cases.  Identical conduct that one jury considers to be conduct presenting a substantial risk that physical force may be used might not, to another jury, present such a risk.  The categorical approach prevents such disparities.  *See Moncrieffe*, 569 U.S. at 201 (emphasizing that the government's proposed case-specific fact-finding approach would lead to unfair results wherein two noncitizens, "each 'convicted of' the same offense, might obtain different aggravated felony determinations" depending on the evidence before the immigration judge about each noncitizen's conduct).

real-life details of [her] crime" only "confirm it"). If § 924(c)(3)(B) is to have a new conduct-based "substantial risk" element, it often will not be the case that we can look to the defendant's admissions to the *elements* of the predicate offense to determine that this *conduct* element is satisfied. This case is a prime example.

To "confirm" its conclusion that the elements of the attempted carjacking offense to which Ms. Ovalles pled guilty satisfied the conduct-based residual clause element, the majority considers the totality of Ms. Ovalles's and her co-conspirators' conduct. But under the majority's own holding, whether the defendant engaged in conduct that satisfies the "substantial risk" standard is an element of the § 924(c) offense that must be decided by a jury or admitted by the defendant. Again, Ms. Ovalles never admitted that her attempted carjacking involved a substantial risk that the use of force might be used. Perhaps, without saying so, the majority is performing a harmless error analysis—an analysis the government never asked us to perform and on which the government bears the burden.

Will we uphold other convictions on appeal under this same flawed logic? Many defendants like Ms. Ovalles were convicted when *McGuire* required use of the categorical approach. Under *McGuire*, the district court was tasked with deciding as a matter of law whether the defendant's charged predicate offense satisfied the residual clause. 706 F.3d at 1336. So even if a defendant was tried by

151

a jury on his predicate offense charge and his § 924(c) charge, the government was not required to prove beyond a reasonable doubt, and the jury was not required to decide, whether his underlying conduct in fact met the risk standard. The same would hold true for a defendant who pled guilty. Under the majority's conduct-based approach, on appeal these defendants should be entitled under the Sixth Amendment to a remand or—at a minimum—the government would have to prove that the error was harmless beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 9-11 (1999). But under the majority's decision today, perhaps defendants will not be afforded these rights. Time will tell.

### III.

The majority claims to be avoiding one constitutional problem—the unconstitutional vagueness of § 924(c)(3)(B)—with a practical solution—abandoning the categorical approach as applied to that statute. The law does not permit the majority's approach, and the text of § 924(c) does not permit the majority's resolution. Even under the majority's flawed framework, neither the government's position, the dictates of the Sixth Amendment, nor practical considerations support application of a conduct-based approach over a categorical one. And there is every indication that the majority's practical solution will breed a host of new practical problems.

152

Our displeasure with the categorical approach and the results of its application to residual clauses does not permit us to jettison it. The categorical approach is dictated by the text of the statute and Congress's intent to impose increased penalties based on the violation of certain predicate statutes. If Congress wants to change course, or enact a residual clause that comports with the dictates of due process, it can readily do so. *See McCarthan v. Director of Goodwill Indust.-Suncoast, Inc.*, 851 F.3d 1076, 1100 (Carnes, C.J., concurring) ("'It is for Congress, not this Court, to amend the statute if it believes'" the statute is too restrictive (quoting *Dodd v. United States*, 545 U.S. 353, 359-60 (2005))); *see also* Pryor Concurrence at 8-9.

In my view, the majority's erroneous decision perpetuates unconstitutional sentences for inmates sentenced under § 924(c)'s residual clause in this circuit. If I am correct that *Leocal* and *Dimaya* require a categorical approach to interpreting § 924(c)(3)(B), these inmates—who should be entitled to relief—are serving between five years and life in prison beyond what our Constitution allows. And we will have perpetuated that injustice by failing to apply faithfully the Supreme Court's directives.

I would not throw out the plain text of § 924(c)(3)(B) to save it from unconstitutionality. I would leave it to Congress save it. Respectfully, I dissent.

153